No. 18-2211
No. 18-2232

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

TYJUAN ANDERSON, LUMONT JOHNSON
 & ANTHONY ROSS

*Plaintiffs-Appellants,*

*v.*

CITY OF ROCKFORD, DOUG
PALMER, DOMINIC IASPARRO,
JOSEPH STEVENS, JAMES RANDALL,
SCOTT MASTROIANNI, THEO GLOVER
KURT WHISENHAND, and TORRY REGEZ,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Illinois
No. 3:15-cv-50064—Frederick J. Kapala, *Judge.*
No. 3:15-cv-50065—Frederick J. Kapala, *Judge.*

---

**BRIEF OF PLAINTIFFS-APPELLANTS**

---

*Attorney for Plaintiff-Appellant*
*Anderson*

Steven Greenberg
Greenberg Trial Lawyers
53 W. Jackson Blvd., Ste. 1260
Chicago, IL 60604
Telephone: (312) 879-9500

*Attorneys for Plaintiffs-Appellants*
*Johnson & Ross*

Jon Loevy
Gayle Horn
Roshna Bala Keen
Elliot Slosar
Loevy & Loevy
311 N Aberdeen, 3rd Floor
Chicago, IL 60607
Telephone: (312) 243-5900

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, counsel for Plaintiff-Appellants Lumont Johnson and Anthony Ross states as follows:

1.      The full name of every party that the undersigned attorneys represented in this case are: Lumont Johnson and Anthony Ross.

2.      The name of all the law firms and the partners and associates that appeared for the parties now represented by us in the trial court or are expected to appear in this Court are:

> Jon Loevy
> Gayle Horn
> Roshna Bala Keen
> Elliot Slosar
> Loevy & Loevy
> 311 N Aberdeen,
> 3rd Floor
> Chicago, IL 60607
> 312-243-5900
> roshna@loevy.com

3.      The parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by the attorneys: N/A.

Date: November 1, 2018                    RESPECTFULLY SUBMITTED,

                                          s/ Roshna Bala Keen
                                          *Counsel of Record for Lumont Johnson &*
                                          *Anthony Ross*

*Attorneys for Plaintiff-Appellants Johnson & Ross*
Jon Loevy
Gayle Horn
Roshna Bala Keen
Elliot Slosar
Loevy & Loevy
311 N Aberdeen, 3rd Floor
Chicago, IL 60607
312-243-5900
roshna@loevy.com

i.

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. 18-2211

Short Caption:    Anderson v. City of Rockford

1.  Full name of every party represented:  Tyjuan Anderson

2.  The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

    Steven A. Greenberg
    Greenberg Trial Lawyers

3.  The party represented is an individual and not a corporation.


Date: November 1, 2018                      */s/* Steven A. Greenberg
                                            *Counsel of Record*

                                            Greenberg Trial Lawyers
                                            53 W. Jackson Blvd., Ste. 1260
                                            Chicago, IL 60604
                                            Telephone: (312) 879-9500
                                            Fax: (312) 650-8244
                                            Steve@GreenbergCD.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................................v.

JURISDICTIONAL STATEMENT ....................................................................................1

ISSUES PRESENTED FOR REVIEW ..............................................................................2

STATEMENT OF THE CASE............................................................................................3

      Introduction...............................................................................................................3

      The Murder ...............................................................................................................4

      Alex Dowthard, The Intended Target, Does Not See Who Shot At Him ...........................5

      The Shooter Drove A Red Car...................................................................................6

      A Suspect Emerges ...................................................................................................6

      Plaintiffs' Names Also Surface But They Do Not Fit As Suspects ....................................7

      Defendants Pursue Dowthard and Brown for Information .....................................................7

      Lataurean Brown's False Statement is Fabricated.............................................................10

      Defendant Stevens Withholds Tapes Containing Alex Dowthard's Prison Calls .............12

      Burying evidence of viable suspect Casel Montgomery.....................................................13

      Exploiting Last-Minute Witness Sonya White ................................................................15

      Alex Dothward Invokes the Fifth Amendment in Subsequent Proceedings......................16

      Defendants' Misconduct Was Not Disclosed ...................................................................16

SUMMARY OF THE ARGUMENT .................................................................................16

ARGUMENT.......................................................................................................................18

Standard of Review.............................................................................................................18

I.      The District Court Erroneously Granted Summary Judgment on Plaintiffs'
      Fabrication Claims ...................................................................................................19

A. Plaintiffs Presented Sufficient Evidence That Defendants Knew They Were Manufacturing a False Statement for Dowthard to Adopt............................................20

B. The District Court Erred in Finding the Dowthard Tapes Inadmissible and Failing to Consider Them in Opposition to Summary Judgment .........................23

C. There Is A Genuine Dispute of Material Fact Regarding Whether Defendants Fabricated Lataurean Brown's False Inculpation ..........................................29

D. The Evidence Fabricated By Defendants Was Used To Deprive Plaintiffs Of Liberty..............................................................................................30

E. There Is A Genuine Dispute Of Fact Regarding Whether Defendants Fabricated False Evidence To Steer the Prosecution Away From Suspect Casel Montgomery...................................................................................31

    1. Defendants Manufacturing A False Statement For Montgomery....................31

    2. Defendants Manufactured Bryce Croft's Recantation of His Statement Exculpating Plaintiffs.......................................................................35

II. Plaintiffs' *Brady* Claims Involve Material Factual Disputes That Only The Jury Can Resolve...............................................................................................36

A. Defendants Withheld Material Impeachment Evidence Offered By Rickedda Young.................................................................................37

B. Defendants Failed to Disclose The Improper Police Tactics That Produced Lataurean Brown's False Inculpation ....................................................39

C. Defendants Failed To Disclose the Improper Police Tactics That Produced Alex Dowthard's False Inculpation .........................................................40

D. Defendants Withheld Consideration Given To Witness Sonya White ........................43

III. Plaintiffs' *Manuel* Claim Must Proceed To A Jury .............................................44

IV. Summary Judgment on Plaintiffs' Failure to Intervene, Conspiracy, and Supervisory Liability Federal Claims Should Be Reversed.................................................44

V. Plaintiffs' State Law Claims Should Be Reinstated .........................................44

CONCLUSION................................................................................................45

## TABLE OF AUTHORITIES

*Alridge Elec., Inc. v. Fid. & Deposit Co. of Maryland*, No. 04 C 4021, 2006 WL 2536687 (N.D. Ill. Aug. 31, 2006)................................................................................................35

*APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624 (7th Cir. 2002).........................24

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir.)...........................................30, 31, 39

*Baxter v. Palmigiano*, 425 U.S. 308 (1976)................................................................18

*Blake v. Kemp*, 758 F.2d 523 (11th Cir. 1985) ...........................................................41, 42

*Bowen v. Maynard*, 799 F.3d 593 (10th Cir. 1986) ....................................................37

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................*Passim*

*Castillo v. Zuniga*, No. 01 C 616, 2002 WL 398519 (N.D. Ill. Mar. 14, 2002) ............................33

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................18, 24

*Dominguez v. Hendley,* 545 F.3d 585 (7th Cir.2008) ....................................................42

*Dowden v. Polymer Raymond, Inc.*, 966 F.2d 1206 (7th Cir. 1992)...............................................18

*Fields v. Wharrie* (*Fields II*), 740 F.3d 1107 (7th Cir. 2014)............................................32, 39 ,40

*Giglio v. United States*, 405 U.S. 150 (1972) .................................................................41

*Gill v. City of Milwaukee,* 850 F.3d 335 (7th Cir. 2017) ..................................................36

*Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) ....................................................40

*Grant v. Allredge*, 498 F.2d 376, 382 (2d Cir. 1974) ...........................................................41, 42

*Hoffman v. United States*, 341 U.S. 479 (1951)....................................................................35

*Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) .............................................................22

*Jimenez v. City of Chicago*, 877 F. Supp. 2d 649 (N.D. Ill. 2012) *aff'd* 732 F.3d 710 (7th Cir. 2013)................................................................................................34

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ....................................................30, 32, 33

*Kluppelberg v. Burge*, No. 13 C 03963, 2017 WL 3147257 (N.D. Ill. July 25, 2017)............19, 22

*Kyles v. Whitley*, 514 U.S. 419 (1995)................................................................37, 40

*LaSalle Bank Lake View v. Seguban,* 54 F.3d 387 (7th Cir. 1995)................................................18

*Lindsey v. King*, 769 F.2d 1034 (5th Cir. 1985) ............................................................37

*Manning v. Miller,* 355 F.3d 1028 (7th Cir.2004) .........................................................42

*Mitchell v. United States*, 526 U.S. 314 (1999) ............................................................35

*Moran v. Clarke*, 296 F.3d 638 (8th Cir. 2002)............................................................21

*Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285 (1892) .......................................28

*Newell v. Hanks*, 283 F.3d 827 (7th Cir. 2002) ............................................................38

*Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003)................................................40, 44

*Ott v. City of Milwaukee,* 48 F. Supp. 3d 1197 (E.D. Wis. 2014) .................................42

*Patrick v. City of Chicago*, 213 F. Supp. 3d 1033 (N.D. Ill. 2016) ...................32, 33, 36

*People v. Johnson*, 2014 IL App (2d) 130368-U......................................................*Passim*

*Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014) .................................................20

*Phillips v. City of Chicago*, No. 14 C 9372, 2018 WL 1309881 (N.D. Ill. Mar. 13, 2018).....21, 32

*Saunders-El v. Rohde*, 778 F.3d 556 (7th Cir. 2015)....................................................32

*Smith v. Cain,* 565 U.S. 73 (2012) ...............................................................................40

*Smith v. McKee,* 598 F.3d 374 (7th Cir. 2010) .............................................................25

*Sornberger v. City of Knoxville, Ill*., 434 F.3d 1006 (7th Cir. 2006)...........................18

*Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004)..............................................................18

*State v. Cain,* 565 U.S. 73 (2012) .................................................................................38

*Stichting Ter Behartiging Van de Belangen v. Schreiber,* 407 F.3d 34, 55 (2d Cir. 2005)...........19

*Stinson v. Gauger*, 868 F.3d 516 (7th Cir. 2015)......................................................20, 21

*Strickler v. Greene*, 527 U.S. 263 (1999) ....................................................................41

*Thompson v. City of Chicago*, 722 F.3d 963 (7th Cir. 2013)........................................25

*U.S. ex rel. Thomas v. Sielaff*, 404 F. Supp. 1037 (S.D. Ill. 1975), *aff'd*, 539 F.2d 715 (7th Cir. 1976)..............................................................................................................25

*United States v. Bagley*, 473 U.S. 667 (1985) .............................................................41

vi.

*United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995) ..............................................................28, 37

*United States v. Cancelmo,* 64 F.3d 804 (2d Cir.1995) ...............................................................26

*United States v. Donley,* 878 F.2d 735 (3rd Cir.1989) ...............................................................28

*United States v. Feekes*, 879 F.2d 1562 (7th Cir. 1989) .............................................................29

*United States v. Garcia*, 897 F.2d 1413 (7th Cir. 1990) .............................................................25

*United States v. Green,* 680 F.2d 520 (7th Cir.), *cert. denied,* 459 U.S. 1072 (1982)..................28

*United States v. Harris*, 886 F.3d 1120 (11th Cir. 2018)............................................................25

*United States v. Hartmann*, 958 F.2d 774 (7th Cir. 1992)...........................................................27

*United States v. Ilori*, No. 01 CR 913, 2002 WL 1359390 (N.D. Ill. June 21, 2002) ..................26

*United States v. Keltner*, 147 F.3d 662 (8th Cir. 1998) ...............................................................26

*United States v. Layton,* 720 F.2d 548 (9th Cir.1983), *cert. denied,* 465 U.S. 1069 (1984) 465 U.S. 1069 (1984)..................................................................................................................26

*United States v. Longstreet*, 567 F.3d 911 (7th Cir. 2009) ..........................................................34

*United States v. Moore*, 824 F.3d 620 (7th Cir. 2016)................................................................28

*United States v. Peak*, 856 F.2d 825 (7th Cir. 1988) ..................................................................27

*United States v. Rivera*, 780 F.3d 1084 (11th Cir. 2015).............................................................25

*United States v. Shaw,* 824 F.3d 624 (7th Cir. 2016)..................................................................25

*United States v. Thurman*, 915 F. Supp. 2d 836 (W.D. Ky. 2013) .........................................25, 28

*Wearry v. Cain,* 136 S. Ct. 1002, 194 L. Ed. 2d 78 (2016) ........................................................43

*Whitlock v. Bruegemann*, 682 F.3d 567 (7th Cir. 2012).......................................................*Passim*

*Williams v. Pugh*, 489 Fed. Appx. 130 (7th Cir. 2012)(unpublished) ..........................................25

*Winslow v. Smith,* 696 F.3d 716 (8th Cir. 2012)........................................................................21

**STATUTES:**

28 U.S.C. § 1291................................................................................................................1

28 U.S.C. § 1331................................................................................................................1

28 U.S.C. § 1367(a) ..........................................................................................................1

42 U.S.C. § 1983................................................................................................................1

**RULES:**

Federal Rule of Civil Procedure 56 ...............................................................................18

Federal Rule of Evidence 804(b)(3) ...............................................................................25

Federal Rule of Evidence 803(3) ..............................................................................25, 27

Federal Rule of Evidence 803(6) ...................................................................................29

**Jurisdictional Statement**

On March 17, 2015, Plaintiffs-Appellants Lumont Johnson and Anthony Ross filed this civil rights lawsuit in the U.S. District Court for the Northern District of Illinois against Defendants-Appellees, current and former Rockford Police Department officers (the "defendant officers"), and the City of Rockford, Illinois. R.1.[1]  Plaintiffs' complaint asserted claims under 42 U.S.C. § 1983 and the United States Constitution's Fourth and Fourteenth Amendments for: violation of their due process rights; detention without probable cause; conspiracy to deprive plaintiffs of their constitutional rights; failure to intervene; and state common law claims for malicious prosecution, intentional infliction of emotional distress, *respondeat superior*, and indemnification. The district court's jurisdiction over the federal claims was based on 28 U.S.C. § 1331, and the court exercised supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

On March 18, 2015, Plaintiff-Appellant Tyjuan Anderson filed a civil rights lawsuit, asserting identical claims against the same defendants sued by Johnson and Ross. Case No. 15 CV 50065 (N.D.Ill) at Doc. 1. The two cases were consolidated for purposes of discovery and trial. R. 59. Johnson and Anderson filed First Amended Complaints on November 30, 2015 and Anderson filed one on December 6, 2015. APP. 43 (Johnson-Ross).

The district court granted summary judgment to all defendants on all of plaintiffs' claims on May 23, 2018, APP.1, and it entered final judgment the next day, R. 267. On June 4, 2018, Plaintiffs timely filed notices of appeal to this Court, which has jurisdiction based on 28 U.S.C. § 1291. Those appeals have been consolidated.

---

[1]  Citations to "R." are to the electronic docket number of the document filed in the district court from Case No. 15 CV 50064 (N.D.Ill). References to the required short appendix are abbreviated "A." followed by the page number.

**Issues Presented for Review**

1.      Whether the district court erred in granting summary judgment to the defendants on plaintiffs' fabrication claim where a main defendant admitted that he and the other defendants manufactured evidence they knew to be false, that defendant then invoked the Fifth Amendment regarding his misconduct, multiple witnesses revealed they were forced to adopt false witness statements under threat of violence and criminal charges, and audio recordings of the prosecutor's star witness contemporaneously documented the fabrication?

2.      Whether the district court erred in granting summary judgment to the defendants on plaintiffs' *Brady* claims where there is significant record evidence that defendants failed to disclose their coercion of numerous material witnesses, their fabrication of statements falsely inculpating plaintiffs, the exculpatory audio recordings of a key prosecution witness, and their offers of leniency to vulnerable witnesses?

3.      Whether the district court erred in summarily denying plaintiffs' federal conspiracy, failure to intervene, and supervisory liability claims, as well as their pendant state law claims, for the same reasons that it erroneously granted summary judgment on the other claims?

**Statement of the Case**

**Introduction**

Plaintiffs Tyjuan Anderson, Lumont Johnson, and Anthony Ross were incarcerated for nearly 12 years each for a crime they did not commit: the tragic murder of an eight-year-old boy who was killed by a stray bullet. There was no physical evidence linking them to the crime. Plaintiffs had verifiable alibies and consistently maintained their innocence. Yet, the Rockford Police detectives assigned to the case set their sights on plaintiffs early on and molded the evidence to fit the suspects. Plaintiffs' wrongful convictions rested on the fabricated false testimony of two individuals, who told the officer defendants they had not seen the shooters, but defendants nevertheless forced them into adopting manufactured statements implicating the plaintiffs.

In a startling discovery, some of the improper police tactics that produced the false, inculpatory witness statements were described nearly contemporaneously on recorded prison calls. After listening to those calls, one of the defendants misrepresented to the prosecution that they contained nothing relevant and then sat on them until the eve of trial, rendering them effectively unavailable to plaintiffs at their criminal trials in violation of *Brady v. Maryland*. The Illinois Appellate Court held that the information on these recordings was material, non-cumulative, and withheld from plaintiffs. *People v. Johnson*, 2014 IL App (2d) 130368-U, ¶ 85.

Additionally, and in an equally startling discovery, one of the defendants confessed to using multiple improper, coercive tactics during post-conviction proceedings, including falsifying witness statements, threatening and physically assaulting witnesses, and offering false promises of leniency. That defendant, Doug Palmer, has now invoked the Fifth Amendment

3

privilege against self-incrimination rather than testify about the misconduct that led to the framing of three innocent men.

Finally equipped with this *Brady* material, and the admissions of Palmer, plaintiffs obtained post-conviction relief. They were re-tried for the Hanson murder and acquitted in a bench trial on November 6, 2015.

Plaintiffs brought this civil suit against the City of Rockford and several Rockford Police Department officers alleging two primary claims: fabrication of inculpatory witness statements, and withholding of material evidence. This case presents two dramatically different factual universes: in one, the defendant officers credibly relied on two third-party witnesses in order to arrest and prosecute the plaintiffs; in the other, the defendant officers pressured and threatened these reluctant witnesses into falsely inculpating plaintiffs with a story defendants knew to be false—and in so doing also steered the prosecution away from viable alternate suspects.

This is a classic he-said-he-said, and one that is ripe for trial. Notwithstanding the profoundly different versions of the facts, and the fact that Plaintiffs' is amply supported by evidence, the district court granted the Defendants' motions for summary judgment and entered final judgment in Defendants' favor. The court's ruling was erroneous and should be reversed.

**The Murder**

On April 14, 2002, multiple gunshots were fired into 2514 Chestnut Street, killing Demarcus Hanson in his sleep. *Johnson*, 2014 IL App (2d) 130368-U at ¶ 6. Hanson's grandmother, Estelle Dowthard, heard the shots and called 911 at 2:53 am. *Id*.

**Alex Dowthard, The Intended Target, Does Not See Who Shot At Him**

Hanson's uncle was a man named Alex Dowthard. *Id*. Dowthard's name surfaced immediately in connection with the shooting, as relatives said that Dowthard had been shot at a few months earlier and thus may have information about this shooting. R.239-5 at JR1-8.

In fact, Dowthard had been the intended target of the bullets that senselessly killed his nephew. *See Johnson*, 2014 IL App (2d) 130368-U, *id*. Earlier that morning, Dowthard and a companion, Lataurean Brown, had been driving around town and briefly exchanged words with several individuals, including plaintiffs. R.249-2 at 69-71. Dowthard and Brown proceeded to cruise around the area near Dowthard's home. At one point, Dowthard shot into the air as plaintiffs were driving by in a blue-and-white Suburban. R.249-1 at 71-72; R.249-7 at 9; R.249-17 at 261.

Plaintiffs did not shoot back and in fact, did not know where the shots came from or interpret the shots as being fired at them. R.39 at RPD 7864; R.2 at 94; R.249-37 at JR40. Instead, Plaintiffs headed to their respective homes on the other side of town. R.249-1 at JR26651-26662, JR26676-87, R.249-4 at 274. Another individual, Casel Montgomery, was also out that night and was in the vicinity when Dowthard fired his gun. R.249-2 at 79-80. Unlike plaintiffs, Montgomery apparently took the insult personally and, unbeknownst to plaintiffs, decided to pursue Dowthard. R.249-8 at 177-78; R. 249-17 at 261-64; R.249-54 at 391-96. Tragically for plaintiffs, their brief interaction with Dowthard earlier that evening made them an easy target for defendants' fabrication, long after defendants realized plaintiffs were innocent.

In the meantime, Dowthard and Brown drove back to his mother Estelle Dowthard's house. R.249-1 at 26811-2. Dowthard exited the car and placed his handgun under a vehicle parked in his mother's driveway. *Id.* As Brown and Dowthard drove away, they heard gunshots

5

coming toward them but did not know who was shooting. R. 249-21 at JR10971-73. The two

men sped off to an apartment complex called Concord Commons, where Brown's cousin

Rickedda Young lived. R.249-14 at 8622:10-15.

As soon as they reached Rickedda Young, Brown and Dowthard both explained they had

just been shot at but that they did not know who had done the shooting. *Id.*

### The Shooter Drove A Red Car

Rockford police officers conducted an immediate canvass of the neighborhood and

learned that the shooters had been traveling in a red vehicle. R.31 at RPD7540-42. Multiple

neighbors saw a red car speed off immediately after hearing the gunshots. *Id.* One of them saw

two men, not three, in the car. *Id.*

### A Suspect Emerges

Defendant Rockford Police detectives Doug Palmer and Joseph Stevens acted as the lead

detectives on the case. On April 15, Detective Stevens learned that Casel Montgomery had been

driving a rental red Pontiac Grand Prix in the vicinity of Dowthard's home at the time of the

shooting. R.249-29 at RPD8140-41. A relative of Alex Dowthard's told Defendant Stevens that

Montgomery could be involved in the shooting. *Id.* Stevens verified with the auto rental

company that Montgomery had been in possession of the red car during the relevant time period.

*Id.* at RPD8146-47. He further learned that the rental car was returned the day after the Hanson

shooting, earlier than the requested return date. *Id*. Based on the investigation thus far, Defendant

Stevens believed that this rented Grand Prix was the vehicle involved in the Hanson shooting.

R.30 at 243.

**Plaintiffs' Names Also Surface But They Do Not Fit As Suspects**

Stevens learned from a responding officer that plaintiffs' names had been mentioned in connection with the shooting. R.249-29 at RPD8130.  This is because Dowthard was rumored to have "had recent problems with Anthony Ross and Lumont Johnson." *Id*. As noted above, plaintiffs briefly exchanged words with Dowthard earlier that night, but Johnson and Ross voluntarily told police about that shortly after the shooting. R.249-2 at 94; R.249-39 at RPD 7864; R.249-4 at 103-04.

Moreover, none of the plaintiffs had a red car, and each of them gave police credible alibis. Anthony Ross was home by 2:45 a.m., which his girlfriend confirmed. R.239-40 at 89. For their part, Johnson and Anderson were at Anderson's home, as corroborated by Anderson's mother, sister, and a friend who all saw them there. R.247 at ¶5. Each plaintiff had trial witnesses who could corroborate his alibi. R.232 at ¶31. Furthermore, defendants knew that on April 14, plaintiffs had been driving their blue-and-white Suburban and a black Cadillac. R.26 at JR19.

Nevertheless, Defendant Stevens admitted that he and the other assigned detectives set their sights on plaintiffs "fairly early on." R.30 at 239.

**Defendants Pursue Dowthard and Brown for Information**

Hours after Demarcus Hanson's death, Defendant Detectives Palmer and Randall spoke with Alex Dowthard. R.249-34 at JR3669. He admitted that he had fired a weapon after seeing plaintiffs earlier that evening, when they were in a blue-and-white Suburban. *Id.* He explained that he went home, placed his weapon under the driveway car, and then went off to Concord Commons. Dowthard denied being at the scene when the shots that killed his nephew were fired and claimed no knowledge of the shooting. R.249-34 at JR3670.

7

Dowthard was on parole at this time, and the defendants used his admission to firing a gun to take him into custody for a parole violation. R.249-10 at 173. Dowthard was sent to the Illinois Department of Corrections while he waited for his parole violation to be adjudicated. R.249-28 at 62-63.

With Dowthard now in custody facing punishment for the parole violation, the defendants began pressing him for inculpatory evidence against plaintiffs, even though he had stated clearly that he did not see the shooting and was not present for it. *See* R.247 at ¶¶68-71. Specifically, the defendants pursued an "eyewitness" statement from Dowthard by using physical violence and threats. On May 2, for instance, defendants Palmer and Stevens questioned Dowthard. R.239-9 at RPD7832-7841. Palmer was violent with Dowthard, repeatedly hitting him in the head and roughing him up. R.65 at JR21948. The Defendants also threatened to charge Dowthard with federal crimes. R.62 at JR21196 (police "talkin' about bringin' me up on some federal charges"). Dowthard characterized the police as "playin' with me, hurtin' me until I'm damn near at the point man, you just don't know." *Johnson*, 2014 IL App (2d) 130368-U at ¶ 45.

Less than two weeks later, while still incarcerated, the police increased the pressure on Dowthard. He was charged with committing an unrelated forgery that had gone uncharged for months. *Id*. ¶ 10.

In addition, defendants used Dowthard's relative Antowan Lambert to communicate "facts," coupled with threats and promises, to Dowthard while he was incarcerated. On May 23, Lambert told Dowthard about his conversation with the police:

> I tell'em man, look man, you know what I'm sayin' what the f* *k do ya'll wanna hear**? They say we got the case d\*mn near closed. We just need dude to come on with it, man, you know what I'm saying'?** I said, look, tell me this here, man, if he come with it, take all these pussy-a*s charges up off of 'em. They man,

8

the head mother f* *ker, Lombardi, **man tell me we'll get these charges up off of 'em, man, and he won't have no hold.** I said the dude ain't got no hold now, but they presented these papers every month. If you don't go to the board, they gonna present the same warrant papers, that gonna, it gonna automatically carry you over every month. The man said he could hold this here, man, for the rest of his mother f* *kin' life every month, man. And ain't nothin' you can do about it, man, as long as a charge is coming up on you, man."

*Johnson*, 2014 IL App (2d) 130368-U at ¶ 46  (emphasis added).

Lambert said that the police gave him a "guarantee" about "the charge and everything else." R.249-64 at JR22120.

The instruction to Dowthard was clear: implicate plaintiffs in the Hanson shooting and he would be released from prison and the pending charges would be dropped. As Lambert explained, "They just want them n*ggers behind * * * bars, man." *Johnson*, 2014 IL App (2d) 130368-U, ¶ 91 The end result of defendants' coercive campaign via Lambert was that Dowthard was pressured into adopting a false story, consisting of three key facts fed to him by the police, through Lambert: (1) plaintiffs drove a red car up to the Dowthard family home; (2) plaintiffs jumped out of the red car and fired gunshots at the house; and (3) Dowthard and Brown drove away. *See* R.249-63 at 22-24. Palmer coerced Dowthard into making these statements while knowing they were false. R.249-9 at 131-33.

Indeed, Dowthard ultimately acquiesced under the pressure. He told the police that he would give information about Hanson's death if they promised to inform the parole board and the State's attorney that he had cooperated. *Id.* On May 30, Dowthard and the defendants struck that deal. But they kept it a secret. R.249-44 at 122-23; R.249-9 at 130-33.

The following day, Dowthard adopted a false and manufactured statement identifying himself as an eyewitness to the Hanson shooting and falsely implicating the plaintiffs. R.249-67 at JR 19267-73. He explained away his earlier inconsistent statements to the police by saying he

9

"thought he could handle the situation himself." *Id.* This claim, of course, was nonsensical: It failed to account for the fact that, immediately after the shooting, he was candid enough to tell Rickedda Young about it and admit that he did not know who shot him.

The narrative that Dowthard parroted back to the police was the story he later told at trial. R.249-14 at JR8615-8621. In a rare admission, Palmer later acknowledged knowing at the time that Dowthard's statement was false and instructing him to stick with the false statement at the criminal trials. R.249-8 at 206-07 (Palmer "told Lataurean Brown and Alex Dowthard to testify consistent with their statements even though [he] believe[s] their statements are not truthful").

### Lataurean Brown's False Statement is Fabricated

Dowthard's companion at the time of the shooting, Lataurean Brown, was similarly pressured into adopting a false, manufactured story that pointed the finger at plaintiffs. Indeed, the defendants wanted to make sure the stories would "coincide." *Johnson*, 2014 IL App (2d) 130368-U at ¶ 44.

On April 24, 2002, Defendants Stevens and Palmer questioned Brown about the Hanson murder. R.249-40 at RPD7825-7831. Brown told the defendants that he was with Alex Dowthard on the early morning of April 14, 2002. *Id.* He admitted that Dowthard fired gunshots and then drove back to Dowthard's house, whereupon Dowthard hid his gun, and then they drove to Concord Commons. *Id.* Brown did not mention the shooting at the Dowthard house, let alone implicate the plaintiffs in that shooting. *Id.*

On May 9, 2002, Defendants Stevens and Palmer re-interviewed Lataurean Brown. At first, Brown told them the same thing he said on April 24. R.30 at 336-37. As Stevens explained, "…I knew what he said earlier, he didn't deviate from that. And the content –the facts were generally the same. They didn't deviate from that. There was no earth-shattering right turn from

10

what he said prior."[2] By the end of that interrogation, Brown had signed a false statement to the effect that (1) he observed plaintiffs driving a red car up to the Dowthard family home; (2) plaintiffs jumped out of the red car and fired gunshots at the house; (3) Dowthard and Brown drove away. R.56 at JR 19261. He was at the police station for nine hours during that interrogation. R. 239-17 at RPD 7821 (located Brown at 12:15 p.m.); R. 249-56 at Johnson-Ross 19259-62 (started statement at 9:35 p.m., signed at 10:26 p.m.).

As noted above, defendants were well aware that Brown (and Dowthard) did not actually know who committed the shooting, so Brown's signed statement was entirely fabricated.

On that score, the following facts are relevant, each of which must be credited at summary judgment:

First, Defendant Palmer admitted to fabricating Brown's statement, and in prior sworn testimony no less. He forced Brown to lie against the plaintiffs, while knowing it was a lie. R.249-8 at 206-07 (admitting that he "told Lataurean Brown and Alex Dowthard to testify consistent with their statements even though [he] believe[s] their statements are not truthful."); R.249-9 at 79-87 (Palmer invoking Fifth Amendment privilege in response to questions about whether he fed Brown false facts and forced Brown to sign false statement); R.249-8 at RPD7825-7831 (Palmer testified that has never believed plaintiffs committed the Hanson murder).

Second, Brown told the police on two separate occasions, April 24 and May 9, that he did not see the shooters. R.249-40 at RPD7828; R.30 at 336-37.

---

[2] The district court reinterpreted this testimony generously to Stevens by finding that Stevens meant the earlier statement was "consistent but not exhaustive." *See* APP.19-20. But that is not what Stevens said. By ignoring the plain meaning of Stevens' deposition testimony and instead construing it in the light most favorable to the Defendants, instead of the non-moving party, the district court violated the familiar principles of summary judgment.

11

Third, Brown did not provide his May 9, 2002 statement until he had been threatened with jail time and detained for nine hours. *See* R.1 at JR27078-79 (Brown testifying he gave a statement only because Palmer "threaten[ed] to put me in jail if I don't give a statement").

Fourth, Defendant Stevens knew that Brown (and Alex Dowthard) told cousin Rickedda Young moments after the shooting that he could not identify the shooter. R.249-21 at JR10967-68, JR10971-73. Stevens interviewed Young on April 24, and she specifically told him that the two men said they did not know who fired the shots. *Id.* Brown and Dowthard's candid admissions to Young were particularly credible as they were made to a close relative to whom there was no reason to lie, mere moments after the shooting.

Crucially, Stevens suppressed from his police report any mention of Brown and Dowthard's admission that they could not identify the shooter(s). R.249-29 at RPD8144. Despite having conducted the interview fifteen days earlier, Defendant Stevens wrote his police report on May 9 – the same date on which he prepared Lataurean Brown's signed statement implicating the plaintiffs. *Id.* at RPD8126, 8144.

### Defendant Stevens Withholds Tapes Containing Alex Dowthard's Prison Calls

Alex Dowthard had several telephone conversations while he was incarcerated at Big Muddy. Those conservations were recorded, pursuant to IDOC policy. R.249-43 at JR 3997-98; R.249-30 at 221-24; R.249-59, R.249-60, R.249-62, R.249-63, R.249-64, R.249-65, R.249-66, R.249-67.

Before arresting the plaintiffs, Detective Stevens requested a copy of Dowthard's recorded conversations (hereinafter, "Dowthard Tapes"). *See* APP.16. He received the recordings and listened to them. *Id.*

12

As summarized by the Illinois Appellate Court, the Dowthard Tapes contained significant impeachment of Dowthard's signed statement, "outright denials of knowledge about the facts of the case, as well as potential coaching and potential incentive to testify a certain way." *Johnson*, 2014 IL App (2d) 130368-U, ¶ 87 (internal citations omitted). Stevens, however, misled the prosecution by falsely assuring them there was nothing relevant on the tapes and then burying them.

As to the latter, rather than timely disclose the Dowthard Tapes, Stevens delayed producing them to the prosecution until October 11, 2002, mere days before trial. *See* APP.16 (Stevens tagged tapes into evidence on October 11, 2002). That late disclosure only happened because plaintiffs' counsel became aware of them and thereafter sought them. *See* R.239-49 at JR7704. Because Stevens withheld the tapes and their significance from the prosecution, plaintiffs' criminal attorneys did not receive them until it was too late to make meaningful use of them. 2014 IL App (2d) 130368-U, ¶¶ 80-82.

### Burying evidence of viable suspect Casel Montgomery

The defendants obtained arrest warrants for plaintiffs on June 30, 2002, and plaintiffs were promptly arrested. On July 29, however, a third-party witness named Bryce Croft came forward – with no consideration or threats – and told Defendant Palmer that he saw Casel Montgomery and a companion driving the red Pontiac Grand Prix on the night of the murder. *See* R.249-53. He further said that he saw Montgomery's companion drop an empty clip from the same type of gun that was used to kill Hanson. *Id.*

With plaintiffs' trial approaching and a new gaping hole in defendants' narrative, Defendant Palmer's supervisor, Defendant Iasparro, instructed Palmer to "make a liar out of" Bryce Croft. R.8 at JR10722, JR10730, JR10819. Accordingly, on October 16, Palmer and

13

Defendant Mastroianni brought a pre-written, contradictory statement to Croft and forced him to sign it. R.8 at JR10723-29; R.54 at JR11396-99, JR11401, JR11406-07, JR11419, JR11462; R.55 at JR19263-65. The new, written statement recanted Croft's earlier statement implicating Casel Montgomery. R.249-55.

Having gone down the road of pursuing the plaintiffs, the defendants also needed to fabricate the missing link: connecting plaintiffs to Casel Montgomery's red car. On May 23, after defendants had manufactured Lataurean Brown's false statement but before they had secured Alex Dowthard's, defendants went back to Casel Montgomery. R.249-43 at Johnson-Ross 4007-11; R.249-11 at 255-58. He had been interviewed in April and acknowledged that he rented a red car but stated clearly that he had not given it to anyone else. On May 23, Defendants Stevens and Randall pursued Montgomery again, hoping to force a link between plaintiffs and the red rental car. Montgomery had apparently gone into hiding after the first interview. *See* R.249-11 at 258. Once found, Stevens told Montgomery that he and Randall "knew that [plaintiffs] were in his car at the time of the Demarcus Hanson shooting." R.249-11 at 259. That fact was not true, however, so Montgomery denied it. *Id.* at 264; R.30 at 246.

On August 27, 2002, after plaintiffs had been arrested, Defendant Stevens pursued Montgomery yet again, this time with Palmer. R.249-9 at 36-48; R.249-30 at 268. According to Montgomery, Palmer scripted a false story that involved Montgomery transferring his red car to plaintiffs moments before the shooting. R.249-5 at JR19370-71; R.249-6 at 31-32, 34-36, 44-45, 53-54, 56; R.249-9 at 37-47. Palmer threatened Montgomery and forced him to adopt false "facts," including that Ross sent him a message ("chirped" him), asked to borrow his car, and then made an inculpatory admission when returning the car. R.249-6 at 98, 100. Montgomery later recanted these false statements, explaining: "Defendant Palmer told me to say that Anthony

14

Ross chirped me and needed to borrow my car, but that never happened. Anthony Ross never had my car that day. The only reason I did it is because Palmer threatened me with murder charges…physical force, and incarceration." R. 249-5 at JR19370-71.

After testifying for several hours over two days at his civil deposition, Montgomery began to assert his Fifth Amendment right against self-incrimination and stopped providing any responsive information.[3] R.249-17 at 227.

### Exploiting Last-Minute Witness Sonya White

At Plaintiff Ross's trial, a witness named Sonya White "came forward" and testified that after the Hanson shooting, Ross made an inculpatory admission to her. *See* R.37 at JR6739-6761. It is undisputed that White's testimony is false: she has consistently recanted it multiple times, including under oath and under penalty of perjury in front of the circuit court that granted plaintiffs post-conviction relief and acquitted them of the murder. R.51 at JR19418-19, ¶4-7; R.52 at JR11344-46; R.1 at JR26173-74.

White lied because she was facing a serious criminal charge of her own and was enticed by Defendant Stevens, who offered to help her on that case if she provided information about the Hanson murder. R.51 at JR19418-19, ¶4-7; *id.* at JR19419; R.1 at JR26201. Stevens prompted White with questions about the plaintiffs in connection with the Hanson murder, at which point White made up a story about Ross. R.52 at JR11346-47.

Stevens' offer to help White with her case – which was the sole motivation for White to fabricate information against Ross – was not disclosed. *See, e.g.,* R.44 at 114-115; R.231 at 25.

---

[3] Montgomery answered questioned during the entire first sitting of his deposition and much of the second sitting, but once defense attorney repeatedly questioned him about why he was not invoking the Fifth Amendment, particularly given plaintiffs' theory of the case, he refused to answer further questions. *See* R.249-17 at 178-79, 223-26.

15

**Alex Dothward Invokes the Fifth Amendment in Subsequent Proceedings**

Dowthard was called to testify on August 16, 2011 during the post-conviction proceedings and on October 27, 2015 at the retrial of the three plaintiffs. R.248 at ¶ 56. Both times, Dowthard invoked his 5th Amendment privilege against self-incrimination. *Id.* When Dowthard appeared for his deposition in this civil suit, he again invoked his 5th Amendment privilege against self-incrimination in responding to nearly every question asked of him. R.248 at ¶ 57.

Notably, the only substantive answer that Dowthard provided was to the question, "Mr. Dowthard, in fact, the information contained in this [May 31, 2002] statement is false, correct?" R.7 at 67. This statement was the one defendants coerced him to sign, in which he inculpated plaintiffs. In response, Dowthard answered "correct" before subsequently asserting his Fifth Amendment privilege. *Id*.

**Defendants' Misconduct Was Not Disclosed**

At no time prior to plaintiffs' wrongful convictions did defendants disclose any of the foregoing misconduct. R.249-44 at 51-52, 114-19, 126-28. They concealed from their police reports and testimony the fact that Dowthard and Brown had been fed facts, coerced, and threatened into adopting statements defendants knew to be false. Defendants also concealed the manner in which they fabricated false statements from Casel Montgomery and Bryce Croft.

**Summary of the Argument**

In arriving at its conclusion that summary judgment should be granted in this case, the district court determined that it could not credit: (i) admissions by a party-opponent (Defendant Palmer) that he fabricated witness statements, engaged in unlawful coercion, and believed throughout the police investigation that plaintiffs were innocent; (ii) adverse inferences that

16

follow from Defendant Palmer and Alex Dowthard's invocations of the Fifth Amendment in the civil suit; (iii) Dowthard's recorded statements contemporaneously documenting the fabrication, coercion, and violence that caused him to falsely inculpate plaintiffs. Once these pieces of evidence were stripped from the record, the district court concluded that plaintiffs lacked sufficient evidence to create triable issues on fabrication, *Brady* claims, conspiracy, failure to intervene, unlawful detention, and the pendant state law claims. The district court was wrong on both accounts, and its decision is without a legal basis.

The record is rich with evidence of actionable police misconduct. Defendants developed a theory that plaintiffs committed the Hanson murder. When it became quickly apparent that plaintiffs were in fact innocent, the defendants molded the evidence to their theory. They crafted false statements and forced Alex Dowthard and Lataurean Brown to adopt them, using violence, threats, and promises—all of which were undisclosed. They manufactured false witness statements from Casel Montgomery and Bryce Croft that not only made these witnesses useless to the defense but steered the prosecution away from the likely real perpetrator. Croft's false statement in particular reveals defendants' intent to manufacture a case against plaintiffs at any cost. They suppressed Rickkedda Young's critical observations of Dowthard and Brown moments after the shooting, when they told her they did not see who shot them. In a similar vein, they failed to disclose the promises of leniency they offered to Sonya White, who was thus motivated to lie against plaintiffs to get help on her case. In each of these ways, defendants violated plaintiffs' due process rights. Taken together, the weight of the evidence is clear: the district court erred in granting summary judgment, and these claims must proceed to a trial.

17

**Argument**

**Standard of Review**

This Court applies a *de novo* standard of review to the district court's grant of summary judgment. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1012 (7th Cir. 2006) (citation omitted). In conducting its review, the Court "must construe all facts and reasonable inferences in the light most favorable to the [plaintiffs], the non-moving parties." *Id.* Summary judgment is *only* available if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (quoting FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Where there are alternate inferences to be drawn from the available evidence, summary judgment is not appropriate. *See, e.g., Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004); *Dowden v. Polymer Raymond, Inc.*, 966 F.2d 1206, 1207-08 (7th Cir. 1992) ("If the record reveals that inferences contrary to those drawn by the trial court might be permissible, then summary judgment should be reversed." (internal citations omitted)). This familiar standard warrants addition consideration where, as here, a moving party is also asserting his Fifth Amendment right over material facts in the case, *inter alia,* whether he manufactured false statements and coerced witnesses into adopting them.

Under *Baxter v. Palmigiano,* the Fifth Amendment assertion permits, but does not require, the jury to draw an adverse inference. 425 U.S. 308, 318 (1976); *LaSalle Bank Lake View v. Seguban,* 54 F.3d 387 (7th Cir. 1995). By definition, then, whether to draw the inference, or not, is a factual question that must be resolved by a jury. At summary judgment, because the court must draw all reasonable inferences in the non-movant's favor, plaintiffs are entitled to the

18

benefit of each and every adverse inference. Thus here, Defendant Palmer's invocation of the Fifth Amendment privilege regarding whether he knowingly committed the constitutional violations alleged creates a factual dispute about whether an adverse inference should be drawn, rendering summary judgment necessarily unavailable. *See Stichting Ter Behartiging Van de Belangen v. Schreiber,* 407 F.3d 34, 55 (2d Cir. 2005) (noting that although "a jury might draw" an adverse inference from the privilege assertion, "we [the court] are required at summary judgment to draw all reasonable inferences in favor of the non-moving party"); *Kluppelberg v. Burge*, No. 13 C 03963, 2017 WL 3147257, at *4 (N.D. Ill. July 25, 2017) (where defendant invoked Fifth Amendment, court held in denying summary judgment that "[t]o prevent the case from going to the jury undermines the jury's ability to draw adverse inferences that could establish the elements of the claim"). Likewise, Dowthard invocation of the Fifth Amendment supports the inference that he did not see who shot at him, that he lied against plaintiffs, and that he adopted false facts that defendants fed him because of intense police pressure, coupled with undisclosed consideration.

## I.     The District Court Erroneously Granted Summary Judgment on Plaintiffs' Fabrication Claims.

Crediting plaintiffs' evidence and drawing reasonable inferences in their favor, there is ample evidence from which a jury could find that defendants fabricated a statement from Alex Dowtard and Lataurean Brown which they knew to be false. Police officers who manufacture false evidence against a criminal defendant violate due process "if that evidence is later used to deprive the defendant of [his] liberty in some way." *Whitlock v. Bruegemann*, 682 F.3d 567, 580 (7th Cir. 2012). *See also Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir.) ("Falsified evidence will *never* help a jury perform its essential truth-seeking function. That is why convictions premised on deliberately falsified evidence will always violate the defendant's right

19

to due process.") (emphasis in original). To support their fabrication claim, plaintiffs must show that the "officers created evidence that they knew to be false[.]" *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014).

Proof of a defendant's intent to fabricate evidence almost never exists in the form of direct evidence. *See, e.g, Stinson v. Gauger*, 868 F.3d 516, 527 (7th Cir. 2015) ("Rarely will there be an admission of subjective intent. The intent to fabricate is a question of fact that the district court concluded could be inferred in Stinson's favor by the evidence in the record at summary judgment…"). Nonetheless, this is the unique circumstance where there is direct evidence of fabrication: Palmer's admissions, as well as his invocation of the Fifth Amendment. As to the former, Palmer has admitted, among other things, knowing Dowthard and Brown's statements were false when he forced them to be adopted; bringing a false, pre-written statement to Bryce Croft and forcing him to sign it; and manufacturing a false statement for Casel Montgomery. At his deposition, Palmer invoked the Fifth Amendment when asked whether he intended to fabricate the statements of Dowthard and Brown. As noted above, at this stage of the proceedings, the jury gets to decide whether to draw that inference. While there is significantly more evidence of fabrication, discussed below, the district court failure to properly credit this evidence is a sufficient basis for reversal.

### A. Plaintiffs Presented Sufficient Evidence That Defendants Knew They Were Manufacturing a False Statement for Dowthard to Adopt

At summary judgment, there was plainly a dispute of fact about whether Dowthard's statement was coerced. Palmer admitted as much in prior sworn testimony, his Fifth Amendment invocation creates adverse inferences on the elements of the fabrication claim, and Dowthard too is on the Fifth. The district court therefore focused on whether there was sufficient proof that the defendants knew that the coerced statement was also false. In reaching its conclusion, however,

the district court failed to credit much of plaintiffs' evidence for legally erroneous reasons and and answered questions that only the jury may decide. Plaintiffs' evidence is sufficient to create triable issues on their fabrication claim.

A reasonable jury could easily infer that Defendants Palmer and Stevens, the lead detectives running the investigation, fabricated the false statements of Dowthard and Brown. Bearing in mind the summary judgment standards, plaintiffs need only present sufficient evidence from which *the inference* can be drawn that a defendant intended to create the false witness statement. *See, e.g., Stinson,* 868 F.3d at 527; *Winslow v. Smith,* 696 F.3d 716, 732-33 (8th Cir. 2012) ("Plaintiffs have presented sufficient evidence to allow the reasonable inference that defendants … purposefully manufactured false evidence to implicate plaintiffs. Specifically, there is evidence that suggests Defendants systematically coached witnesses into providing false testimony that was in line with the narrative of the Defendants' theory as to how the murder had been committed."); *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002) ("Instead of simply allowing a weakly supported prosecution to proceed, Moran correctly asserts that the evidence can be read to show acts designed to falsely formulate a pretense of probable cause."); *Phillips v. City of Chicago*, No. 14 C 9372, 2018 WL 1309881, at *26 (N.D. Ill. Mar. 13, 2018).

Here, Defendant Palmer admitted under oath that he knew Dowthard's statement was false and yet asked him to perpetuate the false statement at plaintiffs' criminal trials. R. 249-8 at 206-07 (admitting that he "told Lataurean Brown and Alex Dowthard to testify consistent with their statements even though [he] believe[s] their statements are not truthful."). That admission is a non-hearsay statement by a party-opponent and is sufficient to create a genuine dispute. Palmer then invoked his Fifth Amendment privilege when asked whether he (i) coerced Dowthard,

Brown, and other witnesses, (ii) fabricated Dowthard's and Brown's statements (as well as other witnesses) and (ii) withheld evidence. PSOF ¶43. Palmer's binding admissions, coupled with the adverse inferences from his Fifth Amendment invocations about whether he fabricated Dowthard's statement, knowing it to be false, create genuine disputes of material fact.

The district court erred by deciding summary judgment without the benefit of this evidence. *Cf. Kluppelberg v. Burge*, No. 13 C 03963 at \*4 (where defendant invoked Fifth Amendment, court held in denying summary judgment that "[t]o prevent the case from going to the jury undermines the jury's ability to draw adverse inferences that could establish the elements of the claim").

There is plenty of other record evidence as well. Dowthard, too, has made significant admissions that defeat summary judgment. When asked whether "the information contained in this [May 31, 2002] statement is false," Dowthard testified, "correct." R.7 at 67. Dowthard then invoked the Fifth Amendment privilege about the circumstances of his false statement, including the police coercion and defendants' role in manufacturing the false sequence of events pinning plaintiffs to the crime.

Dowthard did not give his statement, moreover, until was charged with a forgery and with a parole violation, threatened with federal charges, given promises of leniency in these two criminal charges, physically hit, and pushed to the breaking point. Particularly considering the other evidence of misconduct, the significance of the coercion is that it renders Dowthard's statement objectively less reliable. *See Hurt v. Wise*, 880 F.3d 831, 841-42 (7th Cir. 2018) (the presence of coercion "informs reliability" and diminishes the evidentiary value of such a statement). Indeed, Dowthard's recorded phone calls, discussed further below, reveal a witness being relentlessly pursued by defendants to adopt a false statement because they "just want

22

[plaintiffs] behind bars." The story did not originate with Dowthard, but he parroted it to "coincide" with defendants' theory.

Next, Defendant Stevens and Palmer deliberately withheld evidence that contradicted Dowthard's May 31 statement, creating at least the inference that he knew Dowthard's May 31 statement was false but wanted him to adopt it anyway. On April 24, Rickedda Young told Stevens and Mastroianni that immediately after the shooting, Dowthard and Brown did not know who shot at them. Defendants suppressed this fact from their police report, which they wrote *after* they obtained a statement inculpating plaintiffs despite having interviewed Young fifteen days earlier. The fact that Dowthard's materially inconsistent statement is omitted from the Young police report supports the inference that Defendants were trying to hide Dowthard's earlier revelation that he had not seen the shooter (and therefore could not truthfully implicate plaintiffs).

Taken together, the foregoing evidence creates a genuine dispute about whether the defendants knew Dowthard's May 31 statement was false when they fabricated it. The district court erroneously concluded that the foregoing evidence "at best, shows only coercion." *See* APP.21. But that conclusion is wrong not only because it fails to draw the appropriate inferences but also because it ignores competent evidence about the *falsity* of Dowthard's statement, most prominently, Palmer's admission that he knew it was false (an admission with the district court improperly ignored). Additionally, crediting plaintiffs' evidence about coercion supports the inference that defendants knew the statement they were forcing was false.

## B. The District Court Erred in Finding the Dowthard Tapes Inadmissible and Failing to Consider Them in Opposition to Summary Judgment

The district court declined to rely on the Dowthard Tapes because it mistakenly believed they would not be admissible on hearsay grounds, and further, that Dowthard's taped statements

23

were "cumulative of [his] initial statement to the police in which he denied knowledge of who shot Demarcus and, therefore, would not pass the 403 balancing test." *See* APP.23. Both of these findings were erroneous and caused the court to ignore important evidence defeating summary judgment.

With respect to hearsay, the district court's conclusion that the Dowthard Tapes could not be used as evidence in opposition to  summary judgment is legally erroneous for both procedural reasons and on the merits. First, the Defendants failed to challenge the Tapes' admissibility in their opening briefs, instead waiting until their reply brief to raise it for the first time, and then only in a most cursory fashion. It was not appropriate for the district court to consider, let alone adopt, this cursory argument first raised in reply. *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002). It was particularly unfair to fault plaintiffs for failing to address the Tapes' admissibility when the Defendants themselves cited the Tapes in their own summary judgment pleadings. *See* R.232 at ¶¶59-64. The district court compounded the error by ruling that plaintiffs somehow waived any arguments they could make as to the admissibility of the tapes, even though admissibility appeared to have been conceded in the summary judgment motions to which they were responding.  *See* APP.22. Although Rule 56 requires the non-moving party to demonstrate genuine material facts, that does "not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. at 324.

On the merits, the Dowthard Tapes are admissible for multiple reasons. First, they constitute *Brady* material, discussed in Section II.C., that defendants possessed and withheld, thereby prejudicing plaintiffs. At a minimum, the jury will receive the Dowthard Tapes for this non-hearsay purpose.

There are other non-hearsay purposes of the Dowthard Tapes. Dowthard's conversations explained his evolving statement, from truthfully denying knowledge of the shooters to claiming he saw plaintiffs do the shooting, thus establishing a course of conduct. *See United States v. Thurman*, 915 F. Supp. 2d 836, 864 (W.D. Ky. 2013) (jail calls admissible to show impact on listener, and to explain to the jury "the remaining events as they unfolded"). *See also Williams v. Pugh*, 489 Fed. Appx. 130, 133 (7th Cir. 2012)(unpublished) (statement offered to explain the chain of events leading up to the shooting); *U.S. ex rel. Thomas v. Sielaff*, 404 F. Supp. 1037, 1039 (S.D. Ill. 1975), *aff'd*, 539 F.2d 715 (7th Cir. 1976). *Cf. Smith v. McKee,* 598 F.3d 374, 387 (7th Cir. 2010) (explaining course of conduct).

Relatedly, Lambert's statements to Dowthard about what Dowthard was supposed to do, which facts Dowthard should adopt, how Dowthard's statement must "coincide," and the underlying police motivation of putting the plaintiffs "behind bars," are all non-hearsay statements elicited for their effect on the listener, here, Dowthard. *See United States v. Shaw,* 824 F.3d 624, 630 (7th Cir. 2016); *United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015); *United States v. Harris*, 886 F.3d 1120, 1129–30 (11th Cir. 2018).

Dowthard's taped statements are also admissible as substantive evidence because they are statements against interest. *See* Fed. R. Evid. 804(b)(3). This rule requires: (1) the declarant must be unavailable to testify at trial, (2) the statement must be against the declarant's penal interest, and (3) the statement must be supported by corroborating circumstances indicating the trustworthiness of the statement. *United States v. Garcia*, 897 F.2d 1413, 1420 (7th Cir. 1990). All three elements are met.

First, Dowthard is unavailable at trial. "[A] witness who asserts the Fifth Amendment privilege against self-incrimination is 'unavailable' for purposes" of Rule 804. *Thompson v. City*

25

*of Chicago*, 722 F.3d 963, 975 n.4 (7th Cir. 2013). *See also* APP.22.  Second, Dowthard's taped statements were against his penal interest. Dowthard's statements reveal his decision to give perjured testimony that would frame three men for a murder they did not commit. *See United States v. Keltner*, 147 F.3d 662, 670 (8th Cir. 1998).

("The statement at issue provides details of criminal activity in which Billy Keltner participated *and was planning to participate* with various individuals…") (emphasis added); *United States v. Layton,* 720 F.2d 548, 560-61 (9th Cir.1983) (statement regarding intent to commit crime in the future), *cert. denied,* 465 U.S. 1069 (1984). Such an admission exposes him not only to criminal liability for perjury and obstruction of justice, but also to possible civil liabilities. *Cf. Whitlock*, 682 F.3d at 575 (recantation admitted under 804(b)(3) as statement exposing witness to perjury charges). Indeed, when asked about his statements on the tapes and his May 31 inculpation of plaintiffs, he invoked his Fifth Amendment privilege.

Defendants may argue that Dowthard's taped statements are not explicit admissions, but that does not make them any less indicative of his intent to commit criminal activity. *See, e.g., United States v. Ilori*, No. 01 CR 913, 2002 WL 1359390, at *4 (N.D. Ill. June 21, 2002) ("[A]lthough the Coleman-to-"Sam" phone calls never explicitly stated that the participants were planning to deal drugs, the Court concludes that circumstances surrounding the phone calls, as well as the calls themselves, indicated a fair probability that criminal activity was afoot."). Here, too, Dowthard's conversations were about future criminal activity, while he was inside the prison, and thus used heavy slang and code. *See id.* (caller used code words and never mentioned "drugs" or "heroin" but calls "strongly suggested" plan to deal drugs), citing *United States v. Cancelmo,* 64 F.3d 804, 808 (2d Cir.1995) (use of code commonplace).

26

Third, the statements on the Dowthard Tapes are supported by corroborating circumstances indicating their trustworthiness. They were intimate conversations made described in detail a future plan to commit perjury and frame plaintiffs, and that plan was executed when Dowthard testified at the criminal trials.

In short, while the district court did not consider whether the Dowthard's recorded statements satisfy 804(b)(3)'s statement against interest exception, the foregoing authorities demonstrate that they do.

The statements on the Dowthard Tapes also satisfy the elements of FRE 803(3), the "state-of-mind" hearsay exception, which applies to statements of "the declarant's then-existing state of mind (such as motive, intent, or plan)…." Fed. R. Evi. 803(3). Here, Dowthard's conversations express his then-existing intent to go along with a specific plan: adopt a story that "coincides" with Brown's manufactured statement and claim to have seen plaintiffs do the shooting. "To be admissible, the statement must relate to the declarant's state of mind as it existed at the time it was uttered and it must satisfy other requirements for admissibility." *United States v. Peak,* 856 F.2d 825, 833 (7th Cir. 1988).

To be admitted under Rule 803(3), the declarant's state of mind must be at issue, or the statement must tend to prove the doing of the act intended. *Peak*, 856 F.2d at 833. Here, both are relevant. Dowthard's state of mind is relevant to showing the impact of defendants' coercive behavior on him. The statements between Dowthard and Lambert also show Dowthard's intention to adopt a particular plan. *See United States v. Hartmann*, 958 F.2d 774, 784 (7th Cir. 1992) (declared intent to carry out scam admissible to show intent to execute the plan as well as to prove that he, in fact, carried out that plan"). Moreover, his statements "prove the doing of the

27

act intended," as the taped conversations culminate in his May 31 signed statement falsely inculpating plaintiffs. *See Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285, 295 (1892) ; *United States v. Donley,* 878 F.2d 735 (3rd Cir.1989).

Dowthard's tapes conversations also prove a requisite element of plaintiffs' fabrication claim, namely, defendants' intent to fabricate. *United States v. Green,* 680 F.2d 520, 523 (7th Cir.), *cert. denied,* 459 U.S. 1072 (1982) (kidnapping victim's statement that the defendant "is still bothering me" admitted to show victim's dislike of defendant and thus held against her will). In this case, before signing the false statement, Dowthard expressed pain and fear in response to defendants' relentless pressure (verbal and physical), indicating that he was near the breaking point, coupled with his truth that he did not see the shooters. In a similar vein, these statements prove the prejudice and materiality prongs of Plaintiff's *Brady* claim: defendants' tactics were hugely relevant to explaining Dowthard's false inculpation, and they should have been disclosed.[4]

---

[4] In addition, the Dowthard Tapes would be admissible under the residual exception to the hearsay rule. According to the district court, the Tapes failed the Rule 807 hurdle because Dowthard was a felon gang member, and because Dowthard already told police he did not see who shot at him. The mere fact that Dowthard has a prison record or was part of a gang is not sufficient to exclude the Tapes. Were that the case, then prison recordings would never be admissible—and that is far from the law. *See*, *e.g.*, *United States v. Thurman*, 915 F. Supp. 2d at 864 (finding that excerpts from jail calls admissible). Likewise, the Tapes are more probative than any other evidence. These calls provide information far beyond the fact that Dowthard did not know who shot at him and Brown: they include information about how the police coerced Dowthard into falsely identifying Plaintiffs, the very heart of Plaintiffs' case. *See Boyd*, 55 F.3d at 246 (finding that had coercion been disclosed, jury might have questioned key witnesses' credibility). Finally, the information on the Tapes is corroborated by, among other things, Palmer's Fifth Amendment invocation about the Dowthard interrogation, the timing of the charges against Dowthard and their dismissal, along with the evidence of coercion and fabrication of other witnesses.

At bottom, the "purpose of Rule 807 is to make sure that reliable, material hearsay evidence is admitted, regardless of whether it fits neatly into one of the exceptions enumerated in the Rules of Evidence." *United States v. Moore*, 824 F.3d 620, 624 (7th Cir. 2016). As such, admitting these Tapes serves the interest of justice because it helps explain grave constitutional

28

Finally, the lower court's conclusion that Dowthard's taped statements are cumulative of his initial police statement plainly contradicts the record, in violation of the summary judgment standard. The police report reflecting Dowthard's interviews does not disclose the following facts, each of which are established through the Dowthard Tapes: (i) go-between Antowan Lambert fed Dowthard the sequence of events to "coincide" with the police narrative; (ii) the police told Lambert that "they just want to get [plaintiffs]"; (iii) Palmer hit Dowthard all over his head, hurting him, and threatening him; (iv) defendants promised him leniency in two pending criminal matters; and, (v) the police knew before they took Dowthard's signed statement that Dowthard previously disavowed any knowledge of the shooters to his friend Ms. Young, moments after the shooting. In fact, precisely because the Dowthard Tapes were *not* cumulative of any other evidence, the Illinois Appellate Court held that plaintiffs' due process rights had been violated by being deprived of them at their trials.

Summary judgment was improperly granted on plaintiffs' claim that the defendants fabricated an "eyewitness" statement from Alex Dowthard. This claim should proceed to a trial.

### C. There Is A Genuine Dispute of Material Fact Regarding Whether Defendants Fabricated Lataurean Brown's False Inculpation

For these reasons, there is enough record evidence for a jury to conclude that defendants intended to fabricate Brown's statement as well. When he was first questioned, on April 24, Brown told Defendants Stevens and Palmer about his activities on the night of the murder and

---

violations that occurred in the context of a decades-old criminal investigation that led to the wrongful conviction of Plaintiffs.

Finally, the tapes are admissible pursuant to 18 U.S.C. 2510, the law enforcement exception, *see United States v. Feekes*, 879 F.2d 1562, 1565 (7th Cir. 1989), and because they are created in the "ordinary course" they would satisfy the business records exception (Fed. R. Evid. 803(6)).

did not say he had been shot, and he certainly never said that plaintiffs had shot at him. When he was next interviewed by the same detectives, he against provided the same narrative and did not implicate the plaintiffs. By May 9, the detectives knew that Brown had not actually seen who shot at him – he told his cousin, Rickedda Young, that he did not know who shot at him, and Rickedda Young told Detective Stevens that.

In short, the only way defendants secured a statement Brown inculpating plaintiffs was by threatening him with jail time and detaining him for nine hours. The district court concluded that there is, at best, evidence of coercion, not fabrication. In so finding, it ignored evidence of defendants' intent and knowledge of falsity, without any legal justification. For instance, Palmer *admitted* that he knew Brown's statement was false and yet bound him to it. R.249-8 at 206-07. Next, for purposes of summary judgment, Palmer admitted that he manufactured a false statement for Brown and threatened him to adopt it, by invoking the Fifth Amendment on those questions. R. 249-9 at 81-82. Third, defendants buried Brown's earlier statement (to Rickedda Young) that he did not see the shooter, an action that strongly indicates their belief that Brown's later statement was false.

Accordingly, summary judgment is inappropriate on this claim.

### D. The Evidence Fabricated By Defendants Was Used To Deprive Plaintiffs of Liberty

The district court did not reach the question of whether Dowthard and Brown's fabricated statements contributed to the deprivation of Plaintiff's liberty, but the answer is plainly that it did. *See Avery*, 847 F.3d at 440 (liability stands where detectives knowingly reported a false confession and the fake confession was used at trial); *Whitlock*, 682 F.3d at 583 ("we hold police officers who fabricate evidence liable for the liberty deprivation that occurs later when the fabrication is used.") (citation omitted). In *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.

1988), this Court admonished, "If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials whom they have defrauded." The same is true of defrauding a jury. Defendants cannot hide behind the conviction to argue that the fabricated evidence was inconsequential. *See, e.g., Whitlock*, 682 F.3d at 582; *Avery*, 847 F.3d at 442-43. Dowthard and Brown's false testimony permeated the entire criminals trials from start to finish and resulted in plaintiffs' wrongful incarcerations. Indeed, their testimony was the lynchpin of the case: Without Brown or Dowthard, plaintiffs would not have been convicted.

A jury should be permitted to consider whether their fabricated statements were used to deprive Plaintiff of his liberty.

### E.  There Is A Genuine Dispute Of Fact Regarding Whether Defendants Fabricated False Evidence To Steer the Prosecution Away From Suspect Casel Montgomery

#### 1.  Defendants Manufacturing A False Statement For Montgomery

Montgomery has now testified that his inculpation of the plaintiffs was false, so that is not in dispute. This Court need only decide whether there is a genuine factual dispute about who manufactured the false statement: Montgomery or defendants. There is abundant evidence that defendants are responsible, certainly enough to take this claim to trial. Montgomery's first two statements to the police unequivocally showed that plaintiffs never drove or rode in his red car. The false statement he ultimately provided, on August 27, was entirely scripted by Defendant Palmer. Montgomery offers direct evidence of the defendants' knowledge of falsity. He testified under oath that Palmer fed him false facts and forced him to adopt them, including that Ross sent him a message ("chirped" him), asked to borrow his car, and then made an inculpatory admission when returning the car. R.249-6 at 98, 100. In fact, the only reason Montgomery adopted these

false facts was because Palmer threatened to become violent toward him and charge him with murder.

Palmer himself invoked his Fifth Amendment privilege in response to direct questions about whether he manufactured Montgomery's August 27 statement. The adverse inference from that invocation must be drawn at this stage of the proceedings. Stated differently, for purposes of summary judgment, Palmer manufactured Montgomery's statement.

If this evidence is credited, as it must be at summary judgment, a reasonable jury could conclude that the defendants violated plaintiffs' due process rights by manufacturing Montgomery's August 27 statement. Plaintiffs have pointed to competent evidence that the defendants fabricated a statement that simultaneously implicated plaintiffs in murder and steered the prosecution away from a viable alternate suspect.

The district court assumed that any such fabrication was immaterial, however, because Montgomery's statement was not introduced at trial. But false evidence must only deprive the criminal defendant of liberty "*in some way*" to be actionable. *Whitlock*, 682 F.3d at 580 (emphasis added) (citing *Jones v. City of Chicago*, 856 F.2d at 993; *Saunders-El v. Rohde*, 778 F.3d 556, 560 (7th Cir. 2015). The fabricated evidence need not be admitted at trial in order to state such a claim. *See, e.g., Phillips v. City of Chicago*, No. 14 C 9372 at *25 ("there is a plausible argument that the confessions of plaintiffs' co-defendants caused plaintiffs' convictions, even though none of those confessions was introduced at either Plaintiff's trial."); *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1050 (N.D. Ill. 2016); *Fields v. Wharrie* (*Fields II*), 740 F.3d 1107, 1112 (7th Cir. 2014). ("the fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him") (citation omitted).

In *Patrick*, the court explained that a claim for fabrication of evidence was viable, despite the fact that the false evidence was never presented at trial, because defense counsel's trial strategy "was influenced if not dictated by the existence of the fabricated evidence placing Taylor at the crime scene as well as his knowledge that to put Taylor's alibi in play would open the door to the evidence of the other defendant's fabricated confessions." 213 F. Supp. at 1050. The court explained:

> Thus, the fabricated evidence placing Taylor at the scene of the crime and the fabricated confessions of the other defendants prevented Plaintiff from presenting evidence that would call into question the reliability of the confessions of the other defendants and, by virtue of their common origins, the reliability of Plaintiff's own confession as well.

*Id.* Similarly, here, the fabricated statement from Montgomery linking plaintiffs to his red Pontiac Grand Prix prevented the plaintiffs from calling Montgomery to establish that he, and not they, had that car. In this way, they were deprived of evidence that suggested a viable alternate suspect and simultaneously distanced them from the crime.

A related but distinct way in which Montgomery's fabricated statement deprived plaintiffs of liberty "in some way" was by steering the prosecution away from Montgomery as a suspect and toward plaintiffs instead. In *Castillo v. Zuniga*, No. 01 C 616, 2002 WL 398519, at *9 (N.D. Ill. Mar. 14, 2002), the court upheld a claim based on fabricated pre-trial interview reports, separate and apart from non-cognizable trial testimony. The court noted that "police officers are liable for constitutional violations when they…fabricate inculpatory evidence so that prosecutors base their prosecutorial decisions on incomplete or spurious evidence." *Id.*(citing *Buckley v. Fitzsimmons*, 20 F.3d 789, 796-97 (7th Cir. 1994); *Jones v. City of Chicago*, 856 F.2d at 994; citation omitted). The *Castillo* court explained, "These cases teach that police officers can violate defendants' right to a fair trial by suppressing or fabricating evidence in ways that *cause unfair trials to happen.*" *Id.* (emphasis in original; citing *Jones*, 856 F.2d at 993; citation

33

omitted). The court held, "Because an unfair trial is a predictable consequence when police officers systematically mislead prosecutors, the court concludes that Plaintiff has stated a due process claim with regard to his allegations that the individual Defendants fabricated statements, reports, and interviews." *Id.*

So, too, here. Montgomery's fabricated, false statement not only rendered him unusable as a defense witness at the criminal trial because the police report created by defendants contained an extremely prejudicial statement in which Montgomery pinned plaintiffs for murder, but it also steered the prosecution to make decisions on "incomplete or spurious evidence," in this case, proceeding to trial against the plaintiffs.

The district court, however, discounted all of Montgomery's sworn deposition testimony, as well as his affidavit, based on the incorrect notion that Montgomery's partial invocation of the Fifth Amendment barred him from testifying substantively at trial. That is not the law: Plaintiff could call Montgomery to the stand at trial, and he could invoke the 5th Amendment before the jury where proper, and testify substantively as to matters that he gave testimony about during his recent deposition. *See Jimenez v. City of Chicago*, 877 F. Supp. 2d 649, 671-72 (N.D. Ill. 2012) *aff'd* 732 F.3d 710 (7th Cir. 2013) (witness can be called to the stand to take the Fifth Amendment in civil case). The lower court was factually wrong as well; Casel Montgomery did, in fact, give substantive testimony about being fed facts, the circumstances of his false statement to the police, and the fact that he did not give plaintiffs his red car. Regarding those topics, Montgomery is not entitled to invoke the Fifth Amendment at trial in this proceeding. The Fifth Amendment ensures that a person cannot "be compelled ... to be a witness against himself." *United States v. Longstreet*, 567 F.3d 911, 922 (7th Cir. 2009) (quoting U.S. Const. amend. V). However, the right "must be confined to instances where the witness has reasonable

cause to apprehend danger from a direct answer." *Id.* (quoting *Hoffman v. United States*, 341 U.S. 479, 486 (1951)). Where a witness has already testified in the same proceeding about the same matter, he cannot invoke the Fifth Amendment right about the subject he previously testified to. *See Mitchell v. United States*, 526 U.S. 314, 321 (1999). Thus, for example, in *Alridge Elec., Inc. v. Fid. & Deposit Co. of Maryland*, No. 04 C 4021, 2006 WL 2536687, at *5 (N.D. Ill. Aug. 31, 2006), the court found that a witness had "waived her right to [avoid] self-incrimination by answering questions during her January 2004 sworn statement and reconfirming them voluntarily in December 2005." Accordingly, this Court should regard Montgomery's deposition testimony as admissible evidence for summary judgment purposes

### 2. Defendants Manufactured Bryce Croft's Recantation of His Statement Exculpating Plaintiffs

If there is any doubt about whether defendants knew the statements they coerced were false, the Bryce Croft evidence erases that doubt. Croft's testimony—coupled with Defendant Palmer's admission that Croft's testimony is true—establishes that the defendants were committed to making their false story stick and to bury the evidence of their deceptions. Mr. Croft told the defendants that he saw Casel Montgomery and a companion named Kefentse Taylor driving a red car and possessing a gun that matched the murder weapon. Croft's account exculpated plaintiffs because he did not see them with the gun or the red car; and it added to the mounting evidence pointing toward Montgomery. This was a credible account: Palmer believed Croft's statement, because it was freely given and sought no consideration. *See* R. 249-8 (Palmer EH Tr.) at 91-92.

Instead of Croft being able to exonerate plaintiffs and point the prosecution to the true culprits, however, defendants conspired to make sure that Croft could not undermine their false, coerced inculpation. Specifically, defendants forced Croft to recant his statement in a signed

affidavit on the eve of trial. Defendant Palmer testified under oath that his supervisor, Lindmark, told him to "make a liar out of" Croft. That is what he and Defendant Mastroianni did on October 16. Defendants went a step further and had Croft swear – falsely – that Plaintiff Ross made Croft lie during the first statement.

Palmer admitted under oath that he made up Bryce Croft's recantation out of whole cloth, typed it up, and then instructed Croft to sign it. R. 249-8 at 95-103; R.54. Again, Palmer's admissions alone are sufficient to create genuine disputes. Palmer testified that he threatened to charge Croft with perjury unless he signed, and Croft, facing other criminal charges at the time, became afraid. R. 54 at 380, 384, 385.

As with Casel Montgomery, Croft's statement was not used at trial but still deprived plaintiffs of liberty "in some way." The defense attorneys could not present compelling evidence of an alternate suspect through Croft, because he was now impeached by a sworn affidavit that would undoubtedly have destroyed his credibility. As in *Patrick*, the fabricated evidence "prevented Plaintiff[s] from presenting evidence that would call into question" their guilt by identifying a viable alternate suspect. Whether Defendants fabricated Croft's statement and thereby deprived plaintiffs of due process is a question for the jury.

II.     **Plaintiffs' *Brady* Claims Involve Material Factual Disputes That Only The Jury Can Resolve.**

To prevail on a civil *Brady* claim for an officer's failure to disclose evidence, a plaintiff must show that: (1) the evidence was favorable to him; (2) the officer concealed the evidence; and (3) the concealment prejudiced him. *Gill v. City of Milwaukee,* 850 F.3d 335 (7th Cir. 2017)

The record contains evidence of clear-cut *Brady* violations that meet each of the foregoing elements, much more than required to clear the hurdle of summary judgment. The evidence that was withheld from the Plaintiffs is unquestionably material because it would have

undercut the only evidence on which the convictions rested. Furthermore, all of the suppressed evidence would undermine completely the entire police investigation, which is itself a valid purpose of *Brady* evidence. *See Kyles v. Whitley,* 514 U.S. 419, 444 (1995) (finding that withheld evidence "would have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation"); *United States v. Boyd*, 55 F.3d 239, 246 (7th Cir. 1995) (finding that had the benefits been disclosed, the jury might have questioned the key witnesses' credibility and wondered whether "the prosecution team must have had desperate doubt about the testimonial reliability of these witnesses to have lavished such extraordinary personal attention upon them"); *Bowen v. Maynard*, 799 F.3d 593, 613 (10th Cir. 1986); *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985). The remaining two elements – withholding and prejudice – are amply met as well.

While the following section considers each *Brady* claim individually, this Court must consider the cumulative effect of the suppressed evidence as a whole. *Kyles*, 514 U.S. at 436-37

### A. Defendants Withheld Material Impeachment Evidence Offered By Rickedda Young

Rickedda Young spoke with Detectives Stevens and Mastroianni on April 24, 2002. The detectives did not memorialize this conversation until May 9, 2002, the day they obtained Lataurean Brown's false statement implicating plaintiffs. Unsurprisingly, when they finally reported their conversation with Ms. Young, they omitted a crucial detail: according to Young, Lataurean Brown and Alex Dowthard had been shot at but "did not know who it was" who did the shooting. Brown and Dowthard's admissions that they did not know who shot at them directly contradicted their written statements, and eventual trial testimony, that plaintiffs were responsible for the shooting. As explained above, where the prosecution's case rises and falls with the testimony of an "eyewitness" and no physical evidence, impeachment of that

"eyewitness" is necessarily material. *See State v. Cain,* 565 U.S. 73, 76 (2012); *Newell v. Hanks*, 283 F.3d 827, 837 (7th Cir. 2002). Had plaintiffs been armed with Ms. Young's statement, they could have called her at their trials to impeach Brown and Dowthard.

The district court was dismissive of this *Brady* violation based on a characterization of Young's statement as cumulative and therefore immaterial. Young's first-hand account of what Brown and Dowthard said moments after the shooting, however, was neither cumulative nor immaterial. Although Brown and Dowthard initially told the police that they did not see the shooters, they later explained away this statement by saying they believed they could take care of matters themselves (as opposed to involving the police). That same motivation to lie simply does not exist with Rickedda Young, a relative with whom they were close enough that they drove to her apartment immediately after the shooting. Indeed, Young's statement properly disclosed would allow a reasonable jury to infer that it was not, as Dowthard testified at trial, that Dowthard wanted to take care of the matter himself, but instead because he did not know who committed the crime; he was coerced into lying when the police threatened him and the State lodged a stale forgery charge against him and then offered him a deal on that charge.

Moreover, Young's disclosure to the detectives undermined their reliance on Brown and Dowthard's contradictory statements, given later-in-time under enormous pressure, criminal charges, threats of jail time, and physical violence. The fact that Defendant Stevens withheld Young's entire statement actually underscores the materiality of the statement – a reasonable inference is that Stevens withheld this statement precisely *because* it heavily impeached Dowthard and Brown in a way that other evidence did not.

38

**B. Defendants Failed to Disclose The Improper Police Tactics That Produced Lataurean Brown's False Inculpation**

The district court appropriately credited Brown's testimony that he was threatened into giving a statement and drew the inference in Plaintiff's favor to "assume that Brown's May 9, 2002 written statement was the product of Palmer's threat that if Brown did not give a written statement he would be put in jail." Even though these threats and other features of coercion were not disclosed to plaintiffs, the district court incongruously concluded that this did not amount to a *Brady* violation because Brown revealed the threat in 2015, *more than ten years* after plaintiffs were wrongfully convicted, and because Brown further suggested that the threat did not impact the accuracy of his statement.

Evidence that a witness was threatened or otherwise coerced into giving a statement is material evidence that should be disclosed under *Brady v. Maryland*. "Because coerced testimony may in fact be true, the due-process right to a fair trial isn't implicated **absent a violation of the *Brady* duty to disclose facts about the coercive tactics used to obtain it**. *See Fields v. Wharrie* (*Fields II*), 740 F.3d at 1123 (Sykes, J., concurring in part and dissenting in part) **("[I]f the police officers ... withhold exculpatory information about coerced or fabricated evidence, the aggrieved defendant will have a good § 1983 claim against the officers for violation of *Brady*.")** (emphasis added). Armed with the *Brady* disclosure, the accused can impeach the coerced testimony by pointing to the tactics the officers used to extract it, and the jury has a fair opportunity to find the truth." *Avery v. City of Milwaukee*, 847 F.3d 433 at 439 (emphasis added); *Fields II*, 740 F.3d at 1117 (failing to disclose a false statement's "corrupt origins at trial violates his due-process right to a fair trial under the rule of *Brady v. Maryland*").

This is particularly true when the *only* evidence of guilt comes from one or two witnesses and no corroboration such as physical ties to the crime scene. In those circumstances, any evidence which bears on the way the witness's statement came about – such as threats by police officers that forced the witness into giving a statement – are unquestionably material to the verdict, and their withholding may be prejudicial. *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) (citing *Kyles v. Whitley*, 514 U.S. at 434 (petitioner need only show that the new evidence undermines confidence in the verdict to satisfy materiality requirement). *Cf. Smith v. Cain,* 565 U.S. at 76 (where prosecution's case rested solely on witness testimony and there was no other evidence guilt, evidence impeaching the witness's inculpatory statement was material); *Newsome v. McCabe*, 319 F.3d 301, 302-05 (7th Cir. 2003)("liability is under the due process clause because [defendants] concealed exculpatory evidence—the details about how they induced the witnesses to finger Newsome . . . Newsome's lawyers needed, but did not receive, information vital to probe whether manipulation occurred").

Here, Brown was one of two witnesses on whose testimony the prosecution's entire case rested. The fact that Brown was threatened into giving an inculpatory statement creates a dispute regarding whether material impeachment evidence should have been disclosed. The district court erred by taking this *Brady* claim from the jury.

### C. Defendants Failed To Disclose the Improper Police Tactics That Produced Alex Dowthard's False Inculpation

The foregoing authorities also require the conclusion that defendants' relentless use of threats, physical violence, promises of leniency, and force-feeding facts, all should have been disclosed to plaintiffs. *See Fields II*, 740 F.3d at 1123. The true circumstances of Dowthard's false inculpation would have impeached his trial testimony. Defendants withheld that evidence, however, and never disclosed it to the prosecution.

40

Not only did defendants deliberately withhold evidence of Dowthard's coercion and fabrication, but they suppressed the Dowthard Tapes as well, thus effectively insulating Dowthard's testimony from any meaningful cross-examination. As noted above, Defendant Stevens listened to the tapes, mislead the prosecution that there was "nothing relevant" on them, and then withheld them until it was too late for defendants to use them at trial.[5] This willful supreesion of the Dowthard Tapes violated plaintiffs' due process rights.

Pursuant to Brady and its progeny, the government has a due process obligation to disclose evidence to the defendant that is exculpatory or impeaching of a prosecution witness. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Brady* does not identify a specific timetable for when evidence that falls under its aegis must be disclosed apart from mandating that disclosure be made as a time when it would be of value to the accused. *See Leka*, 257 F.3d at 100 (Brady requires disclosure so that defense has an "opportunity to use the evidence"); *Blake v. Kemp*, 758 F.2d 523, 532-33 n.10 (11th Cir. 1985) ("The prosecution did, however, release this information to the defendant the day before trial. In some instances that may be sufficient. However, as other courts have recognized, some material must be disclosed earlier. This is because of the importance of the information to adequate trial preparation.") (internal citations omitted); *Grant v. Allredge*, 498 F.2d 376, 382 (2d Cir. 1974) (information having a "material bearing on defense preparation" "should have been revealed well before the commencement of the trial"). "[T]he longer the prosecution

---

[5] Plaintiff Ross's trial occurred later in time. While his counsel had an additional opportunity to listen to the Dowthard Tapes, as compared with the other two plaintiffs, the Tapes capture some but not all of the improper tactics employed by the defendants, who were independently obligated to disclose all of the coercive methods they used to extract statements from Dowthard and the other witnesses.

withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use." *Leka*, 257 F.3d at 100. "The opportunity for use under Brady is the opportunity for a reasonable lawyer to use the information with some degree of calculation and forethought." *Id*.

Here, as the post-conviction court correctly found, disclosure of more than 40 hours of tapes on the eve of trial and which the State had in its possession for five months qualifies as being withheld for purposes of *Brady*. *Johnson*, 2014 IL App (2d) 130368-U, ¶ 80. *See also Leka*, 257 F.3d at 100-03 (witness who was identified "nine days before opening arguments and twenty-three days before the defense began its case" was "suppressed" because the "disclosure afforded insufficient opportunity to use the information" provided by the witness); *Blake*, 758 F.2d at 532-33 n.10 (finding that disclosure of defendant's taped confession and suicide note "the day before trial," which had "been in the hands of the police since shortly after [the defendant's] arrest," was insufficient to satisfy Brady's disclosure requirement; *Grant*, 498 F.2d at 382 ("Although it well may be that marginal Brady material need not always be disclosed upon request prior to trial, the fact that [a witness identified a man other than the accused as committing the crime] was without question specific, concrete evidence of a nature requiring pretrial disclosure to allow for full exploration and exploitation by the defense. This information, so withheld by the Government, would have had a material bearing on defense preparation, and therefore should have been revealed well before the commencement of the trial.").

Moreover, the Dowthard Tapes are undoubtedly material as they undercut the prosecution's centerpiece: Dowthard's "eyewitness" identification. *See Dominguez v. Hendley,* 545 F.3d 585, 590 (7th Cir.2008) (Section 1983 due process claim stated where the police withheld exculpatory details surrounding witness manipulations); *Manning v. Miller,* 355

F.3d 1028, 1033 (7th Cir.2004) (inducing witnesses to falsely identify plaintiff formed the basis

of a *Brady* claim); *Ott v. City of Milwaukee,* 48 F. Supp. 3d 1197, 1207 (E.D. Wis. 2014).

Defendant Stevens listened to the tapes, so a reasonable jury could infer that he knew their

crucial impeachment value. The jury could further infer that Stevens' mischaracterization of the

tapes as "nothing relevant" and his failure to produce them until October 11, 2002, reveals his

concern that the tapes heavily impeached their star witness.

### D.  Defendants Withheld Consideration Given To Witness Sonya White

In both criminal trials, only one individual claimed to have overhead a "confession" from

one of the plaintiffs: Sonia White. Although White admitted that she was responsible for

falsifying her own statement (with prompts from the defendants), the circumstances surrounding

her statement should have been disclosed to plaintiffs prior to their criminal trial.

Detective Stevens promised White leniency in her home invasion charge and indicated

that he was interested in what she knew about these plaintiffs relating to the Hanson murder.

White then fabricated a story in which Ross effectively confessed to the murder. In reality, Ross

never made any such admission, and White's statement was false. White has later testified

credibly under threat of perjury that she made up Ross's "confession." Stevens failed to disclose

the true circumstances surrounding White's made-up story: she wanted to curry favor for her

own pending case and was thus highly motivated to lie. By withholding this crucial impeachment

evidence, Ross was unable to attack the sole witness who testified that Ross confessed.

As the Supreme Court explained in *Wearry v. Cain,* even a non-binding promise such as

the one made to Ms. White is material because the jury "might well have concluded that [the

witness] had fabricated testimony in order to curry the [prosecution's] favor"). 136 S. Ct. 1002,

1006–07, 194 L. Ed. 2d 78 (2016).

The district court incorrectly analyzed the materiality prong by asking if White would have testified differently had this impeachment been available. The relevant inquiry is whether the *Brady* material would have undermined confidence in the verdict, not whether White would have testified differently. Here, White was the only witness in either trial who offered anything close to a confession. Plaintiff Ross was unable to impeach White by alerting the jury to the White's strong motivation to lie: a hope for favorable treatment in a serious felony, coupled with the detective's promise of leniency. This evidence would have given jurors a reason to disbelieve White's statements, which in turn undermines confidence in the verdict.

### III.    Plaintiffs' *Manuel* Claim Must Proceed To A Jury

The district court improperly dismissed Count VIII as a malicious prosecution claim prohibited by *Newsome v. McCabe*. *See* APP. 41. In that count, however, plaintiffs have alleged the gist of a *Manuel* claim. As the Supreme Court held last year, and this Court clarified on remand, plaintiffs plead a Fourth Amendment unlawful detention claim where they allege a detention without probable cause. APP.64-65. As discussed above, plaintiffs were detained based on fabricated witness statements, which defendants used to manufacture probable cause. Their *Manuel* claim cannot be dismissed.

### IV.    Summary Judgment on Plaintiff's Failure to Intervene, Conspiracy, and Supervisory Liability Federal Claims Should Be Reversed

The district court dismissed plaintiffs' federal claims of failure to intervene, conspiracy, and supervisory liability, because they were derivative of the federal claims on which the court granted summary judgment. APP.40. Because those federal claims should not have been rejected, these three federal claims should be reinstated and proceed to trial as well.

### V.    Plaintiffs' State Law Claims Should Be Reinstated

The district court erroneously dismissed Plaintiff's state law claims without prejudice for the same flawed reasons it dismissed the federal claims. *See* APP.33. Because the district court failed to consider, let alone properly credit, significant portions of the record, its conclusion that there are no factual disputes about probable cause or the other state law elements is clearly erroneous. Plaintiffs has viable federal claims that should go to trial, and his pendant state law claims should be revived as well.

## Conclusion

Plaintiffs respectfully ask this Court to reverse the district court's grant of summary judgment and remand this case for trial.

RESPECTFULLY SUBMITTED,

 s/ Roshna Bala Keen
*Counsel of Record for Plaintiffs-Appellants*

Jon Loevy
Gayle Horn
Roshna Bala Keen
Elliot Slosar
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
roshna@loevy.com

**CERTIFICATE OF SERVICE**

I, Roshna Keen, hereby certify that I served the Brief and Short Appendix of Plaintiffs-

Appellants on November 1, 2018, using the CM/ECF system, which effected service on all

counsel of record for the Defendants-Appellees.


s/ Roshna Bala Keen
*Counsel of Record for Plaintiffs*


Jon Loevy
Gayle Horn
Roshna Bala Keen
Elliot Slosar
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
roshna@loevy.com

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)**

In accordance with Fed. R. App. P. 32(a)(7)(C)(i), I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 13,847 words, beginning with the words "JURISDICTIONAL STATEMENT" on page 1 and ending with the words "Respectfully submitted" on page 44. In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was Microsoft Word.

/s/ Roshna Keen

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

In accordance with Circuit Rule 30(d), I certify that the short appendix to this brief contains all of the materials required by Circuit Rule 30(a) & (b).

/s/ Roshna Keen

**INDEX OF SHORT APPENDIX**

| DOCUMENT | Page(s) |
| --- | --- |
| Order in 3:15-cv-50064 (Doc. 267) | APP 001 |
| First Amended Complaint in 3:15-cv-50064 (Doc. 60) | APP 043 |
| First Amended Complaint in 3:15-cv-50065 (Doc.48) | APP 070 |

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Lumont Johnson, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No:    15 C 50064 |
| | ) | |
| City of Rockford, et al., | ) | |
| | ) | |
| *Defendants*. | ) | Judge Frederick J. Kapala |

## <u>ORDER</u>

Palmer's motion for summary judgment [230] is granted.  Rockford police officers' motion for summary judgment [235] is granted.  City of Rockford's motion for summary judgment [237] is granted.  All other pending motions [186] [210] are denied as moot.  This case is closed.

## <u>STATEMENT</u>

Plaintiffs, Lumont Johnson, Anthony Ross (a/k/a "Little Daddy"), and Tyjuan Anderson (a/k/a "Ace"), have sued defendants, Rockford Police Officers Doug Palmer, Dominic Iasparro, Joseph Stevens, James Randall, Scott Mastroianni, Theo Glover, Kurt Whisenhand,[1] Torrey Regez, Brad Larson, and Elizabeth Grindley, as well as the City of Rockford under 42 U.S.C. § 1983.[2] Plaintiffs allege various civil rights violations in connection with their purported wrongful murder convictions.  Before the court are motions for summary judgment filed by defendants.  For the reasons that follow, the motions are granted.

## I. FACTS[3]

At about 2:51 a.m. on April 14, 2002, eight-year-old Demarcus Hanson was killed by bullets fired though a window as he slept in a house at 2514 Chestnut Street in Rockford, Illinois belonging to his grandmother Estelle Dowthard.  Later that day, when officers interviewed Demarcus' uncle, Alex Dowthard, he initially claimed that he had no information about his nephew's killers and that he had been with his girlfriend the previous night.  Dowthard later admitted that he and an unnamed

---

[1]Plaintiffs' motion to voluntarily dismiss defendant Whisenhand is granted and he is terminated from these cases.

[2]Gregory Lindmark was also named as a defendant but he was terminated from this case on November 30, 2015.

[3]The facts are taken from the pleadings, the parties' statements of undisputed facts, the parties' responses thereto, the parties' statements of additional facts, and the evidence submitted in support.  The facts are undisputed unless otherwise indicated.

individual were in his 1988 Chevrolet Monte Carlo and exchanged gunfire with plaintiffs who were in a white Chevrolet Suburban.  At that point, however, Dowthard claimed that the unnamed individual, later determined to be Lataurean Brown, was the person who fired at the Suburban. Dowthard said that he hid the gun under a car in his mother's driveway on Chestnut Street, but that he was not present for and did not know who shot at Demarcus' grandmother's house.  Dowthard was taken into custody on a parole violation.

Palmer and Stevens interviewed Brown on April 24, 2002, and he did not indicate who shot Demarcus.  Next, Palmer and Stevens met with Dowthard at Big Muddy River Correctional Center ("Big Muddy") on May 2, 2002.  Dowthard again claimed that he knew nothing about the murder.

On May 9, 2002, officers obtained a written statement from Brown that implicated plaintiffs in the shooting and provided in pertinent part:

> My name is Lataurean Brown, but people call me Johnny Boy.  On Saturday night and into Sunday morning on April 13th and April 14th, I met up with my friend Alex Dowthard on Parmele Street where he was staying at.  After we met up we went to Lamonts on 15th Avenue.  I drove Alex's car to the club.  The car is a purple Monte Carlo with loud mufflers.  We got to Lamonts and went inside.  There wasn't any problems at Lamonts and I didn't see L[u]mont, Lil Daddy or Ace there.  At about closing, we left and I drove to the liquor store on South Main Street.  The liquor store is the one with the gravel parking lot.  I parked on the street just a little ways from the door and I was sitting on the hood of the car talking to some girls.  I don't remember the names of the girls.  Alex was standing next to the car talking to a girl.  Alex was in the street and he was throwing up G.D. and then a white and blue Suburban drove up and stopped.  Lumont was driving, a younger light skinned guy was in the front seat, Lil Daddy was sitting behind the driver and Ace was sitting behind the passenger.  When the Suburban stopped Ace started talking and saying what does that mean asking about the gang signs.  I was still talking to the girls and I was listening to both the girls and Alex but I heard Ace calling Alex a bitch, pussy and a motherfucker.  Alex said something back but I don't remember what he said. I saw Lil Daddy get out when they stopped talking and he was standing in the door frame and raised up over the top of the truck.  At that time I didn't know what he was doing but he looked down the street and I assumed a squad car was coming so he got back into the Suburban and they drove off.

> After a minute Alex said lets go and we drove off also.  We turned on Loomis and headed back towards M and M Market on West Street.  We took a right on Montague and then left on Rose Street and Alex wanted me to stop at a white house on Rose.  I was still driving.

> Alex went inside and came back out after about five minutes and I don't know what he was doing in there.  After he came out we headed up Central to Chestnut where we turned right and went to Tay Street.  We took a left and headed up Tay Street and as we turned we saw the Suburban turning on Tay and coming in our direction.  We had the T-Tops off on the car and as we got close to the car, Alex

2

APP 002

stood on the seat and started shooting a handgun that he had. I don't know where he got it and I didn't know he had it until he started shooting. The gun didn't have any clips, it had a wheel where the bullets were. Alex shot at the Suburban and this Suburban was the same Suburban that Lumont, Lil Daddy, Ace and the light skinned guy were in but when Alex started shooting I just concentrated on driving and getting out of the area I didn't see who was in the Suburban. I didn't know Alex was going to shoot but when he did I got scared and I drove up to West State and turned left. Alex had shot about four shots.

When I turned left on West State, Alex told me to turn left on the street next to the school. After talking to Detective Stevens and Palmer I know that street is Waldo Street. We headed down Waldo and headed to the stop sign at Chestnut. Between Tay and West State and Chestnut and Waldo, I saw Alex reloading the gun. He was putting the bullets in one at a time.

We stopped at the stop sign and saw that the Suburban was coming towards us on Chestnut so Alex started shooting at them again through the T-Top. I kept going straight and made a right on Green Street. I drove to Central and then turned right on Central. I headed up Central to West State and then turned left on West State Street. Alex told me to drive to his mother[']s House on Chestnut. I knew where the house was at so I drove to Johnston then took a left and went to Chestnut and turned right. I stopped the car on the wrong side of the road right in front of the driveway.

Alex got out and ran to the Ford Taurus in the driveway and put the gun up under the car. I don't know why he did that. Alex started walking back to the car and then he stopped and said, "oh shit, there them niggas." Alex started running towards the back of the house right away so I drove off. Before I drove off, I saw a red Pontiac pull up almost next to me on the other side of the road. I looked over and saw Lumont driving, Ace in the front seat, and Lil Daddy in the back seat. They didn't have their hoods up then. I took off towards Henrietta and looked in the rearview mirror and saw Lil Daddy and Ace getting out and chasing Alex toward the back of the house. I turned right on Henrietta and stopped a little ways up the block. I got out and started looking for Alex but was staying by the car. After a short time I saw Alex start running towards me from behind the house next to his mother's house. He kept running and when he was in the middle of the intersection, I heard four gunshots from by his mother's house. The shots were one right after the other. Alex got to the car and got in and we drove and took a left on West State Street. I never saw the red car or those [sic] again.

Alex told me to drive to Concord Commons . . . .

On May 31, 2002, Lindmark and Glover went to Big Muddy and obtained a written statement from Dowthard in which he implicated plaintiffs in the shooting. Dowthard's statement provided in pertinent part:

My name is Alex Dowthard.  I want to tell the truth about what happened at my mother (Estelle Dowthard's House) (2514 Chestnut Street) the night my nephew Demarcus Hanson was killed.

The night Demarcus was killed I had an earlier altercation with Anthony Ross, Lumont Johnson and a dude who's name is 'Ace.'  I do not know Ace['s] real name.  When these altercation[s] happened I was with my friend Johnny, I do not know Johnnie's real name but I identified him from a photo that was shown to me by Sgt. Lindmark.

Johnny and I were riding in my 1988 Monte Carlo, Johnny was driving.  The first altercation I had was when Johnnie and I went to the liquor store on South Main St.  It was about 2:00 a.m.  Johnnie and I parked in front of the liquor store and got out of the car.  We looked up and saw Lumont Johnson in traffic driving his white suburban with blue graphics towards us.  I saw a light skinned black male riding in [the] front passenger seat with Lumont.  Anthony Ross was in the rear seat behind Lumont and "Ace" was sitting behind the light skinned black male who I did not know.

Lumont stopped the suburban beside my purple and blue Monte Carlo and words were exchanged between me and Anthony Ross and 'Ace.'  'Ace' rolled his window down and said something, and Anthony Ross who I call 'Lil Daddy' opened his door and stood outside and said something smart.  After we exchanged words, Lumont drove off.  A crowd had gathered around the liquor store, everybody left after we exchanged words.  Johnnie and I got in my car and we drove up by M&M Market which is located on the corner of West and Montague St.  We saw Lumont [and] them again at M&M Market 'Lil Daddy' yelled at me and called me a 'bitch' then Lumont drove back towards South Main St.  I told Johnnie to head for the westside towards Catfish City.

Before we got to Catfish City I had another altercation with Lumont [and] them at Chestnut and Tay Street.  After the altercation at Chestnut and Tay, I told Johnnie to head to my mother's house on Chestnut Street.

We arrived at my Mom's house and Johnnie parked in front of the house on the wrong side of the street.  I got out [of] my car and put something up.  After I put something up, I walked back towards my car and I saw a red mid-size car pull alongside my car and stop in the middle of the street.  The cars doors opened and I recognized Lumont Johnson, Anthony Ross (Lil Daddy) and Ace all get out of the car.  I do not know who was driving the car, because they all got out so fast.  I heard one of them yell, "there he go" and somebody said "go that way."  I saw Lumont Johnson with a chrome handgun and Anthony Ross (Lil Daddy) had the same type of gun Lumont had.

I turned and ran to the rear of my Mom's house from the front driveway of my mother's house.  'Ace' was chasing me while Lumont and Anthony Ross (Lil Daddy) ran around the opposite side of the house to try and cut me off.  As I ran by

4

APP 004

the garage which is located behind my mother's house, I heard 4 or 5 gunshots coming from the right side of my mom's house which would be the westside of the house.

When I heard the shots I stopped near the end of the garage and waited for about 30 seconds, then I looked on the westside of my mother's house and I saw Lumont Johnson and Anthony Ross (Lil Daddy) running from the westside of my mom's house back towards the car they got out of.

I was able to see Lumont and Anthony Ross because I had moved from the rear of the garage towards the front which allowed me to see Lumont and Anthony (Lil Daddy) running. I don't know where 'Ace' was but I know he did not see me because I had a head start on him. After I saw Lumont and (Lil Daddy) running, I made my way through the rear yard of my mom's house and ended up by my Dad's house on Henrietta.

Johnnie drove my car toward the corner and picked me up by my Dad's house on Henrietta. Johnnie and I drove to Concord Commons to try to use a phone. . . .

. . . .

[M]y nephew Jeffrey Moore came over and told me Demarcus had been shot and everybody was at the hospital. Later on that day I came down to the police station to talk to detectives.

I originally thought I could handle this myself, that's why I did not cooperate at first. I'm now willing to cooperate because I want the guys who did this to my nephew arrested. I have not been offered anything by the police department for my cooperation. I feel bad for my family I just want this to be all over.

Plaintiffs were charged with Demarcus' murder on June 30, 2002.

On July 11, 2002, Palmer and Stevens obtained a written statement from Antonio Leavy which primarily described his involvement with conflicts between Waco and Moe (also known as P. Stones) street gang members which took place before Demarcus was murdered. The written statement was filed under case number 02-073667, rather than 02-048075, the case number of the Demarcus Hanson homicide investigation. In that portion of his statement dealing with the shooting of Demarcus, Leavy stated:

The next thing that happens is Demarcus was shot and killed. On that night I was home and heard four gunshots. I got out of bed ran downstairs and looked out of the front window. I saw a red Grand Am. . . . I saw a heavy set black male driving and he was sitting up some.

. . . .

[Brown] told me what happened and he said that he and [Dowthard] were at the club and they pulled off and went to the liquor store. [Dowthard] was throwing up forks and Ace, Lil Daddy, and Lumont pull up. Ace asks what that meant and [Dowthard] told him that it meant gangster. That was all [Brown] told me. After [Brown] told

5

me that and after all that has been going on with the Moes and the Wacos I figured it was them that was probably involved in Demarcus' shooting.

On August 27, 2002, Stevens and Palmer obtained a written statement from Casel "Café" Montgomery which provided, in pertinent part, that in the early morning hours of April 14, 2002, "Lil Daddy chirped me" and then borrowed Montgomery's rented red Pontiac Grand Prix. When Montgomery woke up the next day, his red Grand Prix was out front with the keys in it. Later that day, Lil Daddy told Montgomery that "he saw them Niggas last night and he got to busting at Alex. Lil Daddy said that Alex's gun jammed and he threw it. Lil Daddy said he just kept shooting." When Montgomery told Lil Daddy that he killed a kid, Lil Daddy said that "he wasn't trying to kill the kid, he was trying to kill his Mama." According to Montgomery, a day or two later Lil Daddy told Montgomery that he had been talking to the police and that Montgomery should get rid of the red Pontiac. Montgomery and his girlfriend turned in the red Pontiac for another rental car.

On September 12, 2002, Stevens obtained a written statement from Ross' cousin Sonya White in which she swore:

> Back a few months ago I was at my mother's house and I had been outside hanging out. It was in the early morning, it wasn't light out yet, but you could tell the sun was coming up. My cousin is Lil Daddy or Anthony Ross and he came over in a maroon older two door car and stopped at my mother's house. He got out and talked to me for a second. He was acting weird, he was pacing and kept grabbing his head and stuff. I told him we could ride and smoke for a while. We got into the car and drove to Levings Lake which is just down the road. We got to Levings Lake and he drove around the lake to the building on the north shore. We got out and walked into the building and Lil Daddy had a gun in his waistband. We walked into the building and Lil Daddy started talking about how he wish[ed] he could turn back time. He said he didn't want to do it. I asked him what and he told me that I would hear about it on the news. Lil Daddy then pulled out the gun and threw it in the lake. I saw the gun and asked him if he shot somebody and he lowered his head and nodded. Lil Daddy told me they were "into it with some niggas" and they wanted to take over the block. Then he started crying. I held him and I asked him what he was going to do. He told me he didn't know. We talked about God and he asked me if I had any money. I gave him two hundred dollars and then he drove me home. He dropped me off and then left and I don't know where he went. A couple days later I heard on the news that a little boy was killed and that[']s when I knew what Lil Daddy had done.

Johnson and Anderson were tried together in October 2002. Ross was tried separately in February 2004.

### A. Johnson and Anderson's October 2002 Jury Trial

Judge Gerald F. Grubb presided at the jury trial of Johnson and Anderson. Assistant State's Attorney Scott Salemi represented the State. Attorney Randy Wilt and Public Defender Karen Sorenson represented Johnson and Anderson, respectively. The trial was scheduled to begin on October 21, 2002. At a pretrial hearing held on that date, Wilt addressed Johnson's motion to continue the trial. Wilt indicated that on October 17, 2002, the prosecution came into possession of

6

recordings of Dowthard's telephone conversations while he was incarcerated at Big Muddy ("Dowthard tapes") which predated Dowthard's May 31, 2002 written statement. Wilt informed the court that the Dowthard tapes were made available to the defense on Friday, October 18, 2002, and that thereafter he and the other two defense attorneys spent two hours listening to one-and-a half tapes.[4] Wilt explained that they needed to listen to the rest of the tapes which could contain exculpatory information, and that they could not do so if the trial started that day. The State did not object to Johnson's motion. Judge Grubb suggested that they delay the trial by one-week, but still pick a jury and have them return on October 28, 2002. Sorenson objected, stating that she did not think a week was enough time and that she could not pick a jury without knowing what was on the Dowthard tapes. Judge Grubb ordered the State to turn the original Dowthard tapes over to the defense and, despite Sorenson's concerns, said that they would pick a jury and have them come back on October 28, 2002, to start the trial.

At trial, after testifying consistently with the facts set forth in his May 31, 2002 written statement, Dowthard explained that he did not tell the police what he knew right away because he was on parole and knew that he was not supposed to be around violence or have a gun. During his initial interview with police, Dowthard made up a story to distance himself from the shooting, although he eventually did admit that he possessed a gun and fired it, and that he had put it up under a car at his mother's house. Dowthard explained that he did not tell the police the truth until he was in Big Muddy on a parole violation due to his possession of the firearm. When detectives came to Big Muddy, he gave them a statement without asking them for anything in return. However, after he gave his statement, Dowthard asked the detectives to take the parole hold off of him and one of the detectives said he would have to talk to the Parole Board. According to Dowthard, he did not get out of Big Muddy any earlier than he otherwise would have.

On cross-examination, Dowthard confirmed that the first time he met with the police on April 14, 2002, he lied to them when he told them that he was with his girlfriend and that he had no knowledge about how Demarcus was killed. Dowthard also agreed that after the police told him he was going to have to submit to a gun powder residue test, he told them that he possessed a gun and fired it. Dowthard agreed that Palmer and Stevens came to see him at Big Muddy on May 2, 2002, and he refused to speak to them. About a week later, Dowthard was served with a criminal warrant for forgery which also became another basis to revoke his parole. On May 30, 2002, Dowthard had a telephone conversation with Glover and Lindmark during which he agreed to talk with detectives if they would agree to notify the State's Attorney's Office and the Parole Board that he cooperated. Dowthard said that he gave his written statement implicating plaintiffs in Demarcus' murder on May 31, 2002, which was the second time detectives, this time Lindmark and Glover, came to see him at Big Muddy. Dowthard agreed that he asked the detectives to release him from the parole hold, but Dowthard explained that the detectives said that they could not make any promises. Dowthard denied that the detectives promised to have the forgery charge dismissed, but Dowthard agreed that the charge was ultimately dismissed on July 31, 2002, and that the State's Attorney's Office sent a letter informing the Parole Board of the dismissal. On re-direct examination, Dowthard denied that

---

[4]The third attorney was Robert Fuenty who represented Ross at the time.

any officer told him what to say in his statement or that any officer told him he had to implicate plaintiffs.

Brown testified that, after Dowthard fired from the Monte Carlo, Dowthard directed him to drive to his mother's house. According to Brown, he curbed the car on the wrong side of the street in front of the house and kept the engine running. Dowthard exited the vehicle, walked up the driveway, placed his gun under the gray Ford Taurus in the driveway, and walked back toward the Monte Carlo. With that, Dowthard said, "Oh shit, here come them niggers," and he ran toward the house. Brown looked to his right and saw Lumont, Ace, and Lil' Daddy in a red car. Brown drove away in the Monte Carlo and saw Ace and Lil' Daddy running after Dowthard in his rearview mirror. Brown eventually stopped the car and saw Dowthard running toward him. Brown heard four gunshots as Dowthard reached the intersection of Chestnut and Henrietta Streets. Dowthard got into the Monte Carlo, and Brown drove to Concord Commons. Brown did not learn that Demarcus had been killed until later that morning. On April 24, 2002, Brown spoke to the police at his cousin's house and also at the public safety building. Brown admitted that he initially lied to the police. Brown disclosed to the police that Dowthard shot at the Suburban, but he did not say who shot at the house in retaliation. In May 2002, Brown gave a statement to the police which intimated that Ace, Lumont, and Anthony were responsible for Demarcus' death.

Larson testified that he was on duty when Anderson and his brother, Terrance Anderson, were being held in adjacent cells following the crime. Larson overheard Terrance instruct defendant not to say anything to the police. Larson then heard Anderson respond, "It's okay man. I'll just do the 20 years and be out." Apparently, Grindley was also present as she is mentioned in Larson's report on the incident. During defendants' case at trial, Terrance denied that the conversation between him and Anderson ever took place.

Johnson testified on his own behalf at trial. Anderson did not. Johnson explained that he, Anderson, Javarus (presumably the light-skinned male), and Ross saw Dowthard and Brown near the Monte Carlo. Dowthard displayed a gang sign and Anderson asked, "what that was about." Johnson dropped Ross off where his Cadillac was parked near the intersection of Tay and Chestnut Streets and then dropped Javarus off at his house. Johnson and Anderson, who were in Johnson's Suburban, followed Ross in his Cadillac. The two vehicles encountered the Monte Carlo at the intersection of Tay and Chestnut Streets. The Monte Carlo paused at the stop sign and turned toward the Suburban. Johnson heard gunshots, turned onto Chestnut Street, and parked near Ross, who had also stopped. Johnson recognized the Monte Carlo, but he did not see the driver or the shooter. Johnson testified that he checked the Suburban for bullet holes but did not find any. Montgomery pulled up in a red Grand Am or Grand Prix and parked behind the Suburban. Johnson asked Ross whether he heard gunshots, and Ross answered "no." Johnson and Anderson drove to Anderson's house and Ross and Montgomery remained on Chestnut Street. Anderson's family members testified that Anderson and Johnson arrived between 2:00 and 2:30 a.m. The next day, Johnson learned that a police officer was looking for him. Johnson called the officer, went to the public safety building, and spoke with the police that day and the next.

Johnson and Anderson argued that Montgomery and Kefentse Taylor were actually the shooters. The jury rejected this argument and found Johnson and Anderson guilty. In their post-trial motions for new trial, Johnson and Anderson raised, among other issues, their late access to the

8

APP 008

Dowthard tapes. The motions were denied and Judge Grubb sentenced each to 50 years' imprisonment.

### B. Ross' February 2004 Jury Trial

Judge Joseph McGraw presided at Ross' trial, the State was represented by Mark Karner, and Ross was represented by Jeffrey Kline. Dowthard and Brown testified consistently with their written statements and their testimony at the jury trial of Johnson and Anderson.

Sonya White was called by the State and testified that a couple hours before daylight, just before she heard about the Hanson murder on the news, her cousin Ross stopped by her mother's house looking frantic and worried. White and Ross rode in Ross' car down the street to Levings Lake where Ross said that "he wished that he could turn back time," and that "he was into it with some niggers over some block territory." Ross then threw a gun into the lake. White testified further that she asked Ross if he shot someone and Ross held his head and nodded yes. White acknowledged that she was awaiting sentencing on a pending attempted home invasion charge. However, White testified that she volunteered the information about Ross, no promises were made to her, and she did not expect anything in return.

During his case at trial, Ross testified to his whereabouts at the time of the murder and denied any involvement. Toni Gulley testified that in April 13, 2002, she was living with Ross, who was her boyfriend, and their baby. Gulley testified that Ross got home at about 2:45 a.m. on the morning of April 14, 2002, while she was changing her baby's diaper. When asked how she could be sure of the time, Gulley said because she looked at the clock on her digital cable box. On cross-examination, Gulley denied telling Detectives Cone and Jimenez on April 24, 2002, that she could have been off on the time by as much as a half-hour.

The jury found Ross guilty. Thereafter, Judge McGraw sentenced Ross to 50 years' imprisonment. Plaintiffs' convictions and sentences were upheld on direct appeal. See People v. Anderson, 367 Ill. App. 3d 653 (2006); People v. Johnson, No. 2-04-0395 (2005) (unpublished order under Supreme Court Rule 23); People v. Ross, No. 2-04-0391 (2006) (unpublished order under Supreme Court Rule 23).

### C. Postconviction Proceedings

In their amended petitions for postconviction relief, plaintiffs brought numerous claims including actual innocence based on a host of individuals coming forward including Palmer, who admitted his and other officers' misconduct; White, who admitted that her trial testimony was false; and Rickedda Young, who stated Brown and Dowthard told her that they did not know who the shooters were minutes after the shooting. Each plaintiff requested outright reversal of his conviction based on his actual innocence or, alternatively, vacature of his conviction followed by a new trial.

The postconviction petitions were supported by various affidavits including an October 28, 2007 affidavit in which White swore in pertinent part that:

3.  In September 2002, I was arrested for home invasion.

4.  When I was arrested, Detective Stevens asked me if I knew about the case they had on Anthony Ross. Even though I knew absolutely nothing about it, I told

9

Detective Stevens that I did know about the case. Detective Stevens told me that if I could help them, they could help me.

5. On September 12, 2002 I gave a false statement to the police about Anthony Ross. I gave the statement because I thought I could get a deal on my home invasion case.

6. The only things that are true in my statement are my name and where I was living at the time. I made up everthing else.

7. I also testified at Anthony's trial. My testimony was false.

8. Anthony was not outside with me on April 14, 2002. Anthony never told me any of the things that I said that he told me. Anthony never threw a gun in Levings Lake.

9. I had no idea what happened in this case. As far as I know, Anthony had no involvement in it whatsoever.

10. I gave false testimony at Anthony's trial because of my home invasion charge. We had talked about my testifying at Anthony's trial and I felt like I had to follow through for my plea.

11. I am coming forward now to tell the truth because what I did was wrong and has been eating at my soul.

Toni Gulley swore in her November 28, 2007, affidavit that:

3. On April 14, 2002, I was changing my baby's diaper and getting ready to feed her when Anthony came home. It was around 2:45 a.m.; I remember looking at the time on the digital cable box in my room.

4. I was interrogated by the detectives multiple times regarding the murder of Demarcus Hanson on April 14, 2002.

5. During those interrogations, I remember the detectives trying to get me to say that Anthony came home at 6:00 a.m. the night of the murder, and not at around 2:45 a.m., as I had told them. I specifically remember Detectives Palmer and Randall ("JR") trying to get me to say this.

6. In addition, Palmer harassed me at work, and Palmer and JR threatened to call DCFS and take my baby away if I did not cooperate. Palmer and JR also harassed me outside the courthouse, saying hurtful things like, "Who's going to take care of your daughter?" or "You need a daddy?"

7. After being threatened that my baby was going to be taken away, I may have told the police that I could have been off by a little on the time that Anthony came home.

. . . .

10. After the first time I gave testimony at the Grand Jury, I was scared to testify again at the Grand Jury.

11.  In addition, my experience at the grand jury plus the police threatening and intimidating me all made me very nervous about testifying at Anthony's trial. I really didn't want to be involved.

12.  I told Anthony's attorney, Jeff Kline, about my experience with the State's Attorney and testifying before the grand jury. I also told Jeff Kline that Palmer told me to say that Anthony came home at 6:00 a.m.

Charles Griffin stated in a July 2, 2008 affidavit that he is serving a 20-year sentence for murdering Taylor. According to Griffin, in the late spring and summer of 2002, when he and Taylor were "locked-up in the Winnebago County Jail," Taylor told Griffin that he and Montgomery "was [sic] trying to get at Alex." When Griffin tried to inform the police, they told him "that if [his] information [did not implicate] [Lu]Mont, Lil' Daddy, and Ace, they did not want to hear it." Griffin also stated in his affidavit that after he was released, he and Taylor were riding in a car and he asked Taylor who was there when Demarcus was shot. Taylor said it was just him and Montgomery. Griffin asked Taylor this question because he wanted to kill everyone who had something to do with Demarcus' killing. Griffin added that because the police would not do anything he had to take matters into his own hands and the only reason he did not kill Montgomery as well was because Montgomery was in prison.

Montgomery swore in a July 18, 2011 affidavit that "Doug Palmer told me to say that Anthony Ross chirped me and needed to borrow my car, but that never happened. Anthony Ross never had my car that day. The only reason I did it is because Palmer threatened me with murder charges . . . physical force and incarceration." On the same date, Montgomery testified at the postconviction evidentiary hearing that his girlfriend rented a red Pontiac Grand Prix on April 11, 2002, and they returned it on April 15, 2002. Montgomery acknowledged that he told the police that Ross "chirped" him on the morning in question and asked to borrow the red Pontiac and that he let Ross borrow the car. However, Montgomery said this was not true. When cross-examined about the specifics of his August 27, 2002 statement, Montgomery repeatedly said "I don't remember."

Bryce Croft testified that he was in the Winnebago County Jail in the summer of 2002 on a drug charge. Croft acknowledged that he was in tier upper C with Ross and spoke to Ross about his murder charge. Croft's conversation with Ross was one to three days before Croft asked to speak to the police regarding Demarcus' murder. On July 29, 2002, Croft met with Palmer and told him that he saw Taylor and Montgomery leave in a red Grand Prix on the early morning of April 14, 2002, with a Ruger P89 handgun, and when he saw them later at a house, Taylor dropped an empty clip from the gun onto the floor. Later that summer, Palmer came and got Croft out of jail, threatened him with perjury charges, and said that what Croft told him the first time was not true and that he knew that Ross had put Croft up to it. Croft said that Palmer gave him a pre-written statement and told him to sign it and initial it, and that Croft did not read the statement. In this statement which was dated October 16, 2002, Croft stated that he made up the story which he had previously told Palmer at Ross' request. At the evidentiary hearing, Croft testified that the October 16, 2002 statement was not the truth and his July 29, 2002 statement was true because he had no reason to lie.

11

White testified that in September 2002, she was taken into custody for questioning about a home invasion and Stevens asked her if she heard about Demarcus' murder. White said that although she did not know anything about the murder or Ross' involvement, she told Stevens that on the morning of the murder Ross nodded his head when she asked him if he had shot someone and Ross threw a gun into Levings Lake. White testified that this was not true. White testified that she made up the story so she could get out of trouble. When asked how she came up with the information in her statement, White said:

> A. Well, when the detectives was [sic] questioning me they asked me about it, and I just went off what they were saying.
>
> . . . .
>
> Q. Did the detectives provide you with information about the murder?
>
> A. In some sorts that's how I find [sic] out about it.

When asked to explain how the detectives provided her with information about the murder, White said:

> A. They asked me did I know about it and did I know about any of the guys that they questioned me about.
>
> Q. And what did you tell the police in response?
>
> A. I told them I just knew Anthony.

White said that her testimony at Ross' trial was not true, and that she made it up because she thought the police would be able to help her with her home invasion case. White conceded that she did not in fact get any consideration for her testimony at Ross' trial. White agreed that on March 24, 2003, she entered into a cooperation agreement with the State which provided that she would testify against her co-defendants on the home invasion charge and in exchange she would be allowed to plead to a probationable reduced charge of attempted home invasion. White also agreed that the cooperation agreement did not contemplate her testimony against Ross at his trial. White further agreed that she did not comply with the conditions of her cooperation agreement, her bond was revoked, and she was in custody awaiting sentencing on her attempted home invasion charge at the time she testified at Ross' trial. In fact, White agreed that at Ross' trial, attorney Kline asked her if she had an agreement worked out regarding Ross' case and she denied it saying she would not have spent the last nine months in jail if she had such an agreement. White agreed further that part of paragraph 10 of her affidavit was false. Specifically, that it was not true that her reason for testifying falsely at Ross' was "because of [her] home invasion charge."

Young testified that in the early morning hours on April 14, 2002, she was staying at Concord Commons when her cousin Brown and Dowthard banged on the door. According to Young, both men said that "some niggers were shooting at [them], but [they] didn't know who." Although she was not sure when, thereafter Young was questioned by two white officers and told them that Brown and Dowthard said "some niggers were shooting at them and they didn't know who it was."

When Palmer was called by plaintiffs at the postconviction evidentiary hearing, he explained that he resigned from the Rockford Police Department in 2004 after he was falsely accused of

APP 012

fathering the child of a confidential informant and having an affair with another informant. Palmer said that he and Randall first interviewed Dowthard on April 14, 2002, and Dowthard did not implicate anyone in the shooting. Palmer said he spoke to Dowthard in May 2002, this time at Big Muddy where Dowthard again failed to implicate anyone in the shooting.

Palmer also testified that the first time he and Stevens interviewed Brown on April 24, 2002, Brown did not identify anyone that he saw at Dowthard's mother's house. Instead, Brown said Dowthard had a verbal confrontation with plaintiffs, thereafter Dowthard shot at plaintiffs, and then Dowthard hid the firearm under a car at his mother's house. Palmer testified that he and Stevens threatened Brown by telling him that he could be charged with obstructing justice if he did not cooperate. A couple weeks later, in May 2002, Palmer and Stevens again spoke to Brown, they made the same threat, and Brown gave a written statement indicating that plaintiffs came to Dowthard's mother's house and he heard shots after he drove away from the house. When asked if he "fed" Brown any of the information contained in Brown's statement, Palmer said that the part indicating that Dowthard and Brown stopped at M&M market did not come from Brown. Palmer explained that he fed this information to Brown because it corroborated the information that Dowthard had provided.

Palmer testified further that he and Randall initially interviewed Toni Gulley on May 16, 2002, at the police station when Gulley said that Ross arrived home at 2:45 a.m. on the morning in question. Palmer said that in an effort to get Gulley to state that Ross came home at a later time, he told Gulley that she had to have been mistaken about the time and threatened to call DCFS and report her for child neglect. Palmer also testified that he later repeated the threat when he spoke to Gulley at Gulley's workplace and then at her apartment.

Palmer also testified that he made up those portions of Croft's October 16, 2002 statement that retracted his July 29, 2002 statement suggesting that Montgomery and Taylor were the shooters. According to Palmer, when he shared the information in Croft's July 29, 2002 statement with Lindmark, Stevens, and Randall, Lindmark instructed him to make a liar out of Croft. Palmer said that on October 16, 2002, he wrote out the statement, told Croft to sign it, and Croft signed it without reading the statement. Palmer did not testify that he threatened to bring perjury charges against Croft if he did not sign the October 16, 2002 statement.

Dowthard was called as a witness at the postconviction evidentiary hearing. When asked about Demarcus' shooting, Dowthard invoked his Fifth Amendment right against self-incrimination.

Judge McGraw entered a memorandum of decision on March 19, 2013, granting in part plaintiffs' postconviction petitions. Judge McGraw began by rejecting all of plaintiffs' claims based on the testimony of Palmer:

> The Court finds that former Detective Palmer's testimony was in no small measure, incredible and unbelievable. Former Detective Palmer, through his words, actions and timing of his "disclosures" cast a pall over the credibility of his latter day revelations. This Court did not find Detective Palmer to be reasonable or credible and discounts, almost entirely, everything he had to say.

13

APP 013

It is important to note that the officers who testified, to refute or rebut Detective Palmer's contentions were, conversely, credible and reasonable.

Accordingly, any claim based on Detective Palmer's testimony is without adequate support and the Petitioners fail on those claims.

Next, Judge McGraw found unpersuasive the lay witness testimony presented during the evidentiary hearing. He specifically determined that "any claim grounded or based upon the believability of that testimony must likewise fail." However, Judge McGraw did find meritorious plaintiffs' postconviction claims that they were deprived of an adequate opportunity to utilize the Dowthard tapes at trial. After deeming it a "one-witness case," Judge McGraw wrote:

> The attorneys (Wilt, Kline and Sorenson) did not have timely access to those recorded conversations, so as to utilize those recorded conversations to shed light upon the truthfulness, or lack of truthfulness, of Dowthard's various evolving statements. Without assigning blame, this Court is unclear why the audiotapes of the recorded conversations of the witness, while at Big Muddy Correctional Center, were turned over to the defense on the virtual eve of trial, just days before jury selection. This Court is not concluding, nor need it do so, that the audio recordings were deliberately withheld or concealed from the defense. The fact of the matter is that many hours of recorded conversations did not become available to defense counsel until shortly before trial. They became available at an interval that was too brief to meaningfully listen to them and evaluate them and determine what, if any significance the statements of Dowthard in those recorded conversations had, as it might relate to the truthfulness of his "eyewitness" testimony.

Judge McGraw found further that while the Dowthard tapes contained long, rambling, disjointed conversations full of street slang, "[t]hey included outright denials of knowledge about the facts of the case, as well as potential coaching to testify a certain way, as well as potential incentive to testify a certain way." Judge McGraw concluded that the court was not sufficiently assured that the outcome of the trial would not have been different had Dowthard been cross-examined concerning his statements on the Dowthard tapes. For this sole reason, the Court found that "due process requires that Petitioners receive a new trial." The State appealed and the Illinois Appellate Court affirmed. People v. Johnson, 2014 IL App (2d) 130368-U.[5]

### D. Plaintiffs' 2015 Bench Retrial

Judge McGraw also presided at plaintiffs' 2015 re-trial without a jury. Brown again provided testimony consistent with both his May 9, 2002 written statement and his prior trial testimony, placing plaintiffs at the scene of the murder. Judge McGraw noted that the State's Attorney had not offered Dowthard immunity for the attempted-first degree murder of Ross, Johnson, and Anderson based on his shooting at them from his Monte Carlo. Without that immunity, Dowthard invoked his

---

[5]While it is unclear why the trial court granted Ross postconviction relief based on the late turn over of the Dowthard tapes because his trial did not commence until February 2004, the Illinois Appellate court affirmed as to Ross on ineffective assistance of counsel grounds based on Kline's failure to impeach Dowthard with the tapes at Ross' trial. See Johnson, 2014 IL App (2d) 130368-U at ¶ 104.

Fifth Amendment privilege against self-incrimination and refused to testify. Because Dowthard was the key eyewitness and refused to testify, Judge McGraw acquitted plaintiffs.

### E. The Instant Cases Pending Before this Court

Johnson and Ross filed their initial complaint in 15 C 50064 on March 17, 2015, and Anderson filed his initial complaint in 15 C 50065 on March 18, 2015. Although the paragraph numbering differs and the verbiage is slightly different in very limited aspects, Johnson's and Ross' first amended complaint and Anderson's second amended complaint are essentially identical and contain the following counts.

Count I contains § 1983 due process claims against all defendants. It is alleged that defendant officers withheld exculpatory evidence, fabricated false statements and police reports, and suborned perjury, thereby depriving plaintiffs of a fair trial and appeal in violation of the Due Process Clause of the Fourteenth Amendment. It is further alleged that defendant officers' misconduct was undertaken pursuant to a policy and practice of the Rockford Police Department to secure false convictions through flawed investigations and maintaining a "code of silence" that eliminated accountability, discipline, or oversight, and provided officers with de facto immunity from departmental discipline or criminal charges.

Count II contains § 1983 failure to intervene claims against all defendants. It is alleged that one or more defendant officers stood by during the constitutional violations without intervening to prevent the misconduct. It is also alleged that these failures to intervene were undertaken pursuant to the policy and practice described in Count I.

Count III contains § 1983 conspiracy claims against all defendants. It is alleged that the defendant officers reached an agreement among themselves to frame plaintiffs for murder and deprive them of their constitutional rights. It is further alleged that this conspiracy was undertaken pursuant to the policy and practice described in Count I.

The operative complaints contain no Counts IV-VI. Count VII contains § 1983 claims for supervisor liability. It is alleged that plaintiffs' constitutional injuries were proximately caused by a pattern and practice of misconduct which occurred with the knowledge and consent of those defendants who acted in a supervisory capacity "including but not limited to Iasparro, Lindmark, and Glover" who knew about, facilitated, and condoned the pattern and practice of misconduct. It is also alleged that the misconduct of these supervisors, was undertaken pursuant to the policy and practice described in Count I.

Count VIII contains § 1983 claims for malicious prosecution.[6] It is alleged that defendant officers maliciously caused plaintiffs to be improperly subjected to judicial proceedings for which there was no legitimate probable cause. It is further alleged that the judicial proceedings were terminated in plaintiffs' favor in a manner indicative of innocence. Counts IX through XII are state-law claims for malicious prosecution, intentional infliction of emotional distress ("IIED"), respondeat superior, and indemnification, respectively.

---

[6]Plaintiffs included this claim to preserve it in the event that the Seventh Circuit overturned its ruling in Newsome v. McCabe, 256 F.3d 747 (7th Cir. 2001).

At his deposition, Stevens testified that he and Palmer interviewed Dowthard at Big Muddy on May 2, 2002, and that he never left the interview room when he, Palmer, and Dowthard were together. After the interview, Stevens learned that the audio recordings of the phone calls Dowthard made and received while at Big Muddy were available, but that the recordings would have to be subpoenaed. Stevens said that an assistant state's attorney had a subpoena issued and personnel at Big Muddy eventually sent him cassette tapes of the recordings in multiple mailings. Once he had all the tapes, Stevens tagged them into evidence on October 11, 2002. Stevens said that he listened to the tapes, but he did not remember when he did so.[7]

During his deposition, Montgomery testified that he did not remember giving a statement on August 27, 2002, and that his signature was not on the purported written statement. Montgomery did say that if the statement indicated that Ross borrowed his red rental car, than it was not true and that he does not remember Ross ever confessing the murder to him. Montgomery testified further that he did not remember Palmer making threats to him during the creation of the August 27, 2002, statement, but he knew that Palmer at some point tried to get him to say that Ross borrowed his car by threatening to charge him with the murder. When asked if Palmer and Stevens made any promises of consideration on August 27, 2002, during the creation of the statement, Montgomery said, "I don't remember the time or the process of the statement." When asked whether it was his testimony that the police fabricated parts of his August 27, 2002 statement, Montgomery said, "I don't remember this statement at all. The whole entire statement." Montgomery acknowledged signing his July 18, 2011 affidavit and said that everything in it was true.

When his deposition was reconvened on a second date, Montgomery began answering questions and in so doing admitted that he had been a member of the Black P. Stones street gang. When Montgomery realized during his deposition that it was the plaintiffs' attorneys' theory that he and Taylor were the real murderers, Montgomery said that he would not have given plaintiffs' attorneys his July 18, 2011 affidavit and he would like to take it back. Montgomery stated further that he did not remember any defendant asking him questions about the murder back in 2002 and, in fact, asserted his Fifth Amendment privilege when asked if he even knew any of the defendants. When asked if the factual statements in his July 18, 2011 affidavit were true, Montgomery responded, "I plead the Fifth." Montgomery also refused on Fifth Amendment grounds to answer any questions regarding whether defendants threatened him, coerced him, or fabricated any of his statements.

During his deposition, Palmer also exercised his Fifth Amendment rights on the advice of counsel when asked numerous questions about his alleged fabrication of false statements and testimony, and about his withholding of exculpatory and impeachment evidence. At his deposition, Dowthard also responded, "I plead the Fifth," to each question posed to him.

---

[7]Plaintiffs cite their Exhibit 36, Stevens' Evidentiary Hearing Testimony, at JR12093, in support of their assertion that Stevens told the prosecutors there was nothing relevant on the tapes but that exhibit ends at JR11706. Nevertheless, the court will assume this is true as it does not change the analysis.

16

APP 016

## II. ANALYSIS

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party. Springer v. Durflinger, 518 F.3d 479, 483 (7th Cir. 2008). Summary judgment is mandated, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). For the purposes of a motion for summary judgment, the court must look at the evidence in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 248.

In Count I, plaintiffs advance multiple due process claims based on both fabrication of evidence and withholding evidence. The Due Process Clause of the Fourteenth Amendment guarantees criminal defendants a fair trial. U.S. Const. amend. XIV. Defendants contend that plaintiffs have not identified sufficient evidence of any due process violations. In response, plaintiffs maintain that there is evidence of seven instances where defendants fabricated evidence that they knew to be false and that there are eleven instances of defendants' withholding exculpatory or impeachment evidence.

### A. Due Process Claims Based on Fabrication of Evidence

The Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." Whitlock v. Brueggemann, 682 F.3d 567, 580 (7th Cir. 2012). However, at the outset, it is essential to the analysis to understand what the Seventh Circuit has called the "terminological distinctions" between coerced testimony and fabricated testimony as these terms relate to Fourteenth Amendment due process jurisprudence. "Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false." Fields v. Wharrie, 740 F.3d 1107, 1110 (7th Cir. 2014). In contrast, in a strictly legal context, "[f]abricated testimony is testimony that is made up; it is invariably false." Id.; see also Petty v. City of Chicago, 754 F.3d 416, 422 (7th Cir. 2014) ("[F]abricating evidence that [is known] to be false is different than getting a reluctant witness to say what may be true."). Fabricated testimony is madeup, manufactured, or created by the fabricator and therefore known by him to be false. Petty, 754 F.3d at 422; Whitlock, 682 F.3d at 570-71 (finding evidence fabricated where the prosecutor was a part of an investigative team that told witnesses what to say knowing that the information they gave the witnesses was false). Understanding this distinction is essential because, even though obtaining testimony that inculpates the accused by coercing a witness may violate that witness' rights, it does not violate the accused's due process rights. Petty, 754 F.3d at 422. The Seventh Circuit has explained that:

> coercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful

17

convictions, but they do not necessarily add up to a constitutional violation even
when their fruits are introduced at trial, because evidence collected with these kinds
of suspect technique, <u>unlike falsified evidence and perjured testimony</u>, may turn out
to be true.

<u>Fields</u>, 740 F.3d at 1112.  It is also important to recognize that while coercion "may be an essential tool in 'persuading' a witness to fabricate testimony," <u>id.</u>, coercing true or false testimony from a reluctant witness without knowingly manufacturing the false testimony does not violate the due process rights of the accused, <u>Petty</u>, 754 F.3d at 422.  Therefore, in order for their fabrication-of-evidence due process claims to survive summary judgment, plaintiffs will need to identify evidence showing that defendants knew that a witness' statement later presented as testimony was false, not merely evidence that the statement and resulting testimony were coerced.  Plaintiffs do not take issue with this analysis as they have stated in their consolidated response to the motions for summary judgment that: "[t]he question at summary judgment as far as Plaintiffs' fabrication claims are concerned is whether there is a genuine dispute over whether Defendants Palmer, Randall, Stevens, Glover, and Mastroianni fabricated evidence they knew to be false and which was used to deprive Plaintiffs' of [their] liberty."  Keeping this essential question in mind, the court will address each of the seven purported instances of defendants fabricating evidence.  Plaintiffs' claims are that defendants fabricated, <u>i.e.</u> made up, evidence that they knew was false and intended that witnesses would testify to that fabricated evidence.

### 1. Lataurean Brown

Plaintiffs maintain that "[d]efendants Palmer and Stevens threatened Mr. Brown into signing a fabricated statement that falsely implicated Plaintiffs in the murder, and which he later testified to at trial."  Plaintiffs argue that at their 2015 retrial, Brown confessed that he only gave the false statement because Palmer threatened to send him to jail.  This argument misstates the evidence. Brown has never said that his May 9, 2002 written statement was false, let alone that Palmer or Stevens fabricated the statement knowing it was false.  In fact, the evidence in the record only shows that Brown's May 9, 2002 written statement, as well as his subsequent testimony at Johnson and Anderson's 2002 trial, Ross' 2004 trial, and the 2015 retrial, was true.  On one of the pages of Brown's 2015 retrial testimony which plaintiffs cite to support their argument, Brown twice reaffirms the truth of his May 9, 2002 written statement:

Q.  Did you tell the officers the truth?

A.  Yes

Q.  Of what you saw?

A. Yes.

MR. GREENBERG: Objection, Judge.

. . . .

THE COURT:  The question was, did you tell the officers the truth?
Overruled.

A.  Yes.

Plaintiffs also point to Palmer's postconviction evidentiary hearing testimony wherein Palmer testified that he "fed" Brown information about the M&M Market because it would corroborate Dowthard's verbal account of events. First, whether Dowthard and Brown visited the M&M Market is a collateral fact that does not go to the core of Brown's testimony, which is that Dowthard shot at plaintiffs before plaintiffs arrived at Dowthard's mother's house and heard four shots as Dowthard was running toward the car while plaintiffs were in the area. Moreover, it is not unusual for an officer to direct a witness to a fact in order to confirm whether his account matches up with another witness' account. Most importantly, there is no evidence that Palmer did not believe that Brown and Dowthard actually went to M&M Market and without evidence that Palmer knew that fact was false, there is no evidence of fabrication. Petty, 754 F.3d at 422.

Plaintiffs also point to Stevens' deposition testimony as evidence of the fabrication of Brown's May 9, 2002 written statement. In particular, plaintiffs claim that Stevens "confessed" that Brown told them the same thing on April 24, 2002, as he did on May 9, 2002. Plaintiffs contend that "[n]otwithstanding Brown's assertion that he did not see and therefore did not know who did the shooting, on May 9, 2002, Brown signed a statement asserting that he saw Plaintiffs driving a red vehicle on Chestnut Street before hearing four gunshots." Plaintiffs conclude that Brown's May 9, 2002 written statement must have been fabricated by Stevens and Palmer. While Stevens repeatedly testified during his deposition that he did not specifically recall what Brown said on April 24, 2002, and unequivocally said that he typed Brown's own words into the May 9, 2002 written statement "as close to [Brown's] words as possible," there are deposition questions and answers that could be interpreted as Stevens stating that he knew what Brown said on April 24, 2002, and what he said on May 9, 2002, was the same:

> Q. Did you have any conversations with Doug Palmer about what Lataurean Brown told him in April of 2002 as it relates to the Demarcus Hanson homicide?
>
> A. Doug Palmer and I were both in the interview room, so we heard the same thing. Then I remember what he said. Like I said before, the statement is usually a much better detailed account of what the overall verbal account is because you are going step-by-step-by-step because you're memorializing it in a written document.
>
> While I knew what he said earlier, he didn't deviate from that. And the content was -- the facts were generally the same. They didn't deviate from that. There was no earth-shattering right turn from what he said prior. So I had typed the statement on the 9th, and we went just step by step. So that's how I documented the May 9th interview.
>
> Q. I see. So you knew what the Lataurean Brown told you and Detective Palmer during the first interview.
>
> A. I remember the interview. I don't remember specifics. As I sit here today, I don't recall specific content and who said what, when, and that kind of thing.

19

At this stage of the litigation, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See Liberty Lobby, Inc., 477 U.S. at 255. Even after doing so, however, plaintiffs' argument fails. Contrary to plaintiffs' contention, Brown did not on April 24, 2002, assert that he did not see who did the shooting. Instead, Brown said nothing at all about a shooting at Dowthard's mother's house. Consequently, when Stevens said that Brown's oral statements on April 24, 2002 and on May 9, 2002 are the same, that does not mean that Brown did not also state on May 9, 2002 that he saw plaintiffs pull up in front of the house and that he heard four gunshots after he drove away from the house because that is not inconsistent with what Brown said on April 24, 2002. In other words, Stevens explained that Brown's April 24, 2002 oral statement was consistent with his May 9, 2002 oral statement, just not as exhaustive. Stevens also explained that the written statement was the best indicator of the complete statement made by a witness because "you are going step-by-step. Therefore, the court concludes that plaintiffs have failed to identify sufficient evidence that Palmer and Stevens fabricated Brown's May 9, 2002 written statement.

As far as coercion producing Brown's May 9, 2002 written statement, Brown testified that Palmer threatened to put him in jail if he did not give a statement, but Palmer testified at the postconviction evidentiary hearing that this "threat" consisted only of his advising Brown that he could be charged with obstructing justice if he did not cooperate and tell the truth. An officer does not improperly coerce a statement from a witness by advising him to tell the truth. See Etherly v. Davis, 619 F.3d 654, 663 (7th Cir. 2010) ("[A police officer] merely telling somebody to tell the truth is not coercive."); see also United States v. June, 312 F. App'x 990, 991 (9th Cir. 2009) ("A police officer's repeated exhortations to tell the truth do not amount to coercion."). In any event, if believed, this is only evidence of coercion and not fabrication and is therefore insufficient. See Petty, 754 F.3d at 422.

Plaintiffs also urge this court to find evidence of fabrication in the form of an adverse factual inference drawn from Palmer invoking his Fifth Amendment privilege when asked the following questions during his deposition in this case:

Q. Sir, isn't it true that on May 9, 2002, yourself and Defendant Stevens coerced Lataurean Brown through a nearly nine-hour interrogation into falsely implicating Lumont Johnson, Tyjuan Anderson, and Anthony Ross in shooting Demarcus Hanson?

. . . .

Q. Sir, isn't it true that this statement by Lataurean Brown is false and was fabricated by yourself and Defendant Stevens on May 9, 2002?

"[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment does not preclude the inference where the privilege is claimed by a party to a Civil cause." Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) (emphasis added); see also Hillmann v. City of Chicago, 834 F.3d 787, 793 (7th Cir. 2016); LaSalle Bank Lake View v. Seguban, 54 F.3d 387, 390 (7th Cir. 1995). Nevertheless, even with regard to a party to the case, the adverse factual inference alone is not enough to meet the non-moving party's summary judgment burden; there must be some other

20

evidence to corroborate the inference. See Curtis v. M&S Petroleum, Inc., 174 F.3d 661, 675 (5th Cir. 1999) ("[T]he adverse inference from a party's refusal to answer questions was not enough to create an issue of fact to avoid summary judgment."); LaSalle Bank, 54 F.3d at 391 ("[A]lthough inferences based on the assertion of the privilege are permissible, the entry of judgment based only on the invocation of the privilege and without regard to the other evidence exceeds constitutional bounds."); Avirgan v. Hull, 932 F.2d 1572, 1580 (11th Cir. 1991) ("Invocation of the fifth amendment privilege did not give rise to any legally cognizable inferences sufficient to preclude entry of summary judgment. The negative inference, if any, to be drawn from the assertion of the fifth amendment does not substitute for evidence needed to meet the burden of production."); Kluppelberg v. Burge, No. 13 C 03963, 2017 WL 3142757, at *4 (N.D. Ill. July 25, 2017) ("[T]he non-movant must point to some evidence in addition to defendant's silence to avoid summary judgment."); Logan v. City of Chicago, 891 F. Supp. 2d 897, 901 (N.D. Ill. 2012) (stating in a § 1983 wrongful conviction case alleging police misconduct that "a party's refusal to answer questions during discovery is not enough to create an issue of fact to avoid summary judgment."); Barker v. Int'l Union of Operating Eng'rs Local 150, No. 08 C 50015, 2011 WL 6338800, at *6 (N.D. Ill. Dec. 19, 2011) ("[A]n adverse inference based on silence pursuant to the assertion of the Fifth Amendment privilege is insufficient by itself to create an issue of material fact precluding summary judgment."). Consequently, no adverse factual inference can be drawn against Stevens since he was not the one invoking the Fifth Amendment.[8] Moreover, even as to Palmer, the inference is not enough because, as the court has indicated, plaintiffs have not identified other evidence to corroborate the alleged fabrication of Brown's statement.

## 2. Alex Dowthard

Plaintiffs maintain that Palmer, Stevens, Randall, and Glover coerced Dowthard into agreeing to go along with a fabricated statement implicating plaintiffs in the murder which Dowthard later testified to at their trials. Plaintiffs argue that Dowthard only falsely implicated them and provided a fabricated statement as a result of coercion and promises of consideration made to him by Palmer, Stevens, Randall, and Glover. Again, however, plaintiffs have failed to identify any evidence of fabrication, that is, evidence that defendants manufactured Dowthard's May 31, 2002 statement knowing it was false.

In an effort to identify evidence of fabrication, plaintiffs have instead cited evidence which, at best, shows only coercion. In particular, plaintiffs cite to portions of the Dowthard tapes wherein Dowthard told someone named "Maria" that Palmer hit him "upside his head," wherein he told his mother that "they" were talking "about bringing [him] up on some federal charges," and wherein he told Antowan Lambert that he "wasn't no mother fucking where around, you know what I'm saying?" As a threshold matter, plaintiffs have not established how the Dowthard tapes would be admissible at trial in order to be properly considered at the summary judgment stage. See Gunville

---

[8]Plaintiffs have not argued that there is some relationship of loyalty between Palmer and his codefendants that would impute Palmer's Fifth Amendment invocation to another party. See LiButti v. United States, 107 F.3d 110, 122 (2d Cir.1997). Nevertheless, the court would find no such relationship because by the time of his deposition Palmer had resigned from the Rockford Police Department under questionable circumstances and was accusing his codefendants of wrongdoing.

21

v. Walker, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment."). Clearly, Dowthard's statements on the Dowthard tapes would be hearsay. Fed. R. Evid. 801(c). Hearsay is not admissible. Fed. R. Evid. 802. Plaintiffs have not identified a hearsay exception that would be applicable. Accordingly, that argument is undeveloped and not supported with pertinent authority and is accordingly waived. See Arlin–Golf, LLX v. Vill. of Arlington Heights, 631 F.3d 818, 823 (7th Cir. 2011) (finding plaintiffs' argument waived because they failed to point out any relevant authority on appeal); United States v. Elst, 579 F.3d 740, 743 (7th Cir. 2009) ("Perfunctory and undeveloped arguments as well as arguments unsupported by pertinent authority are waived.").

Putting the waiver aside, no hearsay exception is apparent. The court has on its own accord considered three possibilities. First, the Dowthard tapes will not be admissible as recorded recollections under Rule 803(5). Dowthard will either refuse to testify at trial on Fifth Amendment grounds or he will be barred from testifying at trial because defendants were unable to depose him in this case. See Barker, No. 08 C 50015, 2011 WL 6338800, at *2 (noting that when a witness invokes her Fifth Amendment rights preventing her deposition she is disqualified from testifying at trial); Nat'l Org. for Women, Inc. v. Scheidler, No. 86 C 7888, 1990 WL 103212, at *1 (N.D. Ill. July 18, 1990) (citing authority in support of an order precluding [a witness] from changing his mind at trial and testifying on matters about which he has refused to testify during his deposition on the basis of the Fifth Amendment). Consequently, plaintiffs will be unable to establish that the Dowthard tapes concern a matter about which Dowthard once had knowledge but now has insufficient recollection to testify fully and accurately as Rule 803(5) requires. See Collins v. Kibort, 143 F.3d 331, 338 (7th Cir. 1998) (holding that the trial court erred in admitting diary as a recorded recollection because witness did not state that he could not recall the events about which he used his diary to testify and therefore witness did not lay the proper foundation for the diary's admissibility as a recorded recollection).

Second, the Dowthard tapes cannot come into evidence as Rule 803(6) business records because the content of the recordings was provided by third-parties with no business duty to make and keep the record. While the recording of inmates' telephone conversations may occur in the ordinary course of prison business, that does not mean the content of the recordings is admissible as a business record where, as here, the providers of the content are under no business duty. See Jordan v. Binns, 712 F.3d 1123, 1133 (7th Cir. 2013) ("[T]hird-party statements contained in a police report do not become admissible for their truth by virtue of their presence in a public record and instead must have an independent basis for admissibility.").

Third, the Rule 807 residual exception requires, among other things, "circumstantial guarantees of trustworthiness" equivalent to the Rule 803 and Rule 804 exceptions. It cannot be argued that a conversation durring a prison telephone call between two felon gang members meets this requirement. See United States v. Moore, 824 F.3d 620, 623 (7th Cir. 2016) (noting that a declarant's criminal record is an appropriate factor to consider in assessing trustworthiness). Rule 807 also requires that the hearsay statement be more probative on the point for which it is offered that other available evidence. In this case, up to the point of the conversations constituting the Dowthard tapes, Dowthard had several times claimed that he did not know who was responsible for shooting DeMarcus and had done so in documented statements to the police. Thus, more statements

by Dowthard of that sort on the Dowthard tapes would not be more probative on that point than his previous statements made to the police.

Nevertheless, even if the Dowthard tapes were admissible and the statements thereon believed by a jury, evidence that a witness was coerced to provide a statement without evidence of fabrication is insufficient to sustain plaintiffs' fabrication-of-evidence due process claims. See Petty, 754 F.3d at 422. Moreover, the Dowthard tapes would be cumulative of Dowthard's initial statement to the police in which he denied knowledge of who shot Demarcus and, therefore, would not pass Rule 403 balancing. See Fed. R. Evid. 403 (permitting the exclusion of relevant evidence where its probative value is substantially outweighed by the danger of needlessly presenting cumulative evidence).

Plaintiffs also cite portions of Dowthard's deposition testimony where he asserts his Fifth Amendment privilege when asked whether Palmer coerced his statement implicating plaintiffs in the murder by hitting him, as well as by promises not to charge him with firing a gun or with forgery. But no adverse factual inference can be drawn against defendants with respect to Dowthard's assertion of his Fifth Amendment rights because defendants are not the ones asserting the right. See Baxter, 425 U.S. at 318; Hillman, 834 F.3d at 793; LaSalle Bank, 54 F.3d at 390. Moreover, even if such an adverse factual inference could be drawn against defendants, it would still only amount to evidence of coercion and not fabrication. See Petty, 754 F.3d at 422.

Plaintiffs also attempt to rely on Palmer's deposition testimony wherein he refused to answer questions suggesting that Dowthard's statement was the product of coercion on Fifth Amendment grounds. While an adverse factual inference may be drawn from this against Palmer because he is a party, the inference that might be drawn is by itself insufficient. See LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901. In addition, even if believed this would only amount to evidence of coercion, not of fabrication, and is therefore insufficient. See Petty, 754 F.3d at 422. Consequently, plaintiffs have failed to identify sufficient evidence to support their second instance of purported evidence fabrication.

### 3. Toni Gulley

The third instance of purported fabrication is that Palmer and Randall fabricated Toni Gulley's statement that she may have been incorrect in her approximation of the time that Ross came home, which plaintiffs claim effectively nullified Ross' alibi at trial. In support, plaintiffs cite Gulley's November 28, 2007 affidavit in which she swore that Palmer and Randall threatened to have DCFS take her baby away if she did not say that Ross came home at 6:00 a.m. the morning of the murder, and not around 2:45 a.m. as she had previously indicated. In her affidavit, Gulley states that after being threatened she "may have told the police that [she] could have been off by a little on the time that [Ross] came home." In his postconviction evidentiary hearing testimony, Palmer said that he did threaten Gulley that he would call DCFS if she did not cooperate in an effort to convince Gulley to say that Ross got home sometime after 2:45 a.m. However, during his deposition Palmer refused on Fifth Amendment grounds to answer questions about his interview of Gulley. In contrast, at his deposition, Randall testified that he did not threaten Gulley and never heard Palmer make threats during any interrogation.

23

Plaintiffs will not be able to prove this purported instance of fabrication through Gulley's trial testimony. In an order entered on January 19, 2017, this court accepted the magistrate judge's report and recommendation that defendants' motion to bar Gulley from testifying at trial be granted because defendants were not afforded the opportunity to depose her. In addition, the court has not been directed to sufficient evidence showing that Palmer knew he was coercing Gulley to tell a falsehood, as opposed to coercing her to tell the truth about when Ross got home on the morning in question. Palmer's refusal on Fifth Amendment grounds to answer a question suggesting that he knowingly attempted to coerce Gulley to state a falsehood will not suffice since there is no other evidence to corroborate any adverse inference. See LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901.

Even if plaintiffs were not precluded from presenting Gulley's testimony at trial, her testimony does not support a fabrication-of-evidence claim because she did not adopt the purported fabrication. At Ross' trial, Gulley testified that Ross came home at 2:45 a.m. on April 14, 2002. She did not testify to a later time as she and Palmer claim Palmer asked her to do. On cross-examination, Gulley denied that she told detectives Cone and Jimenez on April 24, 2002, that she could have been off on the time by as much as a half-hour. Therefore, assuming that Palmer and Randall did attempt to fabricate a different time for Gulley to include in her statement and subsequent trial testimony, an evidence-fabrication claim cannot be sustained on this alleged incident because Gulley did not testify to the fabricated time at Ross' trial. Instead, Gulley was steadfast in her testimony that Ross got home at 2:45 a.m. It must be remembered that Whitlock and Fields stand for the principle that police officers who fabricate evidence against a criminal defendant violate due process only if that evidence is used to deprive the defendant of his liberty in some way. Whitlock, 682 F.3d at 580; Fields, 740 F.3d at 1111-12. When an officer "fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest." Whitlock, 682 F.3d at 582. Because Gulley's trial testimony was favorable to Ross, it was not used to deprive him of his liberty.[9] Thus, plaintiffs have failed to identify adequate evidence to support their third fabrication-of-evidence due process claim.

### 4. Larson's Testimony as to Anderson's Statement

Plaintiffs maintain that Larson and Grindley fabricated a false statement attributed to Anderson which the State characterized at trial as a confession. During his deposition, Larson explained that he assisted in apprehending Anderson on a murder warrant on July 1, 2002. Anderson's brother Terrance Anderson was also arrested. Anderson and Terrance were placed in adjacent holding cells and Larsen and Grindley were posted outside the holding cells. Larson overheard Terrance say to Anderson, "just don't tell them anything." Anderson responded, "it's okay, man, I'll just do the 20 years and be out." Larson wrote down Anderson's statement on his

---

[9]Plaintiffs argue that at Ross' trial, after Gulley denied telling Detectives Cone and Jimenez that she could have been off on the time, the State called Jimenez to impeach Gulley and he testified that Gulley had indeed so stated when he and Detective Cone interviewed her on April 24, 2002. But this is not evidence that a statement fabricated by Palmer and Randall was utilized at trial because Palmer testified that he threatened to report Gulley to DCFS on May 16, 2002, and thereafter. Consequently, any equivocation by Gulley on April 24, 2002, as to the time Ross got home could not have resulted from a threat made by Palmer on or after May 16, 2002.

24

notepad and also noted that Grindley verified that the statement was exactly what she heard. Larson later wrote a report documenting Anderson's statement and testified to the statement at Anderson and Johnson's 2002 trial. During his deposition, Anderson said he never made the statement.

At summary judgment, the court must construe the facts in favor of the nonmovant and, therefore, the court must assume that Larson contrived Anderson's statement. However, unlike the other six purported incidents of evidence fabrication, this one involves a claim that the officer fabricated his own trial testimony. It is clear that this type of due process claim is not cognizable. See Briscoe v. LaHue, 460 U.S. 325, 326 (1983) (holding that § 1983 does not authorize a convicted person to assert a claim for damages against a police officer for giving perjured testimony at his criminal trial because witnesses are absolutely immune from damages liability based on their testimony); see also Curtis v. Bembenek, 48 F.3d 281, 283-84 (7th Cir. 1995); Elsayed v. Vill. of Schaumburg, No. 14 C 8387, 2015 WL 1433071, at *4 (N.D. Ill. Mar. 26, 2015). This rule protects the truth-seeking function of the judicial system because, "[a] witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence." Briscoe, 460 U.S. at 333-34. Testimonial immunity also protects truthful police officers, and indirectly the public which relies on their performance, because "[s]ubjecting government officials, such as police officers, to damages liability under § 1983 for their testimony might undermine not only their contribution to the judicial process but also the effective performance of their other public duties." Id. at 343. For these reasons, even if plaintiffs could convince a trier of fact that Larson and Grindley fabricated Anderson's inculpatory statement they would be absolutely immune from liability under § 1983 and plaintiffs' fourth evidence-fabrication claim therefore fails.

### 5. Sonya White

Plaintiffs claim that Stevens fabricated portions of White's September 12, 2002, statement in which she said that Ross confessed to the shooting and threw a gun into Levings Lake, all of which she testified to at trial. White, however, has never indicated that her purportedly false statement or subsequent trial testimony was fabricated by Stevens. White did not swear in her October 28, 2007 affidavit that any assertions in her September 12, 2002 statement were manufactured by Stevens, or that Stevens knew that anything in her statement was false. Instead, in her affidavit White swore that: "[t]he only things that are true in my statement are my name and where I was living at the time. I made up everything else." Likewise, White did not testify at the postconviction evidentiary hearing that Stevens or any other defendant fabricated the content of her September 12, 2002 statement knowing that it was false. Instead, White repeatedly testified that she "made up" the facts in her statement.

Based on the following exchange during White's postconviction evidentiary hearing testimony, plaintiffs maintain that White did testify that Stevens provided her with the information contained in her statement:

> Q. So how did you come up with the information that's in your statement?
>
> A. Well, when the detectives was [sic] questioning me they asked me about it, and I just went off what they were saying.

25

. . . .

Q. Did the detectives provide you with information about the murder?

A. In some sorts that's how I find [sic] out about it.

When asked to explain how the detectives provided her with information about the murder, White said:

A. They asked me did I know about it and did I know about any of the guys that they questioned me about.

Q. And what did you tell the police in response?

A. I told them I just knew Anthony.

White's response, "[i]n some sorts that's how I find [sic] out about it," when asked if the detectives provided her with information about the murder, is too vague to constitute evidence of fabrication. Moreover, White's purportedly fabricated statement was not about the murder itself but, rather, what occurred after the murder. This testimony establishes only that the detectives asked White if she knew about the murder and whether she knew the plaintiffs. It hardly amounts to evidence that the detectives provided the facts that White put into her statement, or that the detectives knew those facts were false. Moreover, White claimed no less than fifteen times during her postconviction evidentiary hearing testimony that <u>she</u> made up the account in her September 12, 2002 statement as well as the account she gave during her testimony at Ross' 2004 trial.

Plaintiffs maintain further that White swore in her October 28, 2007 affidavit that she provided false information against Ross because Stevens promised to help her on her pending home invasion case. But White admitted under cross-examination at the postconviction evidentiary hearing that she did not get any consideration on her home invasion charge in exchange for her testimony against Ross. In fact, White admitted that by the time she testified against Ross in 2004 she had already pleaded guilty to attempted home invasion and, in exchange, had agreed to testify against her co-defendants in that case, breached that agreement, and was in custody awaiting sentencing. In any event, evidence of promises made to or consideration given to White are evidence of coercion and not evidence that her statement was fabricated.

Plaintiffs also cite portions of Palmer's deposition in which he exercised his Fifth Amendment rights when asked whether he fed White false information in order to obtain a false statement from her implicating Ross. The adverse factual inference that could be drawn from Palmer invoking his Fifth Amendment rights could only be drawn against Palmer, not Stevens. <u>See</u> <u>Steco, Inc. v. S & T Mfg., Inc.</u>, 745 F. Supp. 305, 309 (E.D. Pa. 1990) (citing <u>Palmigiano</u> and noting that adverse inferences from the assertion of the fifth amendment privilege are allowed in civil cases only against the party who invoked the privilege and no adverse inference can be drawn against one defendant because another defendant refused to answer questions). Moreover, it is clear that such an adverse factual inference is by itself insufficient to create a genuine issue of material fact as to whether Palmer fabricated White's statement. <u>See</u> <u>LaSalle Bank</u>, 54 F.3d at 391; <u>Logan</u>, 891 F. Supp. 2d at 901. Thus, plaintiffs have failed to identify sufficient evidence of fabrication with respect to their fifth claim.

26

### 6. Casel Montgomery

Plaintiffs contend that according to the depositions of Stevens, Randall, and Palmer they instructed Montgomery to falsely state in his August 27, 2002 statement that Ross "chirped" Montgomery in the early morning hours of April 14, 2002, borrowed Montgomery's red rental car, and that Ross later confessed to Montgomery that he committed the murder and requested that Montgomery return the red rental car as soon as possible. It is significant that Montgomery did not testify at any of plaintiffs' trials and therefore his August 27, 2002 written statement, which plaintiffs claim was fabricated, did not lead to any trial testimony causing their convictions and resulting deprivation of liberty. This is because police officers who fabricate evidence against a criminal defendant violate due process only if that evidence is used to deprive the defendant of his liberty in some way. Whitlock, 682 F.3d at 580; Fields, 740 F.3d at 1111-12. Nevertheless, plaintiffs argue that their due process rights were still violated as a result of Montgomery's fabricated statement because it deprived them of the opportunity to call Montgomery at trial as a defense witness to testify that he, and not plaintiffs, was in possession of the red rental car at the time of the murder. Plaintiffs contend that they were prevented from calling Montgomery because doing so would have enabled the State to introduce Montgomery's August 27, 2002 statement claiming plaintiffs were in possession of the red car at the time of the murder and that Ross later confessed to the murder.[10]

Despite this argument, it is clear that Montgomery's purportedly fabricated statement did not prevent plaintiffs from calling him at trial. If the facts were as plaintiffs maintain and they interviewed Montgomery before trial and asked him about the veracity of his August 27, 2002 written statement, they would have learned that it was fabricated and could have called Montgomery at trial to expose that fabrication. After all, determining truth or falsity of witnesses' testimony is one of the primary purposes of criminal trials. See Portuondo v. Agard, 529 U.S. 61, 62 (2000) (referring to the trial's truth-seeking function). In support of their argument that Montgomery's August 27, 2002, fabricated statement resulted in a violation of their due process rights even though he did not testify at trial, plaintiffs cite Saunders-El v. Rohde, 778 F.3d 556, 560-61 (7th Cir. 2015); Alexander v. McKinney, 692 F.3d 553, 557 (7th Cir. 2012); and Patrick v. City of Chicago., 213 F. Supp. 3d 1033, 1048 (N.D. Ill. 2016). However, these cases do not stand for the principle that due process is violated because a fabricated statement prevents the defendant from calling that witness. Instead, these cases stand for the principle that a due process claim based on fabrication of evidence, although most commonly based on the presentation of the fabricated evidence at trial which results in a wrongful conviction followed by incarceration, can also be based on the use of fabricated evidence to secure an arrest or indictment which leads to pre-trial incarceration. See Saunders-El, 778 F.3d at 561(holding that "Saunders–El, released on bond following his arrest and acquitted at

---

[10]Plaintiffs also claim that during an April 26, 2002 interview, Randall fabricated a number of statements that he attributed to Montgomery; in particular, that Montgomery said: he saw Ross go into Timothy Robinson's home and retrieve a pistol prior to the murder; that Ross drove off in a Cadillac with the pistol while Johnson and Anderson followed in the Suburban; and that Johnson later told him "we handled that last night." Plaintiffs do not contend that any of this evidence was presented to either of their juries and, therefore, it is not clear how a fabrication of evidence claim could be sustained on this evidence. See Whitlock, 682 F.3d at 582. To the extent that plaintiffs are advancing the argument that these fabricated statements also kept them from calling Montgomery at trial, the argument fails for the same reason it failed in connection with to plaintiffs' arguments in Sections II.A.6 & 7 of this order.

27

trial . . .cannot make out an evidence fabrication-based due process violation."); Alexander, 692 F.3d at 557 (same); Patrick, 213 F. Supp. 3d at 1048 ("[W]hat matters for a due-process fabrication claim is simply whether fabricated evidence caused a plaintiff to be wrongfully confined ("in some way")."). In this case, plaintiffs were arrested on June 30, 2002, and July 1, 2002. Montgomery's statement was obtained on August 27, 2002. Consequently, Montgomery's statement was not used to secure plaintiffs' arrests. Nor did Montgomery testify before the grand jury and his August 27, 2002 statement could not have been presented to the grand jury by any other witness because the indictments returned against plaintiffs were filed on July 24, 2002. Thus, plaintiffs were not prevented from calling Montgomery as a witness at trial and no such impediment resulted in a deprivation of their liberty.

Even if plaintiffs had shown, and they have not, that Montgomery's August 27, 2002 written statement somehow led to their being deprived of liberty, for the reasons that follow, the court concludes that plaintiffs have failed to identify admissible evidence showing that Stevens, Randall, and Palmer fabricated Montgomery's statement. When last questioned during his deposition on April 7, 2017, about the circumstances leading to his August 27, 2002 written statement and on how his July 18, 2011 affidavit came about, Montgomery repeatedly refused to answer on Fifth Amendment grounds. Specifically, Montgomery refused to answer on Fifth Amendment grounds when asked whether any of his August 27, 2002 written statement was fabricated by Palmer. Because Montgomery refused to be deposed on these issues on Fifth Amendment grounds, he cannot testify about these issues at trial. See Barker, No. 08 C 50015, 2011 WL 6338800, at *2 (noting that when a witness invokes her Fifth Amendment rights preventing her deposition she is disqualified from testifying at trial); Scheidler, 1990 WL 103212, at *1(citing authority in support of an order precluding [a witness] from changing his mind at trial and testifying on matters about which he has refused to testify during his deposition on the basis of the Fifth Amendment). Plaintiffs have not informed the court how any prior statements, affidavits, or testimony by Montgomery would be admissible at trial such that it can be relied upon now in the summary judgment analysis. "[A] court may consider only admissible evidence in assessing a motion for summary judgment." Gunville, 583 F.3d at 985. Accordingly, that argument, which is undeveloped and not supported with pertinent authority, is waived. See Arlin–Golf, LLX, 631 F.3d at 823; Elst, 579 F.3d at 743.

Putting the waiver aside, no hearsay exception is apparent. In contrast to Palmer's prior testimony, for example, which might be admitted as an opposing party's statement under Rule 801(d)(2), Montgomery's prior testimony and statements are inadmissible hearsay. See Fed. R. Evid. 801(c) & 802.

The court has considered on its own accord whether Montgomery's prior testimony and statements could be admitted as prior inconsistent statements under Federal Rule of Evidence 801(d)(1)(A). Under that Rule, a prior statement of a witness who testifies at trial and is subject to cross-examination about the prior statement is not hearsay if the statement is inconsistent with the declarant's testimony. Fed. R. Evid. 801(d)(1)(A). However, the requirements of Rule 801(d)(1)(A) would not be met at trial with respect to Montgomery's prior testimony. By invoking his Fifth Amendment privilege in response to questions about his prior statements, Montgomery will not be properly subjected to cross-examination regarding those prior statements. See United States v. Owens, 484 U.S. 554, 562 (1988). ("[A]ssertions of privilege by the witness may undermine the

28

APP 028

process to such a degree that meaningful cross-examination within the intent of the Rule no longer exists."); United States v. Torrez-Ortega, 184 F.3d 1128, 1132 (10th Cir. 1999) (holding that witness was not subject to cross-examination for purposes of Rule 801(d)(1)(A) where the witness asserted Fifth Amendment privilege). The court has also considered the three hearsay exceptions discussed with regard to the Dowthard tapes. Because Montgomery refused to answer questions during his deposition he will not be able to testify at trial and, consequently, plaintiffs' would be unable to establish the Rule 803(5) recorded recollection foundation requirement that he lacks recollection. No one would take the position that deposition testimony could qualify as a business record and a prior written statement from a third party, even if documented in a police report, does not qualify as a business record. See Jordan, 712 F.3d at 1133. Plaintiffs would also be unable to admit Montgomery's prior statements under the Rule 807 residual exception because Montgomery's prior statements do not have "circumstantial guarantees of trustworthiness" as he is also a felon and a gang member who has given inconsistent accounts during the course of this case. Thus, plaintiffs have failed to establish how any of Montgomery's prior statements, affidavits, or deposition testimony create a genuine issue of material fact on this fabrication-of-evidence due process claim.

Plaintiffs also claim that Randall's deposition testimony establishes that Stevens told Montgomery to say that plaintiffs were in his red rental car at the time of the shooting. This is a mischaracterization of the record. During his deposition, Randall agreed that he was present when Stevens told Montgomery that he, Stevens, and Randall knew that plaintiffs were in his car at the time of the shooting. Randall did not agree that Stevens told Montgomery what to say.

Plaintiffs are left only with Palmer's refusal on Fifth Amendment grounds to answer questions at his deposition about his procurement of Montgomery's August 27, 2002 statement. However, this evidence could only be used against Palmer, not Stevens and Randall, see Baxter, 425 U.S. at 318; Hillman, 834 F.3d at 793, and for Palmer there would have to be other evidence to support the inference in order to withstand summary judgment, see LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901. As such, there has been an inadequate showing by plaintiffs of admissible evidence that Montgomery's August 27, 2002 written statement was fabricated. For all these reasons, plaintiffs' sixth fabrication of evidence claim fails.

### 7. Bryce Croft

Seventh, plaintiffs maintain that Palmer and Mastroianni fabricated a statement for Croft to sign which falsely recanted the information he previously provided to Palmer about Taylor and Montgomery's potential involvement in the murder.[11] This misconduct, according to plaintiffs, was carried out at the direction of their supervisors, Lindmark and Iasparro.[12] Like Montgomery, Croft

---

[11]In their response brief, plaintiffs maintain that "defendants" fabricated a statement for Croft to sign. During his postconviction evidentiary hearing testimony, Palmer said that he was alone when he took the statement from Croft while Mastroianni testified at his deposition that he was present when Palmer took Croft's statement. However, this factual discrepancy does not alter the court's analysis.

[12]The court notes that at the postconviction evidentiary hearing, Palmer claimed that Lindmark told him to make a liar out of Croft, but Palmer did not mention Iasparro. The only evidence of Iasparro's involvement is Palmer's deposition testimony wherein he asserts his Fifth Amendment rights in response to a question suggesting Iasparro's involvement. However, the negative factual inference that could be drawn from this could not be used against Iasparro,

29

did not testify on behalf of the State or plaintiffs at any of plaintiffs' trials and his purportedly fabricated statement was not used to deprive plaintiffs of their liberty. Plaintiffs advance the same argument that they did with respect to Montgomery, that the fabricated statement prevented them from calling Croft as a defense witness at their trials. This argument is rejected for essentially the same reasons stated above with regard to Montgomery. In particular, the case law cited by plaintiffs does not support their argument. Furthermore, plaintiffs were not prevented from calling Croft as a witness at their trials because, if the facts are as they claim, they should have subpoenaed Croft and allowed the truth-seeking function of the trial determine which of Croft's statements were the truth. See Agard, 529 U.S. at 62. Croft's purportedly fabricated October 16, 2002 statement was not used to secure plaintiffs' arrests or indictments. Consequently, because Croft's statement was not utilized to effectuate the deprivation of plaintiffs' liberty, it cannot form the basis of a fabrication-of-evidence due process claim, see Whitlock, 682 F.3d at 580; Fields, 740 F.3d at 1111-12, and plaintiffs' seventh claim therefore fails.

For all the foregoing reasons, the court finds that either plaintiffs have failed to identify sufficient evidence to support all seven of their fabrication-of-evidence due process claims, and as a result no reasonable jury could return a verdict for plaintiffs; or the claims otherwise fail as a matter of law.

## B. Due Process Claims Based on Withholding Evidence

To succeed on a civil § 1983 claim against a police officer for violating Brady v. Maryland, 373 U.S. 83 (1963), a plaintiff must establish that: "(1) the evidence is favorable to him; (2) the evidence was concealed by the officer; and (3) the concealed evidence resulted in prejudice." Cairel v. Alderden, 821 F.3d 823, 832 (7th Cir. 2016). Evidence is favorable to the accused if it is either exculpatory or impeaching. Harris v. Kuba, 486 F.3d 1010, 1014 (7th Cir. 2007). If evidence is turned over to the prosecutors, it has not been concealed by the officer. Cairel, 821 F.3d at 832. "A Brady violation further requires materiality of the evidence withheld, which in the Brady context is the same thing as prejudice." Harris, 486 F.3d at 1014. "Prejudice exists if there is a reasonable probability that the suppressed evidence would have produced a different verdict." Id.

### 1. Lataurean Brown

Plaintiffs maintain that Palmer and Stevens hid the measures they used to induce Brown to falsely implicate plaintiffs in his May 9, 2002 written statement. Plaintiffs assert that at their 2015 retrial, Brown confessed that he only gave the statement because Palmer threatened to send him to jail:

> Q. When you gave your typed statement to officers, did anyone threaten you to make that statement?
>
> A. Well, the police officer Palmer, you know, he -- he was threatening me, put me in jail, you know what I'm sayin'?
>
> Q. For what?

---

see Baxter, 425 U.S. at 318; Hillman, 834 F.3d at 793, and, in any event, at summary judgment would not be sufficient by itself to establish Iasparro's involvement, see LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901.

30

A. For if I want to make a statement.

Q. And so -- but when you made that statement to the officers, was that based upon what you saw and what you remember at the time?

A. Yeah, at the time.

Q. Did you tell the officers the truth?

A. Yes.

Q. Of what you saw?

A. Yes.

In contrast, Palmer testified at the postconviction evidentiary hearing that this "threat" consisted only of his advising Brown that he could be charged with obstructing justice if he did not cooperate and tell the truth. An officer does not coerce a statement from a witness by advising him to tell the truth. Etherly, 619 F.3d at 663; June, 312 F. App'x at 991. However, at this stage of the litigation, the court must view the facts in a light most favorable to the non-movants and assume that Brown's May 9, 2002 written statement was the product of Palmer's threat that if Brown did not give a written statement he would be put in jail. Nevertheless, plaintiffs suffered no resulting prejudice because Brown made clear during his 2015 retrial testimony that he told the truth despite the threat. In other words, had Brown been asked at plaintiffs' 2002 and 2004 trials: "Is it true that you only gave a written statement because Palmer threatened to put you in jail?," Brown would have answered yes, but that his written statement was still the truth. Therefore, there is no reasonable probability that impeaching Brown's trial testimony with this purportedly withheld evidence would have produced different verdicts. See Harris, 486 F.3d at 1014. Significantly, Brown has never claimed that his May 9, 2002 written statement implicating plaintiffs in the murder was false, and he has always testified consistently with that statement. Consequently, plaintiffs have failed to identify adequate evidence to satisfy the prejudice element of this Brady claim based on a failure to disclose that Palmer coerced Brown's written statement.

Plaintiffs also contend that defendants withheld the fact that Palmer fabricated the content of Brown's May 9, 2002 written statement. As explained in section II.A.1 of this order, according to Palmer's postconviction evidentiary hearing testimony, this "fabrication" involved Palmer feeding Brown the minor detail that Brown and Dowthard went to M&M Market on the morning in question prior to the shootings. Plaintiffs have failed to identify any evidence showing that Palmer thought the M&M Market detail was false and, consequently, there is no evidence of fabrication of Brown's May 9, 2002 written statement that should have been disclosed. Neither does Palmer's refusal to answer on Fifth Amendment grounds when asked if he had fabricated his statement constitute sufficient evidence of a Brady violation because this evidence alone does not create a genuine issue of material fact for summary judgment purposes. See LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901. Because there is insufficient evidence that Brown's written statement was fabricated, there is insufficient evidence of a failure to disclose that fabrication. Therefore, plaintiffs have failed to identify evidence to support their first Brady claim.

**2. Antowan Lambert**

31

APP 031

Plaintiffs claim that Palmer and Stevens withheld their conversations with Dowthard's friend and confidante, Antowon Lambert, regarding Lambert convincing Dowthard to change his original story and implicate plaintiffs in the murder. In support of this claim, plaintiffs cite Stevens' deposition testimony. Stevens, however, only stated that he interviewed Lambert and told him that, if he were to speak to Dowthard, he hoped that Lambert would encourage Dowthard "to cooperate, to tell the truth," because Stevens did not believe Dowthard's initial account that Dowthard did not know the identity of the shooters. Plaintiffs have not explained how this conversation constitutes exculpatory or impeachment evidence. It would be exculpatory if Stevens told Lambert to encourage Dowthard to falsely claim that plaintiffs were the murderers, but that is not what Stevens said during his deposition. Nor would Stevens' conversations with Lambert be useful impeachment evidence because Lambert did not testify at any of plaintiffs' trials. Therefore, plaintiffs have not satisfied the favorable evidence element of a civil Brady claim.

Plaintiffs also cite Palmer's deposition testimony wherein Palmer refused to answer questions accusing him and Stevens of promising Dowthard through Lambert that Dowthard would be released from prison and not face any charges as long as Dowthard implicated plaintiffs in the murder, and telling Lambert that he would be free to sell drugs in Rockford as long as he assisted them in obtaining a statement from Dowthard that implicated plaintiffs in the murder. However, the adverse factual inferences that could be drawn from Palmer's refusal to answer such questions could only be used against Palmer, not Stevens, see Baxter, 425 U.S. at 318; Hillman, 834 F.3d at 793, and even as to Palmer there has to be other evidence in order to withstand summary judgment, see LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901. Plaintiffs have not identified other evidence that these purported promises were made to Dowthard through Lambert or even to Lambert himself. Significantly, Palmer did not admit to this conduct during his testimony at the postconviction evidentiary hearing. For these reasons, plaintiffs have failed to demonstrate adequate evidence to support a Brady claim against Palmer and Stevens with respect to their conversations with Lambert.

### 3. The Dowthard Tapes

Plaintiffs argue that Stevens withheld from Johnson and Anderson the exculpatory and impeachment evidence contained on the Dowthard tapes. Plaintiffs maintain that Stevens listened to the tapes and that instead of timely disclosing the tapes, he informed Palmer that he was going to bury the information in order to frame plaintiffs by informing prosecutors that the tapes contained no relevant information. Assuming that Stevens listened to the Dowthard tapes and told the prosecutors that there was nothing relevant on the recordings, there is insufficient evidence to support the assertion that Stevens truly believed that there was exculpatory or impeachment evidence on the Dowthard tapes and told Palmer that he was going to bury the information in order to frame plaintiffs. The only source of evidence that Stevens said he was going to bury the tapes to frame plaintiffs is Palmer's refusal to answer on Fifth Amendment grounds when asked whether Stevens made that statement. The adverse factual inference that could be drawn from this could not be used against Stevens. See Baxter, 425 U.S. at 318; Hillman, 834 F.3d at 793.

Furthermore, even if the inference could be used against Stevens and was by itself sufficient, which it is not, this Brady claim still fails because plaintiffs have failed to identify evidence that the tapes were "concealed by the officer," an essential element of any Brady claim. See Cairel, 821 F.3d

at 832.  The Dowthard tapes were subpoenaed from the Illinois Department of Corrections by someone at the State's Attorney's Office and, therefore, it is not clear how Stevens would have concealed the tapes.  That Stevens listened to them and concluded that there was no relevant information on the tapes is inconsequential.  It is undisputed that the tapes were in the hands of the prosecution by October 17, 2002.  Evidence turned over to the prosecution has not been concealed by the officer.  Cairel, 821 F.3d at 832.  On October 21, 2002, the day trial was scheduled to begin, Johnson and Anderson both moved to continue the trial because they did not have enough time to listen to all the tapes.  As a result, Judge Grubb gave them an additional week to do so.  Under these circumstances, any resulting prejudice due to a lack of time to listen to the tapes and use them at trial for impeachment of Dowthard or otherwise was not caused by Stevens.  Any unfairness with regard to the amount of time the defense was afforded to listen to the tapes was the result of Judge Grubb's limited continuance of the trial, not the late disclosure by the prosecution, and certainly not because of any concealment of the evidence by Stevens.

It is important to recognize that when Judge McGraw, in ruling on the postconviction petitions, found a Brady violation with regard to the late turnover of the Dowthard tapes he was not concerned about who was responsible, only that it resulted in unfairness.  In contrast, in this § 1983 civil rights action, this court has to determine if there is sufficient evidence to support a Brady claim against Stevens; there is not.  As with all constitutional torts brought under § 1983, plaintiffs must demonstrate personal involvement of a particular defendant in order to recover against that defendant.  See Colbert v. City of Chicago, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation."); Marshall v. Buckley, 696 F. Supp. 2d 964, 969 (N.D. Ill. 2010) (granting summary judgment to defendant officers on Brady claim because plaintiff did not put forth evidence to show that they were personally involved in the suppression of evidence).  For all these reasons, plaintiffs' civil Brady claim against Stevens for withholding the Dowthard tapes is not supported by sufficient evidence.

### 4. Alex Dowthard

Plaintiffs claim that Glover, Palmer, Stevens, and Randall withheld the coercion and promises made to Dowthard to induce him to give a false statement implicating plaintiffs in the murder.  Plaintiffs attempt to support this claim with Dowthard's statements on the Dowthard tapes and with Dowthard's deposition transcripts.  However, plaintiffs had the Dowthard tapes before their trials started so no defendant in this case concealed them from plaintiffs.  In addition, as explained in section II.A.2 of this order, plaintiffs have not shown how Dowthard's statements on the Dowthard tapes will be admissible at trial.  See Gunville, 583 F.3d at 985; Fed. R. Evid. 802.  Nor does Dowthard's deposition testimony support this Brady claim because exercising his Fifth Amendment privilege throughout his deposition does not create a situation where any adverse factual inference can be drawn against a party.  See Baxter, 425 U.S. at 318; Hillman, 834 F.3d at 793.  Moreover, even if the inference could be drawn it does not by itself create a genuine issue of material fact for summary judgment purposes.  See LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901.  Therefore, plaintiffs have failed to identify evidence to adequately support their fourth Brady claim.

### 5. Toni Gulley

Ross maintains that, according to Palmer, he and Randall withheld the fact that they threatened Toni Gulley by indicating that if she did not cooperate and say that Ross came home later than 2:45 a.m. on the morning of the murder they would contact DCFS and have her baby taken away.  However, as explained in section II.A.3 of this order, Gulley did not succumb to this purported threat.  Consequently, assuming as the court must at this stage that the threat was made, the failure to inform the defense does not satisfy the prejudice element of a civil Brady claim against a police officer because the withholding was immaterial and, consequently, not prejudicial.  In other words, there would be no reason to impeach Gulley's testimony during Ross' trial because it was favorable to him and therefore there is no reasonable probability that asking her about the concealed threat "would have produced a different verdict."  Harris, 486 F.3d at 1014.  Thus, plaintiffs have failed to present adequate evidence to support a Brady claim against Palmer and Randall with respect to their failure to disclose that Gulley was threatened.

### 6. Rickedda Young

Plaintiffs claim that on April 24, 2002, Rickedda Young told Stevens and Mastroianni that shortly after Demarcus was shot Dowthard and Brown told her that some people were shooting at them when they left Dowthard's mother's house but Dowthard and Brown did not know who the shooters were.  According to plaintiffs, despite its importance, Stevens and Mastroianni wrote a police report that omitted this information.  This claim is based on Young's testimony at the postconviction evidentiary hearing that on April 14, 2002, she saw her cousin Brown and Dowthard at Concord Commons.  According to Young, "[Brown] just said some niggers were shooting at him but he didn't know who it was," and Dowthard said the same thing.  When asked if Dowthard told her where he was when he was shot at, Young said "[t]hey said it was coming from his mother['s] house."  Young further testified that either the next day or about a week later, Young spoke to two police officers and told them what Brown and Dowthard had said.

Stevens' police report signed May 9, 2002, does reflect that he and Mastroianni spoke to Young on April 24, 2002, but does not include the statement Young claims that she made to them about Brown and Dowthard not knowing who shot at them.  Thus, if believed, this constitutes sufficient evidence that Stevens and Mastroianni withheld evidence that could have been used by the defense to impeach Brown and Dowthard's trial testimony that it was plaintiffs who came to Dowthard's mother's house.

However, the withholding of Young's statement did not result in the type of prejudice Brady requires because it merely echoed the fact that Dowthard and Brown had initially indicated that they did not know who shot into Dowthard's mother's house.  The Supreme Court has instructed on the prejudice element of a Brady claim:

> [T]he term "Brady violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called "Brady material"—although strictly speaking, there is never a real "Brady violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

34

APP 034

Strickler v. Greene, 527 U.S. 263, 281 (1999). "[T]he question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 289. A "reasonable probability" of a different result is shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." Bagley, 473 U.S. at 678. In the instant case, both juries at plaintiffs' criminal trials heard evidence that Dowthard and Brown indicated multiple times during their initial interviews with the police that they did not know who shot into Dowthard's mother's house; Dowthard on April 14, 2002 and again on April 24, 2002, and Brown on April 24, 2002. The juries also heard that this did not change until Brown gave his written statement to the police on May 9, 2002, and Dowthard gave his written statement to the police on May 31, 2002. At both trials, Dowthard's and Brown's testimony implicated plaintiffs and they each acknowledged their initial statements which did not, but that they both explained were untrue. Thus, it was firmly established and undisputed at the trials that Dowthard and Brown had given oral statements in April that were inconsistent with their May written statements as well as with their trial testimony. Had Stevens and Mastroianni revealed to the defendants prior to their trials that on April 24, 2002, Young also reported that Dowthard and Brown made the same initial statements to her, that evidence would have been merely cumulative of what the jury already knew and of what was undisputed at plaintiffs' trials. The Seventh Circuit has made clear that withheld evidence that is "merely cumulative," because it impeaches an already impeached witness, cannot give rise to a Brady violation because there is no reasonable probability that the cumulative evidence would have changed the outcome of the trial. Socha v. Richardson, 874 F.3d 983, 989 (7th Cir. 2017); United States v. Ervin, 540 F.3d 623, 632 (7th Cir. 2008); United States v. Bailey, 510 F.3d 726, 737 (7th Cir. 2007); United States v. Wilson, 237 F.3d 827, 832-33 (7th Cir. 2001); United States v. Kozinski, 16 F.3d 795, 819 (7th Cir. 1994); United States v. Dweck, 913 F.2d 365, 370-72 (7th Cir. 1990). Similarly, in this case, plaintiffs have not given the court a reason to think that the jurors in their criminal trials would have disregarded Dowthard's and Brown's trial testimony implicating plaintiffs in the shooting just because one more person testified that in April 2002 Dowthard and Brown denied knowing who shot at the house. Therefore, plaintiffs' sixth Brady claim fails on the third element required of Brady claims, namely, a reasonable probability that the suppressed evidence would have produced different verdicts. See Cairel, 821 F.3d at 832.

### 7. Sonya White

Plaintiffs contend that Stevens withheld the fact that White's statement given on September 12, 2002, was the product of a promise to help with her pending home invasion case. "[E]vidence that a witness who testified for the Government was the beneficiary of an understanding or agreement as to a future prosecution is relevant to that witness' credibility and . . . in some circumstances, the suppression of such information will violate an accused's right to due process." United States v. Price, 418 F.3d 771, 785 (7th Cir. 2005). But in this case, the record makes clear that by 2004, when White testified at Ross' trial, she knew that she was no longer the beneficiary of any agreement because she acknowledged during her postconviction evidentiary hearing testimony that, at that time, she had already breached her cooperation agreement with the State with respect to her pending attempted home invasion case. White entered into that cooperation agreement with the State on March 24, 2003, long after any "if you can help us we can help you" promise was made by Stevens on September 12, 2002. As such, White knew on March 24, 2003, that she had received

35

from the State all the consideration on her attempted home invasion case that she was going to receive and that any promise that may have been made by Stevens on September 12, 2002, was irrelevant. For these reasons, the purported promise Stevens made to White was not favorable impeachment material and, consequently, not Brady material.

Additionally, there is no evidence of resulting prejudice from this purported Brady violation because at the time White testified at Ross' trial in 2004, she knew that she would not receive any consideration in her attempted home invasion case as a result of her testimony, yet her testimony remained consistent with her September 12, 2002 statement that was purportedly the result of a promise made by Stevens. In other words, impeaching her about the vague promise Stevens made to her would not have been effective because her testimony at Ross' trial was the same even after she knew no consideration was forthcoming. Thus, there is inadequate evidence of a reasonable probability that the outcome of Ross' trial would have been different had Stevens disclosed his "if you can help us we can help you" statement. Thus, there is insufficient evidence to support plaintiffs' seventh Brady claim.

### 8. Bryce Croft

Plaintiffs maintain that there is evidence to support their claim that Palmer and Mastroianni withheld that they coerced Croft on October 16, 2002, into retracting his prior statement implicating Montgomery and Taylor in the murder by fabricating a statement under the direction of their supervisors Iasparro and Lindmark. At the postconviction evidentiary hearing, Croft testified that Palmer made him sign his October 16, 2002 statement retracting his true statement which implicated Montgomery and Taylor under threat of perjury charges. Palmer testified at the same hearing that he alone fabricated Croft's second statement after being directed by Lindmark to "make a liar out of Croft," but Palmer did not claim that he threatened Croft. However, during his deposition, Palmer refused on Fifth Amendment grounds to answer questions suggesting that he threatened Croft. Mastroianni agreed at his deposition that he was present for Croft's October 16, 2002 statement but specifically testified that Palmer did not threaten Croft. Nevertheless, Croft's evidentiary hearing testimony and the adverse inference drawn from Palmer's Fifth Amendment invocation may constitute evidence of fabrication of Croft's second statement and evidence of a threat made to coerce the statement. It is also undisputed that this fabrication and threat were never disclosed to the defense before plaintiffs' trials.

Even so, this concealed evidence has to be material, and its concealment consequently result in prejudice, before it constitutes a Brady violation. See Cairel, 821 F.3d at 832. Plaintiffs have not explained why their lack of knowledge that Croft's second statement, which retracts his first statement implicating Montgomery and Taylor in the murder, was coerced and fabricated prejudiced them at trial. Croft was not called by either side at any of plaintiffs' trials. Plaintiffs have argued that the second statement kept them from calling Croft as a witness at trial, but the court has already rejected that argument with regard to Montgomery and Croft in sections II.A.6 & 7 of this order as logically flawed and not supported by authority. At the time of plaintiffs' trials, Croft had given two written statements, one tending to implicate Montgomery and Taylor in the murders and one retracting that statement. Either side could have called Croft and allowed the adversarial trial process to flesh out the truth. Thus, the concealment of the coercion and fabrication of Croft's second statement did not prevent plaintiffs from calling him as a witness at their trials. Having heard

36

no other argument that there is a reasonable probability that the outcome of the trials would have been different had plaintiffs known Croft's second statement was coerced and fabricated, this element of a Brady claim is lacking and plaintiffs' eighth claim fails.

### 9. Police Reports Referencing Montgomery

Plaintiffs claim that Regez, Palmer, Randall, Stevens, and Mastroianni withheld three police reports that implicated Montgomery and were therefore exculpatory with respect to plaintiffs: (1) a December 5, 2002 police report documenting Montgomery saying "what can I do to help myself out of this?" and "you got me, I know I am going to prison and I just want to help myself;" (2) a September 23, 2002 police report indicating that Montgomery was using the nickname "D.J. Hanson;" and (3) a police report from 1999 documenting a report of Montgomery shooting through the window of a house in retaliation for the murder of a relative.

The first police report documents a December 5, 2002 conversation with Montgomery about a drug charge, not Demarcus' murder. When Montgomery said "you got me," and "what can I do to get out of this," he was referring to the drug charge, not Demarcus' murder. Plaintiffs have not explained why they think this is exculpatory Brady material.

The second police report documents a September 23, 2003 report of a person with a stolen cellular phone at a US Cellular store which turned out to be Montgomery. A customer service representative told police that the person used the name "D.J. Hanson." The police arrived and discovered the person was Montgomery who said, among other things, that he used his nickname, "D.J. Hanson." Once again, plaintiffs have not explained why they think this is exculpatory Brady material. Montgomery was not the only person in Rockford who knew that a little boy named Demarcus Hanson had been murdered in 2002.[13]

The third police report is from a 1999 murder investigation during which a witness reported that she heard from another person that Montgomery, the victim's nephew, was one of the individuals who shot in retaliation at the suspect's house. The report was authored by Officer Brass. Plaintiffs have not explained why a report of Montgomery shooting at a house in 1999 is exculpatory. Moreover, the information about Montgomery was not concealed, it was documented in a police report. If plaintiffs' theory of defense was that Montgomery was Demarcus' murderer, then they could have requested all police reports concerning Montgomery from the Rockford Police Department. In any event, the court has not been convinced that this report was Brady material. Even if this report was Brady material, plaintiffs have not identified evidence that any defendant in this case had knowledge of the report such that they could have concealed it. See Colbert, 851 F.3d at 657 ("Individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation); see also Marshall, 696 F. Supp. 2d at 969 (granting summary judgment to defendant officers on Brady claim because plaintiff did not put forth evidence to show that they were personally involved in the suppression of evidence). The only evidence plaintiffs offer in this regard is Palmer's refusal to answer on Fifth Amendment grounds when asked at his deposition

---

[13]The court notes that even if the first and second police reports were Brady material, there would be no violation vis-a-vis Johnson and Anderson because the reports and described events occurred after their October 2002 trial.

about his knowledge of this report at the time of Demarcus' murder investigation.  However, without other evidence of this fact, the negative factual inference that might be drawn is not sufficient to create a genuine issue of material fact at summary judgment.  See LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901.

Moreover, even if these three police reports were exculpatory, there is no evidence of concealment by any defendant because, not surprisingly, these police reports were filed under different case numbers than the case number for the Demarcus Hanson murder investigation.  As such, there is no evidence that the failure to turn over these reports to plaintiffs before their respective trials was other than inadvertent.  This is another circumstance where criminal and civil Brady claims differ.  In the criminal context, Brady applies whether the suppression of evidence is willful or inadvertent.  However, although the Seventh Circuit has yet to address the issue directly, the weight of authority is that in a civil § 1983 Brady claim against a police officer, plaintiffs have to show more than mere negligence or inadvertence in failing to turn over Brady material because "the no-fault standard of care Brady imposes on prosecutors in the criminal or habeas context has no place in a § 1983 damages action against a law enforcement official in which the plaintiff alleges a violation of due process."  Porter v. White, 483 F.3d 1294, 1306 (11th Cir. 2007); see also Villasana v. Wilhoit, 368 F.3d 976, 980 (8th Cir. 2004) ("[T]he recovery of § 1983 damages requires proof that a law enforcement officer other than the prosecutor intended to deprive the defendant of a fair trial."); Jean v. Collins, 221 F.3d 656, 660-61 (4th Cir. 2000).  Although there is contrary authority, see Moldowan v. City of Warren, 578 F.3d 351, 388-89 (6th Cir. 2009), this court believes that the Seventh Circuit would agree with the Eleventh, Eighth, and Fourth Circuits.  The Seventh Circuit has cited Jean and stated that "police who deliberately withhold exculpatory evidence, and thus prevent the prosecutors from complying with the obligations articulated in Brady, violate the due process clause" without discussing whether any lesser degree of culpability, such as recklessness, would suffice.  Newsome v. McCabe, 260 F.3d 824, 825 (7th Cir. 2001).  Moreover, its use of the word "concealment" in Cairel, is a strong indicator that an intentional act is required.  821 F.3d at 832.  Plaintiffs argue that Iasparro agreed during his deposition that the report concerning the 1999 shooting incident should have been mentioned in a report filed in Demarcus' murder investigation and the prior report number cross-referenced.  But this is at best evidence of negligence, not concealment.  For all these reasons, plaintiffs' ninth civil Brady claim fails.

### 10. Charles Griffin

Plaintiffs contend that Palmer withheld that he learned in the summer of 2002 that Taylor had admitted to Griffin to committing the Hanson murder.  According to plaintiffs, instead of documenting and disclosing this information to the prosecution, Palmer withheld the exculpatory information and informed Griffin that he only wanted information that implicated plaintiffs.  In support of this contention, plaintiffs rely on Griffin's affidavit, Griffin's postconviction evidentiary hearing testimony, and Palmer's deposition testimony.  But these three sources of evidence are not sufficient to sustain this civil Brady claim.  In his affidavit, Griffin does not say that he tried to inform Palmer of Taylor's purported admission and that Palmer was not interested.  Instead he said he tried to tell "the police" and "the police" told him if the information was not about plaintiffs they were not interested.  In his postconviction evidentiary hearing testimony, Griffin never mentioned Palmer either, he just said he talked a "detective."  As a result, even if a trier of fact were to believe

that Griffin told a detective about Taylor's purported admission that Taylor and Montgomery committed the murder, Griffin offers no evidence that the detective he told was Palmer. That leaves only Palmer's deposition testimony wherein he asserts his Fifth Amendment privilege when asked whether he interviewed Griffin prior to plaintiffs' trials. But, as has been explained, the negative inference drawn from a defendant's invocation of his Fifth Amendment privilege is not by itself enough to establish a disputed fact for summary judgment purposes. See LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901. Palmer makes no mention of Griffin in his postconviction evidentiary hearing testimony. As such, plaintiffs' tenth withholding-of-evidence due process claim cannot survive summary judgment.

### 11. Antonio Leavy

Plaintiffs claim that Palmer and Stevens withheld Leavy's July 11, 2002 written statement that on the night of Demarcus' murder he heard four gunshots and saw a red four-door Pontiac drive past his house toward Preston with a heavy-set male driving. Plaintiffs maintain that this information is exculpatory because Dowthard and Brown testified at the trials that Ross, a heavy-set black male, was not driving the vehicle but rather Johnson, who is skinny.[14] This argument mischaracterizes the evidence presented at the trials because neither Dowthard nor Brown identified the driver of the red Grand Prix as it left 2514 Chestnut Street, only as it arrived. As such, Leavy's statement about who was driving when the vehicle left had little impeachment value.

In addition, Leavy's statement was not "concealed" by Palmer and Stevens because it was documented in a police report which was filed under the case number for a different investigation. That is, the on-going investigation of the conflict in Rockford between the Moes and the Wacos street gangs and, specifically, a drive-by shooting directed at Leavy and his friends that occurred a week before Demarcus was murdered. In his statement, Leavy related details about a confrontation between him and a member of the Moes named Antwan "Buck" Maxey, that Leavy believed was the drive-by shooter. Leavy's remarks about Demarcus' murder were anecdotal to his account of the drive-by shooting. The court has not been directed to any evidence showing that this was other than inadvertence or a mistake which, as discussed above, is not sufficient to sustain a civil Brady claim. See Porter, 483 F.3d at 1306.[15]

Furthermore, plaintiffs suffered no prejudice as a result of not having Leavy's statement because the statement indicates that, based on what Brown told him, Leavy held the belief that plaintiffs were responsible for the murder. Consequently, the statement on the whole was inculpatory, not exculpatory, and therefore not Brady material. Likewise, plaintiffs also suffered no prejudice in not calling Leavy to testify because Leavy thought that plaintiffs were the shooters. In

---

[14] Actually, only Brown testified that Johnson was driving the red Pontiac when it arrived in front of Dowthard's mother's house, Dowthard did not.

[15] The court notes further that Palmer and Stevens would likely have qualified immunity for any Brady violation resulting from the "withholding" of Leavy's statement. This is because plaintiffs have not identified Supreme Court or Seventh Circuit precedent that clearly establishes that a Brady violation occurs under these circumstances. See District of Columbia v. Wesby, 583 U.S. ___, 138 S. Ct. 577, 589 (2018) (holding that the doctrine of qualified immunity shields police officers in § 1983 actions from liability for money damages unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time").

addition, plaintiffs suffered no prejudice in not calling Leavy because he would have said that the driver of the red Grand Prix was a heavy-set black male and this is not inconsistent with the State's theory that the plaintiffs were the individuals who came to 2514 Chestnut Street in the red Grand Prix and shot into the house.  This is because it is undisputed that Ross is a heavy-set black male.

Plaintiffs also claim that Palmer and Stevens withheld that in the same statement Leavy told them that he had a conversation with Brown shortly after the murder and Brown did not say that he was present for the shooting or that he knew who was involved.  Indeed, according to the statement, Brown did not say anything about the shooting.  This absence of evidence has negligible value to plaintiffs.  In any event, this evidence would not impeach Brown because Brown never testified that he was present for the shooting.  Instead, Brown testified that he sped away in the Monte Carlo after plaintiffs arrived in the red Grand Prix and, again, after talking to Brown, Leavy concluded, "I figured it was [plaintiffs] that was [sic] probably involved in Demarcus' shooting."  Therefore, plaintiffs have not identified sufficient evidence of a <u>Brady</u> claim based on the purported concealment of Leavy's statement.

Based on the foregoing, the court concludes that plaintiffs have failed to identify sufficient evidence to support their eleven § 1983 <u>Brady</u> claims.

### C. Issue Preclusion

Based on this court's conclusion that all of plaintiffs' claims fail on the merits, the court need not address defendants' arguments that all of plaintiffs' due process claims are barred by collateral estoppel because of Judge McGraw's rejection of the same claims during the litigation of plaintiffs' postconviction petitions.

### D. § 1983 Monell, Failure to Intervene, Conspiracy, and Supervisor Liability Claims

Nested within their due process claims in Count I are plaintiff's claims against the City of Rockford brought pursuant to <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658 (1978).  The above analysis, however, precludes any recovery on any of these claims.  <u>See</u> <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986) (requiring that plaintiff suffered a "constitutional injury at the hands of the individual police officer" for <u>Monell</u> liability to attach).  Similarly, if there is insufficient evidence to support plaintiffs' § 1983 due process claims that defendants violated their rights by fabricating or withholding evidence, then there is insufficient evidence to support plaintiffs' failure to intervene claims and conspiracy claims against any individual defendant or the City of Rockford.  <u>See</u> <u>Smith v. Gomez</u>, 550 F.3d 613, 617 (7th Cir. 2008) ("[C]onspiracy is not an independent basis of liability in § 1983 actions."); <u>Harper v. Albert</u>, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation.").  The same analysis holds with respect to the § 1983 supervisor liability claims in Count VII.  If there is insufficient evidence to support an underlying constitutional violation, then there is no evidence to support supervisory liability for that violation.  <u>See</u> <u>Gossmeyer v. McDonald</u>, 128 F.3d 481, 495 (7th Cir. 1997); <u>Charles v. City of Chicago</u>, No. 16-CV-679, 2018 WL 318484, at *10 (N.D. Ill. Jan. 8, 2018).  Thus, defendants are entitled to summary judgment on Counts II, III, and VII.

40

### E. Malicious Prosecution under § 1983

Defendants contend that plaintiffs' claim in Count VIII for malicious prosecution under § 1983 is barred because "[t]he existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution." Newsome v. McCabe, 256 F.3d 747, 750 (7th Cir. 2001), abrogated on other grounds by Manuel v. City of Joliet, Ill., 580 U.S. ___, 137 S.Ct. 911, ___ (2017).   Plaintiffs contend that Manuel abrogated Newsome, and held that a claim for unlawful pretrial detention is actionable under the Fourth Amendment.

Since the parties filed their briefs, the Seventh Circuit has explained that:

> We said in Newsome v. McCabe, 256 F.3d 747 (7th Cir. 2001), that there is no free-standing constitutional tort of malicious prosecution, though there are other constitutional rights (e.g., such as those under the Due Process Clause and the Fourth Amendment) that protect people against abusive arrests, fabrication of evidence, etc. While Manuel rejected some aspects of Newsome's holding, nothing in Manuel changed the general rule that the federal constitution does not codify state tort law. But in this case, the fact that the plaintiffs have used the terminology "malicious prosecution" is of no moment. What matters is whether they have identified the constitutional right at issue, and they have done so.  The Fourteenth Amendment's Due Process Clause is the relevant constitutional source; it forbids the state from depriving a person of liberty (including by pre-trial detention) based on manufactured evidence.

Hurt v. Wise, 880 F.3d 831, 843 (7th Cir. 2018).  It is now clear that there is no free-standing constitutional tort of malicious prosecution.  Plaintiffs' § 1983 claims do not cite to any federal constitutional provision but, rather, parrot the elements of state-law malicious prosecution.  It is also clear that the federal constitution does not codify state tort law and that a § 1983 claim based on the elements of state-law malicious prosecution does not exist. Id.  To the extent that Count VII is based on the same Fourteenth Amendment due process violations that are alleged in Count I, it is merely redundant of that claim, no matter how it is styled, and is therefore superfluous.  For these reasons, defendants are entitled to summary judgment on Count VIII.

### F. Remaining Claims

Count IX sets forth a state law claim for malicious prosecution.  To establish a claim for malicious prosecution under Illinois law, a plaintiff must establish, among other elements the absence of probable cause. Johnson v. Saville, 575 F.3d 656, 659 (7th Cir. 2009). "[P]robable cause is not determined by retrospect.  It depends on what the police know, or reasonably believe at the time." Bridewell v. Eberle, 730 F.3d 672, 675 (7th Cir. 2013).  When plaintiffs were arrested on or about June 30, 2002, defendants reasonably believed that they were the murderers based on the accounts given by Dowthard and Brown.  Based on the written statements of Dowthard and Brown alone, defendants had probable cause.  As discussed above, plaintiffs have failed to present evidence showing that defendants had a reason to doubt that Dowthard and Brown were credible witnesses, and an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause. Woods v. City of Chicago, 234 F.3d 979, 996 (7th Cir. 2000). "It is axiomatic that the existence of probable cause is a complete defense to a malicious prosecution claim." Logan

v. Caterpillar, Inc., 246 F.3d 912, 926 (7th Cir. 2001). Accordingly, the court grants defendants summary judgment on Count IX.

Count X alleges IIED under Illinois law. The elements of the Illinois tort of IIED are: (1) extreme and outrageous conduct, (2) the intention to, or knowledge of a high probability that the conduct would, cause severe emotional distress, and (3) the conduct actually caused severe emotional distress. Zoretic v. Darge, 832 F.3d 639, 645 (7th Cir. 2016). This court has already determined that there is insufficient evidence to support plaintiffs' claims of evidence fabrication and withholding of exculpatory or impeachment evidence. Because plaintiffs rely on the same evidence to support the "extreme and outrageous" conduct element of their IIED claim, it fails for the same reasons. Therefore, defendants are entitled to summary judgment on Count X.

Plaintiffs also bring claims of respondeat superior in Count XI. A claim of respondeat superior requires a surviving underlying claim against an employee. See Huon v. Mudge, 597 F. App'x 868, 877 (7th Cir. 2015) (citing Lawlor v. N. Am. Corp. of Ill., 2012 IL 112530). Because the court has already determined that all individual defendants are entitled to summary judgment on all claims against them, there is no basis for respondeat superior liability against these defendants. Consequently, defendants are entitled to summary judgment on Count XI.

In Count XII, plaintiffs bring claims for indemnification against the City of Rockford pursuant to 745 ILCS 10/9-102, which states in pertinent part that, "[a] local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages . . . for which it or an employee while acting within the scope of his employment is liable in the manner provided in this Article." Because the court has determined that defendants are entitled to summary judgment on all claims brought against them, there is no underlying liability to support plaintiffs' claims for indemnification, and the City of Rockford is therefore entitled to summary judgment on Count XII.

### III. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted. These cases are closed.

Date: 5/23/2018

ENTER:

_____

FREDERICK J. KAPALA

District Judge

42

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISON

| | |
|---|---|
| LUMONT JOHNSON & ANTHONY ROSS, )<br><br>)<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>CITY OF ROCKFORD, DOUG PALMER, DOMINIC )<br>IASPARRO, JOSEPH STEVENS, JAMES RANDALL,)<br>SCOTT MASTROIANNI, THEO GLOVER, KURT )<br>WHISENHAND, TORRY REGEZ, SHERYL )<br>LINDMARK AS THE INDEPENDENT EXECUTOR )<br>OF THE ESTATE OF GREGORY LINDMARK, AND )<br>UNKNOWN EMPLOYEES OF THE CITY OF )<br>ROCKFORD, )<br>)<br>Defendants. ) | 15-cv-50064<br><br><br><br><br><br>JURY DEMAND |

**FIRST AMENDED COMPLAINT**

Plaintiffs, LUMONT JOHNSON & ANTHONY ROSS, by their undersigned attorneys, complain of Defendants, CITY OF ROCKFORD, DOUG PALMER, DOMINIC IASPARRO, JOSEPH STEVENS, JAMES RANDALL, SCOTT MASTROIANNI, THEO GLOVER, KURT WHISENHAND, TORRY REGEZ, SHERYL LINDMARK AS THE INDEPENDENT EXECUTOR OF THE ESTATE OF GREGORY LINDMARK, AND UNKNOWN EMPLOYEES OF THE CITY OF ROCKFORD as follows:

**Introduction**

1. Plaintiffs Lumont Johnson and Anthony Ross spent 11 years in prison for the murder of Demarcus Hanson that they did not commit.

2.     Mr. Johnson and Mr. Ross were convicted after the Defendants engaged in a tapestry of egregious wrongdoing, including fabricating statements, threatening witnesses and withholding highly exculpatory evidence – including a third party confession of the real killer – in an effort to shortcut the investigatory process and frame Plaintiffs for a crime they did not commit.

3.     Never giving up on proving their innocence, Mr. Johnson and Mr. Ross filed post-conviction petitions.  During those proceedings, Defendant Doug Palmer came forward and confessed to a host of misconduct that violated Plaintiffs' right to due process – a confession that he has stood by despite being attacked by his former colleagues and threatened with perjury.

4.     Finally, the Defendants purposely ignored compelling evidence that two other individuals, Kefentse Taylor and Casel Montgomery, actually committed the shooting.  Taylor has since died.  Montgomery was confronted on the stand with his wrongdoing.  Rather than answer questions about his whereabouts on the night of the shooting, he invoked his Fifth Amendment rights because he had a legitimate concern that testifying would subject him to criminal liability for the Hanson murder.

5.     On March 19, 2013, after a lengthy evidentiary hearing at which Mr. Johnson and Mr. Ross presented overwhelming

2

evidence of their innocence, Plaintiffs' convictions were finally reversed.  On November 6, 2015, after a two-week retrial, Mr. Johnson and Mr. Ross were acquitted of all charges lodged against them.  This lawsuit seeks to bring these injustices to light so that they never occur again.

## Jurisdiction and Venue

6.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

7.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Venue is proper under 28 U.S.C. § 1391(v).  The events giving rise to this complaint occurred in this judicial district.

## Parties

8.    Plaintiff Lumont Johnson is a 42-year-old resident of Rockford, Illinois.  Mr. Johnson is the father of two children.  He is currently working for the Rockford Register Star.

9.    Plaintiff Anthony Ross is a 34-year-old father and resident of Rockford, Illinois.  He is currently working for the Rockford Register Star.

10.   At all times relevant hereto, Defendants Doug Palmer, Dominic Iasparro, Joseph Stevens, James Randall, Scott Mastroianni, Theo Glover, Gregory Lindmark, Kurt Whisenhand and

3

APP 045

Torry Regez (hereinafter "Defendant Officers") were police officers in the Rockford Police Department.  All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation of the murder at issue.

11.  Defendant City of Rockford is an Illinois municipal corporation.  The City of Rockford is or was the employer of each of the Defendant Officers.

### The Crime

12.  On April 14, 2002, eight-year-old Demarcus Hanson was killed by shots that were fired through a window in his grandmother Estella Dowthard's house.  Estella Dowthard called 911 at approximately 2:53 a.m. to report the shooting.

13.  According to the police, the shooting was a misfire; the shooters were aiming at Estella Dowthard's son, Alex Dowthard, but accidentally hit Demarcus Hanson.

### Plaintiffs' Innocence

14.  Mr. Johnson and Mr. Ross had absolutely nothing to do with this heinous crime. In fact, they were nowhere near the house at the time it occurred.  Earlier in the night, Plaintiffs had been with their friend and eventual co-defendant, Tyjuan Anderson, visiting with friends and going to a nightclub.

4

APP 046

15. By the time of the shooting, all three men were back home: Mr. Johnson and Mr. Anderson were together at Mr. Anderson's house, and Mr. Ross was at his own home.

16. Plaintiffs had strong alibi evidence. Mr. Johnson made several phone calls to his friend trying to find a place to stay that evening because he had had a fight with his girlfriend. Those calls occurred between 2:46 a.m. and 2:53 a.m.

17. Mr. Ross was also at home when the shooting occurred, with his then-girlfriend Toni Gulley and their infant baby. When he arrived home, Gulley had just awoken to change their baby's diaper and feed her.

### The Police Investigation

18. There was never any physical evidence linking Plaintiffs to this crime. None of their fingerprints or DNA were found at the crime scene.

19. The Defendant Officers spoke to Plaintiffs on the day of the shooting. Mr. Ross, Mr. Johnson and Mr. Anderson learned that the police wanted to speak with them, and so each went to the police station and told the Defendant Officers about their whereabouts – and their alibi – the night before.

20. Mr. Johnson, Mr. Ross and Mr. Anderson were each released from custody that day.

APP 047

21.   On the day of the shooting, the Defendant Officers also spoke to the alleged target of the shooting, Alex Dowthard.  Mr. Dowthard told the Defendants that he was not present at the time of the shooting and therefore, could not identify the shooters.  Mr. Dowthard, however, admitted to possessing and shooting a firearm in a separate incident, and therefore was taken into custody on a parole violation.

22.   Lataurean Brown was with Mr. Dowthard at the time of the shooting.  As a result, the Defendant Officers also spoke with him. Mr. Brown also denied seeing the shooting or who the shooters were.

23.   Mr. Brown said that after partying earlier in the night with Mr. Dowthard, the two stopped at Estella's house to drop off Mr. Dowthard's gun and then drove to Concord Commons where they visited with Mr. Dowthard's cousin.

24.   With no credible suspect and no leads, the case went cold.  Yet the police were facing pressure to solve the crime.  The young age of the victim, and the tragic circumstances in which he died, at home sleeping in his bed, garnered media interest in the case.

**The Defendants' Misconduct**

25.   Determined to close the Hanson murder, the Defendant Officers engaged in a campaign of misconduct to frame Plaintiffs for a crime they did not commit.  To do so, the

6

APP 048

Defendant Officers fabricated witness statements, coerced, hit and threatened witnesses, and withheld exculpatory evidence that not only would have explained why witnesses were falsely incriminating Plaintiffs, but also the identity of the real shooters.

26. That misconduct was never disclosed to the prosecutor or Plaintiffs' defense attorneys. Indeed, the prosecutor stated that had he known of this egregious litany of wrongdoing, it would have set off a cataclysmic chain of events, unraveling the criminal investigation and Plaintiffs' prosecution.

### The Defendants Coerce the Key Witnesses and Fabricate Their Statements

27. The Defendant Officers coerced and fabricated the statements of the State's two key witnesses.

28. To move Lataurean Brown off of his statement that he did not see the shooters, the Defendant Officers threatened Mr. Brown. They then fabricated a statement for him to sign that would coincide with known facts about the shooting.

29. Defendant Officers further suborned perjury by instructing Mr. Brown to testify consistent with his police statement at Plaintiffs' trials even though it was false and fabricated.

7

APP 049

30. Alex Dowthard was similarly instructed. When questioned at the beginning of the investigation, Mr. Dowthard repeatedly told the Defendant Officers that he did not see the shooters. Unsatisfied, the Defendant Officers threatened Mr. Dowthard that if he did not change his story, they would keep him imprisoned on a parole hold and bring additional criminal charges against him. The Defendant Officers also beat Mr. Dowthard.

31. Mr. Dowthard was then fed details of the crime. He falsely implicated Plaintiffs in the crime.

32. When confronted with evidence that he gave false statements and testimony about the shooting, Mr. Dowthard refused to answer and instead invoked his Fifth Amendment rights because he had a legitimate concern that testifying truthfully would subject him to criminal liability.

33. To compound this unconstitutional conduct, the Defendant Officers buried evidence that both thoroughly impeached Mr. Brown's and Mr. Dowthard's false and fabricated statements that Plaintiffs committed the Hanson murder, and corroborated the fact that neither saw the offenders and could not identify them.

34. In particular, the Defendant Officers spoke to Mr. Brown's cousin. Mr. Brown's cousin told the Defendant Officers that right after the shooting, she spoke to Mr. Brown

8

and Mr. Dowthard at Concord Commons.  Mr. Brown and Mr. Dowthard told her that they did not see who committed the crime.

35.  Notwithstanding the obvious importance and exculpatory value of this information, the Defendant Officers failed to disclose it to the prosecution or defense.

### *The Defendants Coerce and Threaten Other Witnesses*

36.  The Defendant Officers similarly coerced other witnesses into giving false evidence and failed to disclose the fact of that coercion.

37.  For example, the Defendant Officers threatened to take witness Carmen Hearns' children to the Department of Children and Family Services ("DCFS") and re-activate an old misdemeanor charge into a felony.

38.  Even though Ms. Hearns told the Defendant Officers that she did not know anything about the shooting, the Defendant Officers told her that if she did not give them something, they were going to lock her up.

39.  The Defendant Officers made good on their promise.  After two days in jail, Ms. Hearns agreed to sign a fabricated statement that the Defendant Officers had pre-written, which falsely inculpated Plaintiffs in the crime.

40.  Similarly, the Defendant Officers threatened and harassed Toni Gulley in an effort to destroy Mr. Ross' alibi.  On that score, the Defendant Officers told Ms. Gulley that she

APP 051

must have been mistaken about the time that Mr. Ross came home, and that if she did not "cooperate" with the Defendant Officers, they would call DCFS and report her for child neglect. The Defendants further created false reports saying that Ms. Gulley could have been off on the time that Mr. Ross came home.

41. In addition, the Defendant Officers coerced and physically abused another witness when he threatened to change his story and expose the Defendant Officers' lies about how the Hanson shooting occurred. The Defendant Officers told him to testify consistent with those lies, and hit him and threatened to arrest his mother if he did not.

### *The Defendants Bury and Destroy Evidence*<br>### *Of the Identity of the Real Offenders*

42. Finally, the Defendant Officers unlawfully buried and destroyed any evidence demonstrating that two other people – Kefentse Taylor and Casel Montgomery – committed the crime. In fact, Defendant Lindmark told the Defendant Officers to make a liar out of anyone that pointed the finger at Taylor and Montgomery, or discredited the police version that Plaintiffs and Mr. Anderson committed the crime. The Defendant Officers did just that.

43. For example, the Defendant Officers received highly detailed and credible information from a witness who was with Mr. Taylor and Mr. Montgomery on the night of the shooting

10

APP 052

and who directly implicated Mr. Montgomery and Mr. Taylor in the crime.

44.   Rather than investigate the information that the witness provided, the Defendant Officers met with the witness a second time.  The Defendant Officers handed the witness a statement that the Defendant Officers had already written out for the witness to sign that falsely recanted the information he had provided about Mr. Montgomery's and Mr. Taylor's culpability for the Hanson shooting.

45.   To get him to sign off on that false and fabricated recantation, the Defendant Officers threated the witness.  That misconduct was never disclosed to the prosecution or the defense.

46.   Similarly, the Defendant Officers received information from another witness that Mr. Taylor had confessed to the Hanson shooting.  Despite the obvious exculpatory value of that evidence, it was buried and never turned over to the prosecutor or to Plaintiff's criminal defense attorneys.  The Defendant Officers told the witness that if his information was not about Plaintiffs or Mr. Anderson, then they did not want to hear it.

47.   As a result, Plaintiffs were wrongfully prosecuted and convicted, and the real killers – Mr. Taylor and Mr. Montgomery – were never brought to justice for this crime.

**Plaintiffs' Wrongful Conviction**

48.   As a result of the Defendants' misconduct, Plaintiffs were convicted of first-degree murder and sentenced to 50 years in prison.

49.   During the trial, the Defendants not only suborned perjury – e.g., telling Mr. Brown and Mr. Dowthard to testify consistent with their false and fabricated statements – but also committed perjury themselves by lying about their conduct during the investigation, their role in procuring false statements, and about the reliability of various statements obtained in the investigation.

50.   Without the Defendants' misconduct, Plaintiffs would not have been prosecuted or convicted.

**Plaintiffs' Exoneration**

51.   Never giving up hope and remaining steadfast in their protestations of innocence, the Plaintiffs filed post-conviction petitions challenging their convictions.

52.   During proceedings on those post-conviction petitions, Defendant Palmer came forward and admitted to a host of misconduct that he and the Defendant Officers committed in an effort to frame the Plaintiffs for a crime that they did not commit.  Defendant Palmer testified to the same during the Plaintiffs' post-conviction evidentiary hearing.

12

53.  Following the Plaintiffs' evidentiary hearing, on March 19, 2013, the Circuit Court granted Plaintiffs' post-conviction petitions, overturning their convictions, vacating their sentences and granting them new trials.  That decision was affirmed on appeal.

### Rockford's Code of Silence

54.  The constitutional injuries that Plaintiffs suffered were caused by the policies and practices of the Rockford Police Department.

55.  In particular, there was a "code of silence" that permeated the Department.  As Defendant Palmer testified, that code meant "[k]eep your mouth shut and do what you're told."  In other words, Rockford police officers are taught to look the other way and acquiesce when fellow officers are committing misconduct; under no circumstances were officers to provide adverse information against a fellow officer.

56.  As a result of that code of silence, Rockford police officers are not properly supervised or disciplined in any way.  To the contrary, officers are allowed to continue to commit misconduct with impunity, including the type of misconduct at issue here.

57.  Indeed, within the Rockford Police Department, there was a policy and practice of taking short cuts to solve criminal investigations, including by fabricating statements,

13

APP 055

coercing witnesses and withholding exculpatory and impeachment evidence.

58.  This policy and practice repeated itself in numerous criminal investigations conducted by the Rockford Police Department.  As Defendant Palmer has testified, that misconduct was widespread.

59.  Nonetheless, and despite notice to (and often involvement of) policymakers in the above-described unconstitutional policies and practices, there was no effort to rectify any such misconduct.  The City of Rockford and officials within the Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.  They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiffs' ongoing injuries.

60.  The policies and practices described in the foregoing paragraphs were consciously approved by City of Rockford policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

61.  Those policies and practices were the proximate cause of the constitutional injuries that Plaintiff sustained, as described more fully above.

14

APP 056

62.  Moreover, The City's failure to train its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiffs in this case.  Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

**Plaintiffs' Damages**

63.  Plaintiffs spent over a decade in prison for a crime that they did not commit.

64.  During their wrongful incarceration, the Plaintiffs were stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  They missed out on the ability to raise their children, share holidays, births, funerals and other life events with loved ones, and the fundamental freedom to live one's life as an autonomous human being.

65.  As a result of their wrongful incarcerations, Plaintiffs must now attempt to rebuild their lives all without the benefit of a decade of life experience that ordinarily equip adults for that task.

66.  Plaintiffs have suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

15

**Count I – Due Process**

**42 U.S.C. § 1983**

67.  Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

68.  As described more fully above, the Defendant Officers, while acting individually, jointly, and in conspiracy with other named and unnamed individuals, as well as under color of law and within the scope of their employment, deprived Plaintiffs of their constitutional right to a fair trial.

69.  In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory and impeachment evidence, fabricated false statements, reports and other evidence, and suborned perjury, thereby misleading and misdirecting the criminal prosecutions of Plaintiffs.  Absent this misconduct, the prosecutions of Plaintiffs could not and would not have been pursued.

70.  The Defendant Officers' misconduct also directly resulted in the unjust criminal convictions of Plaintiffs, thereby denying them their constitutional right to a fair trial, and a fair appeal thereof, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

71.  As a result of this violation of his constitutional right to a fair trial, Plaintiffs suffered

16

APP 058

injuries, including, but not limited to, physical sickness and injury, and emotional distress, as is more fully alleged above.

72. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

73. The misconduct by the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Rockford Police Department, which Plaintiffs were the victims of, and his injuries were proximately caused by a policy and practice on the part of the City of Rockford to pursue and secure false convictions through profoundly flawed investigations as described more fully above.

74. Specifically, during the relevant time period, a group of Rockford police officers, including some or all of the Defendant Officers herein, engaged in a systematic pattern of coercion, fabrication of evidence, withholding of exculpatory information, and other illegal tactics, the sum total of which completely corrupted the investigative process.

75. This institutional desire to close cases through unconstitutional tactics regardless of actual guilt or innocence, in order to enhance police officers' personal standing in the Department, was known to the command personnel, who themselves participated in the practice.

17

76.  The above-described widespread practices, so well-settled as to constitute *de facto* policy in the Rockford Police Department during the time period at issue, were able to exist and thrive because municipal policymakers with authority over the same either concurred with the practices or exhibited deliberate indifference to the problem.

77.  The widespread practices described in the preceding paragraphs were allowed to take place because the City declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment.  Indeed, the Department's system for investigating and disciplining police officers accused of the type of misconduct that befell Plaintiffs was, and is, for all practical purposes, nonexistent.  Indeed, the Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline or oversight.

78.  Rockford police officers who manufactured criminal cases against individuals such as Plaintiffs had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and/or Departmental discipline, but that they also stood to be rewarded for closing cases no matter what the costs.  In this way, this system proximately caused abuses, such as the Defendant Officers' misconduct at issue in this case.

18

APP 060

**Count II - Failure to Intervene**

**42 U.S.C. § 1983**

79.  Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

80.  In the manner described above, during the Constitutional violations described above, one or more of the Defendant Officers (including as-yet-unknown Police Officers) stood by without intervening to prevent the misconduct.

81.  As a result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiffs' constitutional rights, Plaintiffs suffered damages, including physical sickness and injury, as well as emotional distress.  These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

82.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

83.  The Defendant Officers' misconduct described in this Count was undertaken pursuant to Rockford's policy and practice in the manner described in preceding paragraphs.

19

APP 061

**Count III - Conspiracy**

**42 U.S.C. § 1983**

84.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

85.    Prior to arresting Plaintiffs, the Defendant Officers reached an agreement amongst themselves to frame Plaintiffs for the crime, and to thereby deprive Plaintiffs of their constitutional rights, all as described in the various Paragraphs of this Complaint.

86.    In addition, before and after Plaintiffs' conviction, each of the Defendant Officers further conspired, and continue to conspire, to deprive Plaintiffs of exculpatory materials to which they are lawfully entitled and which would have led to their more timely exoneration of the false charges as described in the various Paragraphs of this Complaint.

87.    In this manner, the Defendant Officers, acting in concert with each other and with other unknown co-conspirators, including persons who are and who are not members of the Rockford Police Department, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

88.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

20

89. As a direct and proximate result of the illicit prior agreement referenced above, Plaintiffs rights were violated, and they suffered physical injury and sickness, and severe emotional distress and anguish, as is more fully alleged above.

90. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

91. The Defendant Officers' misconduct described in this Count was undertaken pursuant to the policy and practice of the Rockford Police Department in the manner described more fully in preceding paragraphs, and was tacitly ratified by policy-makers for Rockford with final policymaking authority.

## Count VII - Supervisor Liability

### 42 U.S.C. § 1983

92. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

93. The constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct, which occurred with the knowledge and consent of those of the Defendant Officers who acted in a supervisory capacity, including but not limited to Defendants Iasparro, Lindmark and Glover, such that these officers personally knew about, facilitated, approved, and/or condoned this pattern and practice

21

of misconduct, or least recklessly caused the alleged deprivation by their actions or by their deliberately indifferent failure to act.

94.   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

95.   The misconduct described in this Count was undertaken pursuant to the City's policy and practice in the manner more fully described above.

96.   As a result of this violation, Plaintiffs suffered injuries, including but not limited to physical sickness and injuries, and emotional distress, as is more fully alleged above.

97.   Absent knowing participation by the command personnel responsible for supervising the Defendant Officers, the misconduct alleged in this Complaint could not have occurred.

### Count VIII – Malicious Prosecution

### 42 U.S.C. § 1983[1]

98.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

---

[1]   Plaintiffs are including this claim in his First Amended Complaint to preserve it in the event that the Seventh Circuit overturns its ruling in *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001).

22

APP 064

99.  Defendant Officers caused Plaintiffs to be improperly subjected to judicial proceedings for which there was no legitimate probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Plaintiffs' favor in a manner indicative of his innocence.

100. The Defendant Officers accused Plaintiffs of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

101. Statements of the Defendant Officers regarding Plaintiffs' alleged culpability were made with knowledge that said statements were false and perjured.  In so doing, the Defendant Officers fabricated evidence and withheld exculpatory information.

102. The misconduct in this Count violated Plaintiffs' rights under the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

103. The misconduct described in this Court was undertaken with malice, willfulness, and reckless indifference to the rights of others.

23

104. The misconduct described in this Count was undertaken pursuant to the City's policy and practice in the manner more fully described above.

105. As a result of this misconduct, Plaintiffs' sustained, and continue to sustain, injuries including physical injury and sickness, and emotional pain and suffering.

### Count IX – State Law Claim

### Malicious Prosecution

106. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

107. Defendant Officers caused the Plaintiffs to be improperly subjected to judicial proceedings for which there was no legitimate probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in the Plaintiffs' favor in a manner indicative of innocence.

108. Defendant Officers accused the Plaintiffs of criminal activities knowing those accusations to be without genuine probable cause, and made statements to the police and/or prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

109. Defendant Officers also fabricated evidence and failed to disclose the manner in which that evidence was

24

APP 066

fabricated.   Additionally, the Defendant Officers withheld evidence that would have proven the Plaintiffs' innocence.

110. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

111. As a result of this misconduct, the Plaintiffs' sustained injuries, including physical injury and sickness, and emotional pain and suffering, as more fully alleged above.

**Count X -- State Law Claim**

**Intentional Infliction of Emotional Distress**

112.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

113.   In the manner described more fully above, by wrongfully inculpating the Plaintiffs in crimes they did not commit, Defendant Officers intended to cause emotional distress.

114.   In doing so, Defendant Officers' conduct was extreme and outrageous and caused the Plaintiffs' severe, disabling emotional distress.

115.   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

116.   As a result of this misconduct, the Plaintiffs' sustained injuries, including physical injury and sickness, and emotional pain and suffering, as is more fully alleged above.

25

**Count XI -- State Law Claim**

**Respondeat Superior**

117. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

118. In committing the acts alleged in the preceding paragraphs, Defendant Officers were members of the Rockford Police Department, acting at all relevant times within the scope of their employment.

119. Defendant City of Rockford is liable as the principal for all torts committed by its agents.

**Count XII -- State Law Claim**

**Indemnification**

120. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

121. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

122. The Defendant Officers are or were employees of the Rockford Police Department, and acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiffs, LUMONT JOHNSON and ANTHONY ROSS, respectfully request that this Court enter judgment in his favor and against Defendants, CITY OF ROCKFORD, DOUG PALMER,

26

APP 068

DOMINIC IASPARRO, JOSEPH STEVENS, JAMES RANDALL, SCOTT

MASTROIANNI, THEO GLOVER, KURT WHISENHAND, TORRY REGEZ, SHERYL

LINDMARK AS THE INDEPENDENT EXECUTOR OF THE ESTATE OF GREGORY

LINDMARK, AND UNKNOWN EMPLOYEES OF THE CITY OF ROCKFORD,

awarding compensatory damages, costs, and attorneys' fees, as

well as punitive damages against all individual defendants, and

any other relief this Court deems just and appropriate.

### JURY DEMAND

Plaintiffs, LUMONT JOHNSON and ANTHONY ROSS, hereby

demand a trial by jury pursuant to Federal Rule of Civil

Procedure 38(b) on all issues so triable.


RESPECTFULLY SUBMITTED:


s/ Elliot Slosar
Attorneys for Lumont Johnson and
Anthony Ross


Arthur Loevy
Jon Loevy
Gayle Horn
Roshna Bala Keen
Elliot Slosar
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

27

APP 069

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISON

| | | |
|---|---|---|
| TYJUAN ANDERSON, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 15-cv-50065 |
| | ) | |
| CITY OF ROCKFORD, DOUG PALMER, | ) | |
| DOMINIC IASPARRO, JOSEPH STEVENS, | ) | |
| JAMES RANDALL, SCOTT MASTROIANNI, | ) | |
| THEO GLOVER, KURT WHISENHAND, TORRY REGEZ, | ) | |
| SHERYL LINDMARK AS THE INDEPENDENT EXECUTOR | ) | |
| OF THE ESTATE OF GREGORY LINDMARK, AND | ) | |
| UNKNOWN EMPLOYEES OF THE CITY OF | ) | |
| ROCKFORD, | ) | JURY DEMAND |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff, TYJUAN ANDERSON, by his undersigned attorney, complains of

Defendants, CITY OF ROCKFORD, DOUG PALMER, DOMINIC IASPARRO,

JOSEPH STEVENS, JAMES RANDALL, SCOTT MASTROIANNI, THEO

GLOVER, KURT WHISENHAND, TORRY REGEZ, SHERYL LINDMARK AS THE

INDEPENDENT EXECUTOR OF THE ESTATE OF GREGORY LINDMARK, AND

UNKNOWN EMPLOYEES OF THE CITY OF ROCKFORD as follows:

### Introduction

1.      Plaintiff Tyjuan Anderson spent years in prison and on other

forms of detention for the murder of Demarcus Hanson.

2.      Anderson did not commit the crime.

APP 070

Case: 3:15-cv-50065 Document #: 48 Filed: 12/06/15 Page 2 of 27 PageID #:223
Case: 18-2211     Document: 29     Filed: 11/16/2018     Pages: 153

3.      Mr. Anderson along with his criminal co-defendants (now themselves plaintiffs) are innocent.

4.      Mr. Anderson was convicted after the Defendants engaged in a smorgasbord of egregious wrongdoing, including fabricating statements, threatening witnesses and withholding highly exculpatory evidence – including a third party confession of the real killer – in an effort to shortcut the investigatory process and frame Plaintiff for a crime he did not commit.

5.      Never giving up on proving his innocence, Mr. Anderson filed Post-Conviction Petitions.

6.      During the Post-Conviction proceedings, Defendant Doug Palmer came forward and confessed to a host of misconduct that violated Plaintiffs' right to due process – a confession that he has stood by despite being attacked by his former colleagues and threatened with perjury.

7.      The Defendants, in their zeal to frame Anderson, purposely ignored compelling evidence that two other individuals, Kefentse Taylor and Casel Montgomery, actually committed the shooting.  Taylor has since died.

8.      Montgomery was confronted on the stand with his wrongdoing. Rather than answer questions about his whereabouts on the night of the shooting, he invoked his Fifth Amendment rights because he had a legitimate concern that testifying would subject him to criminal liability for the Hanson murder.

APP 071

9. On March 19, 2013, after a lengthy evidentiary hearing during which Mr. Anderson presented overwhelming evidence of his innocence, the conviction was vacated and a new trial ordered.

10. On November 6, 2015, after a two-week retrial, Mr. Anderson was acquitted of all charges.

## Parties-Jurisdiction and Venue

11. Mr. Tyjuan Anderson is a 33-year-old resident of Rockford, Illinois. Mr. Anderson is the father of a young child who was born during his 2015 trial.

12. Mr. Anderson was jointly charged and tried with Anthony Ross and Lumont Johnson. They too were acquitted. (Collectively they will be referred to as "Plaintiffs").

13. At all times relevant hereto, Defendants Doug Palmer, Dominic Iasparro, Joseph Stevens, James Randall, Scott Mastroianni, Theo Glover, Gregory Lindmark, Kurt Whisenhand and Torry Regez (hereinafter "Defendant Officers") were police officers in the Rockford Police Department. All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation and trials of the murder at issue.

14. The true names and capacities of John Does One though Nine are presently unknown to the Plaintiff. Plaintiff is informed and believes, and based on such belief alleges that each of said John Does is or was at times relevant

3

APP 072

responsible for damages suffered by ANDERSON. Leave of Court will be sought to amend this complaint to include the true names and capacities of John Does One through Nine as soon as such information becomes known to ANDERSON.

15. Defendant City of Rockford is an Illinois municipal corporation. The City of Rockford is or was the employer of each of the Defendant Officers.

16. This is a civil action seeking money damages on behalf of Plaintiff Tyjuan Anderson (herein "ANDERSON"), under 42 U.S.C. § 1983 for violations of ANDERSON'S constitutional rights under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

17. This Court has original jurisdiction of ANDERSON'S causes of action under 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 1983.

18. Venue is proper with this Court under 28 U.S.C. 1391 (b) as a substantial part of the events and omissions giving rise to the claims asserted herein occurred in the Northern District of Illinois.

19. On March 19, 2013, the Order granting ANDERSON'S Post-Conviction relief was entered, vacating his conviction. The decision was affirmed on appeal by the Appellate Court of Illinois, Second District, on November 14, 2014.

The Crime

20. On April 14, 2002, eight-year-old Demarcus Hanson was killed by shots that were fired through a window in his grandmother Estella Dowthard's house.

21. Estella Dowthard called 911 at 2:53 a.m. to report the shooting.

4

APP 073

22.     According to the police, the shooting was a misfire; the shooters were aiming at Estella Dowthard's son, Alex Dowthard, but accidentally hit Demarcus Hanson.

### Plaintiffs' Innocence

23.     None of the other defendants were involved with this crime. In fact, they were nowhere near the house at the time it occurred.

24.     Earlier in the night, Plaintiffs had been with each other visiting with friends and going to a nightclub.

25.     At the time of the shooting, all three men were elsewhere: Mr. Johnson and Mr. Anderson were together at Mr. Anderson's house, and Mr. Ross was at his own home.

26.     Mr. Johnson made several phone calls to his friend trying to find a place to stay that evening because he had had a fight with his girlfriend.  The calls occurred between 2:46 a.m. and 2:53 a.m.

27.     Mr. Ross was at home when the shooting occurred, with his then-girlfriend Toni Gulley and their infant baby. |

### The Police Investigation

28.     There was never any physical evidence linking Plaintiffs to this crime.

5

APP 074

29.     None of their fingerprints or DNA were found at the crime scene.

30.     The Defendant Officers spoke to Plaintiffs on the day of the shooting.

31.     When Mr. Ross, Mr. Johnson and Mr. Anderson learned that the police wanted to speak with them, each went to the police station and told the Defendant Officers about their whereabouts – that they were elsewhere and innocent.

32.     Mr. Johnson, Mr. Ross and Mr. Anderson were each released from custody that day.

33.     Javarus Williams, the fourth person that Anderson, Ross, and Johnson were with on the night of the shooting, also voluntarily came to the police station on the day of the shooting. Williams gave a statement consistent with what Anderson, Ross, and Johnson had already told the police. He corroborated the fact that the four were together that night and that they then went home.

34.     Also on the day of the shooting, the Defendant Officers spoke to the suspected target of the shooting, Alex Dowthard.

35.     Mr. Dowthard, who was then on parole, told the Defendant Police Officers that he was not present at the time of the shooting and could not identify the shooters.

36.     Mr. Dowthard admitted to possessing and shooting a firearm in a separate incident, and therefore was taken into custody on a parole violation.

6

APP 075

37. Mr. Dowthard remained in custody until he changed his story.

38. Shortly before the Demarcus Hanson shooting, Alex Dowthard had tried to frame ANDERSON, Ross, and Johnson for a separate incident in which Dowthard was shot.

39. Dowthard's attempt to falsely frame ANDERSON, Ross, and Johnson for the shooting failed when the police investigation confirmed that Dowthard had been shot by a member of his own street gang.

40. On April 24, 2002, Antowan Lambert, went to the police station and told detectives that Ross and Johnson were responsible for the murder of Demarcus Hanson.

41. Lambert claimed that he had gotten this information from Lataurean Brown, who he said was with Alex Dowthard on the night of the shooting.

42. Lambert was the leader of Dowthard's gang.

43. After speaking with Antowan Lambert, the police called Lataurean Brown.

44. Initially Brown did not corroborate Lambert's account of the shooting.

45. Still, Brown told the Defendant Officers that Dowthard had shot at a blue suburban earlier that night, and that after that shooting, he and Dowthard drove to Estella Dowthard's home where Alex Dowthard hid his gun.

7

46.    Brown did not initially tell Defendant Police Officers that he witnessed the shooting at Estella Dowthard's house, or that he saw ANDERSON, Ross or Johnson at Estella Dowthard's house.

47.    From that point the investigation went cold.

### The Defendants' Misconduct

48.    Determined to "solve" the Hanson murder, the Defendant Officers engaged in a campaign of misconduct to frame Plaintiffs for a crime they did not commit.

49.    To do so, the Defendant Officers fabricated witness statements, coerced, hit and threatened witnesses, and withheld exculpatory evidence that not only would have explained why witnesses were falsely incriminating Plaintiffs, but also the identity of the real shooters.

50.    That misconduct was never disclosed to the prosecutor or Plaintiffs' defense attorneys.

51.    Indeed, the prosecutor stated that had he known of this egregious litany of wrongdoing, it would have set off a cataclysmic chain of events, unraveling the criminal investigation and Plaintiffs' prosecution.

### *The Defendants Coerce and manufacture the Key Witnesses and Fabricate Their Statements*

52.    The Defendant Officers coerced and fabricated the statements of the State's key witnesses.

8

APP 077

53.     To induce Lataurean Brown to alter his statement that he did not see the shooters, the Defendant Officers threatened him.

54.     The Officers fabricated a statement for Brown to sign that would support their "theory" of the shooting.

55.     Defendant Officers further suborned perjury by instructing Brown to testify consistent with his police statement at Plaintiffs' trials even though it was false and fabricated.

56.     Alex Dowthard was similarly manipulated.

57.     When questioned at the beginning of the investigation, Mr. Dowthard repeatedly told the Defendant Officers that he did not see the shooters.

58.     The Defendant Officers threatened Mr. Dowthard that if he did not change his story, they would keep him imprisoned on a parole hold and bring additional criminal charges against him.

59.     The Defendant Officers also beat Mr. Dowthard.

60.     Mr. Dowthard was then provided with details of the crime.

61.     Dowthard falsely implicated Plaintiffs in the crime.

62.     When confronted with evidence that he gave false statements and testimony about the shooting, at both the post-conviction evidentiary hearing and 2015 trial, he invoked his Fifth Amendment right.

63.     To compound this unconstitutional conduct, the Defendant Officers buried evidence that both thoroughly impeached Mr. Brown's and Mr. Dowthard's false and fabricated statements that Plaintiffs committed the Hanson

9

murder, and would have corroborated the fact that neither saw the offenders and could not identify them.

64.     In particular, the Defendant Officers spoke to Mr. Brown's cousin.  Mr. Brown's cousin told the Defendant Officers that right after the shooting, she spoke to Mr. Brown and Mr. Dowthard at Concord Commons.  Mr. Brown and Mr. Dowthard told her that they did not see who committed the crime.

65.     Notwithstanding the obvious importance and exculpatory value of this information, the Defendant Officers failed to disclose it to the prosecution or defense.

### The Defendants Coerce and Threaten Other Witnesses

66.     The Defendant Officers similarly coerced other witnesses into giving false evidence and failed to disclose the fact of those coercions.

67.     For example, the Defendant Officers threatened to take witness Carmen Hearns' children to the Department of Children and Family Services ("DCFS") and re-activate an old misdemeanor charge into a felony.

68.     Even though Ms. Hearns told the Defendant Officers that she did not know anything about the shooting, the Defendant Officers told her that if she did not give them something, they were going to lock her up.

69.     The Defendant Officers made good on their promise to "lock her up".  After two days in jail, Ms. Hearns agreed to sign a fabricated statement that the Defendant Officers had pre-written, which falsely inculpated Plaintiffs in the crime.

10

70.     Similarly, the Defendant Officers threatened and harassed Toni Gulley in an effort to destroy Mr. Ross' alibi. The Defendant Officers told Ms. Gulley that she must have been mistaken about the time that Mr. Ross came home, and that if she did not "cooperate" with the Defendant Officers, they would call DCFS and report her for child neglect.  The Defendants further created false reports saying that Ms. Gulley could have been wrong when she provided the time that Mr. Ross came home.

71.     In addition, the Defendant Officers coerced and physically abused another witness when he threatened to change his story and expose the Defendant Officers' lies about how the Hanson shooting occurred.  The Defendant Officers told him to testify consistent with those lies, and hit him and threatened to arrest his mother if he did not.

### The Defendants Bury and Destroy Evidence
### Of the Identity of the Real Offenders

72.     The Defendant Officers unlawfully buried and destroyed any evidence demonstrating that two other people – Kefentse Taylor and Casel Montgomery – committed the crime.

73.     Defendant Lindmark told the other Defendant Officers to make a liar out of anyone that pointed the finger at Taylor and Montgomery, or discredited the police version that Plaintiffs and Mr. Anderson committed the crime. The Defendant Officers did just that.

74.     For example, the Defendant Officers received highly detailed and credible information from a witness who was with Mr. Taylor and Mr.

11

APP 080

Montgomery on the night of the shooting and who directly implicated Mr.

Montgomery and Mr. Taylor in the crime.

75.     Rather than investigate the information that the witness

provided, the Defendant Officers met with the witness a second time.

76.     The Defendant Officers handed the witness a statement that the

Defendant Officers had already written out for the witness to sign, that falsely

recanted the information he had provided about Mr. Montgomery's and Mr. Taylor's

culpability for the Hanson shooting.

77.     To induce the witness to make the false and fabricated

recantation, the Defendant Officers threated the witness.  That misconduct was

never disclosed to the prosecution or the defense.

78.     The Defendant Officers received information from a second

witness that Mr. Taylor had confessed to the Hanson shooting.

79.     Despite the obvious exculpatory value of that evidence, it was

buried and never turned over to the prosecutor or to Plaintiff's criminal defense

attorneys.

80.     The Defendant Officers told this second witness that if his

information was not about Plaintiffs they did not want to hear it.

12

## Plaintiffs' Wrongful Conviction

81.    As a result, Plaintiffs were wrongfully prosecuted and convicted, and the real killers – Mr. Taylor and Mr. Montgomery – were never prosecuted for this crime.

82.    As a result of the Defendants' misconduct, Plaintiffs were convicted of first-degree murder and sentenced to 50 years in prison.

83.    During the trial, the Defendants not only suborned perjury – e.g., telling Mr. Brown and Mr. Dowthard to testify consistent with their false and fabricated statements – but also committed perjury themselves by lying about their conduct during the investigation, their role in procuring false statements, and about the reliability of various statements obtained in the investigation.

84.    Without the Defendants' misconduct, Plaintiffs would not have been prosecuted or convicted.

## Plaintiffs' Exoneration

85.    Never giving up hope and remaining steadfast in their protestations of innocence, the Plaintiffs filed Post-Conviction Petitions challenging their convictions.

86.    During those proceedings Defendant Palmer admitted to a host of misconduct that he and the Defendant Officers committed in an effort to frame the Plaintiffs for a crime that they did not commit.

87.    Defendant Palmer testified to the same during the Plaintiffs' post-conviction evidentiary hearing.

APP 082

88. On March 19, 2013, the Circuit Court granted Plaintiffs' post-conviction petitions, overturning their convictions, vacating their sentences and granting them new trials. That decision was affirmed on appeal.

89. During the course of the investigation, ANDERSON was offered a plea deal which would have required him to falsely implicate Johnson and Ross in the shooting. Had he done so, he would have been granted probation and never served a day in prison. He refused to join the Defendant Officers' scheme to manufacture evidence and maintained his innocence.

## Rockford's Code of Silence

90. The constitutional injuries that Plaintiff suffered were caused by the policies and practices of the Rockford Police Department.

91. In particular, there was a "code of silence" that permeated the Department. As Defendant Palmer testified, that code meant "[k]eep your mouth shut and do what you're told." In other words, Rockford police officers are taught to look the other way and acquiesce when fellow officers are committing misconduct; under no circumstances were officers to provide adverse information against a fellow officer.

92. As a result of that code of silence, Rockford police officers are not properly supervised or disciplined in any way. To the contrary, officers are allowed to continue to commit misconduct with impunity, including the type of misconduct at issue here.

14

93.     Indeed, within the Rockford Police Department, there was a policy and practice of taking short cuts to solve criminal investigations, including by fabricating statements, coercing witnesses and withholding exculpatory and impeachment evidence.

94.     This policy and practice repeated itself in numerous criminal investigations conducted by the Rockford Police Department.  As Defendant Palmer has testified, that misconduct was widespread.

95.     Nonetheless, and despite notice to (and often involvement of) policymakers in the above-described unconstitutional policies and practices, there was no effort to rectify any such misconduct.  The City of Rockford and officials within the Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.  They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiffs' ongoing injuries.

96.     The policies and practices described in the foregoing paragraphs were consciously approved by City of Rockford policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

97.     Those policies and practices were the proximate cause of the constitutional injuries that Plaintiff sustained, as described more fully above.

98.     Moreover, The City's failure to train its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiffs in this case.  Constitutional violations such as occurred

15

in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

## Plaintiff's Damages

99.    Plaintiff spent over a decade in prison for a crime he did not commit.  He spent other time in the Winnebego County Jail and on home detention.

100.    During their wrongful incarceration, the Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  He missed out on the ability to conceive and raise children, share holidays, births, funerals and other life events with loved ones, and the fundamental freedom to live one's life as an autonomous human being.

101.    As a result of his wrongful incarceration, Plaintiffs must now attempt to rebuild his life all without the benefit of over a decade of life experience that ordinarily equip adults for that task.

102.    Plaintiff has suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

## Count I – Due Process

## 42 U.S.C. § 1983

103.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

APP 085

104.     As described more fully above, the Defendant Officers, while acting individually, jointly, and in conspiracy with other named and unnamed individuals, as well as under color of law and within the scope of their employment, deprived Plaintiffs of their constitutional right to a fair trial.

105.     In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory and impeachment evidence, fabricated false statements, reports and other evidence, and suborned perjury, thereby misleading and misdirecting the criminal prosecutions of Plaintiff.  Absent this misconduct, the prosecutions of Plaintiffs could not and would not have been pursued.

106.     The Defendant Officers' misconduct also directly resulted in the unjust criminal convictions of Plaintiff, thereby denying him their constitutional right to a fair trial, and a fair appeal thereof, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

107.     As a result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including, but not limited to, incarceration, physical sickness and injury, and emotional distress, as is more fully alleged above.

108.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

109.     The misconduct by the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Rockford Police

17

APP 086

Department, which Plaintiff was the victims of, and his injuries were proximately caused by a policy and practice on the part of the City of Rockford to pursue and secure false convictions through profoundly flawed investigations as described throughout this complaint.

110.    Specifically, during the relevant time period, a group of Rockford police officers, including some or all of the Defendant Officers herein, engaged in a systematic pattern of coercion, fabrication of evidence, withholding of exculpatory information, and other illegal tactics, the sum total of which completely corrupted the investigative process.

111.    This institutional desire to close cases through unconstitutional tactics regardless of actual guilt or innocence, in order to enhance police officers' personal standing in the Department, was known to the command personnel, who themselves participated in the practice.

112.    The above-described widespread practices, so well-settled as to constitute *de facto* policy in the Rockford Police Department during the time period at issue, were able to exist and thrive because municipal policymakers with authority over the same either concurred with the practices or exhibited deliberate indifference to the problem.

113.    The widespread practices described in the preceding paragraphs were allowed to take place because the City declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment.  Indeed, the Department's system for investigating and disciplining police officers accused of the

18

type of misconduct that befell Plaintiffs was, and is, for all practical purposes, nonexistent.  Indeed, the Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline or oversight.

114.    Rockford police officers who manufactured criminal cases against individuals such as Plaintiffs had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and/or Departmental discipline, but that they also stood to be rewarded for closing cases no matter what the costs.  In this way, this system proximately caused abuses, such as the Defendant Officers' misconduct at issue in this case.

## Count II - Failure to Intervene

### 42 U.S.C. § 1983

115.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

116.    In the manner described above, during the Constitutional violations described above, one or more of the Defendant Officers (including as-yet-unknown Police Officers) stood by without intervening to prevent the misconduct.

117.    As a result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered damages, including physical sickness and injury, as well as emotional distress.  These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

APP 088

118.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

119.   The Defendant Officers' misconduct described in this Count was undertaken pursuant to Rockford's policy and practice in the manner described in preceding paragraphs.

## Count III - Conspiracy

## 42 U.S.C. § 1983

120.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

121.   Prior to arresting Plaintiff, the Defendant Officers reached an agreement amongst themselves to frame Plaintiffs for the crime, and to thereby deprive Plaintiffs of their constitutional rights, all as described in the various Paragraphs of this Complaint.

122.   In addition, before and after Plaintiff's conviction, each of the Defendant Officers further conspired, and continue to conspire, to deprive Plaintiff of exculpatory materials to which they are lawfully entitled and which would have led to their more timely exoneration of the false charges as described in the various Paragraphs of this Complaint.

20

123.    In this manner, the Defendant Officers, acting in concert with each other and with other unknown co-conspirators, including persons who are and who are not members of the Rockford Police Department, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

124.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

125.    As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and they suffered physical injury and sickness, and severe emotional distress and anguish, as is more fully alleged above.

126.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

127.    The Defendant Officers' misconduct described in this Count was undertaken pursuant to the policy and practice of the Rockford Police Department in the manner described more fully in preceding paragraphs, and was tacitly ratified by policy-makers for Rockford with final policymaking authority.

**Count VII - Supervisor Liability**

**42 U.S.C. § 1983**

128.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

APP 090

129.    The constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct, which occurred with the knowledge and consent of those of the Defendant Officers who acted in a supervisory capacity, including but not limited to Defendants Iasparro, Lindmark and Glover, such that these officers personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or least recklessly caused the alleged deprivation by their actions or by their deliberately indifferent failure to act.

130.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

131.    The misconduct described in this Count was undertaken pursuant to the City's policy and practice in the manner more fully described above.

132.    As a result of this violation, Plaintiffs suffered injuries, including but not limited to physical sickness and injuries, and emotional distress, as is more fully alleged above.

133.    Absent knowing participation by the command personnel responsible for supervising the Defendant Officers, the misconduct alleged in this Complaint could not have occurred.

### Count VIII – Malicious Prosecution

22

## 42 U.S.C. § 1983[1]

134.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

135.    Defendant Officers caused Plaintiffs to be improperly subjected to judicial proceedings for which there was no legitimate probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Plaintiffs' favor in a manner indicative of his innocence.

136.    The Defendant Officers accused Plaintiffs of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

### Count IX – State Law Claim

### Malicious Prosecution

137.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

138.    Defendant Officers caused the Plaintiffs to be improperly subjected to judicial proceedings for which there was no legitimate probable cause. These judicial proceedings were instituted and continued maliciously, resulting in

---

[1]    Plaintiffs are including this claim in his First Amended Complaint to preserve it in the event that the Seventh Circuit overturns its ruling in *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001).

injury, and all such proceedings were ultimately terminated in the Plaintiff's favor in a manner indicative of innocence.

139.    Defendant Officers accused the Plaintiffs of criminal activities knowing those accusations to be without genuine probable cause, and made statements to the police and/or prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

140.    Defendant Officers also fabricated evidence and failed to disclose the manner in which that evidence was fabricated.  Additionally, the Defendant Officers withheld evidence that would have proven the Plaintiff's innocence.

141.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

142.    As a result of this misconduct, the Plaintiff sustained injuries, including physical injury and sickness, and emotional pain and suffering, as more fully alleged above.

## Count X -- State Law Claim

### Intentional Infliction of Emotional Distress

143.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

144.    In the manner described more fully above, by wrongfully inculpating the Plaintiff in a crime he did not commit, Defendant Officers intended to cause emotional distress.

APP 093

145.    In doing so, Defendant Officers' conduct was extreme and outrageous and caused the Plaintiff severe, disabling emotional distress.

146.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

147.    As a result of this misconduct, Plaintiff sustained injuries, including physical injury and sickness, and emotional pain and suffering, as is more fully alleged above.

## Count XI -- State Law Claim

### Respondeat Superior

148.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

149.    In committing the acts alleged in the preceding paragraphs, Defendant Officers were members of the Rockford Police Department, acting at all relevant times within the scope of their employment.

150.    Defendant City of Rockford is liable as the principal for all torts committed by its agents.

APP 094

## Count XII -- State Law Claim

### Indemnification

151.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

152.   Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

153.   The Defendant Officers are or were employees of the Rockford Police Department, and acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, TYJUAN ANDERSON, respectfully request that this Court enter judgment in his favor and against Defendants, CITY OF ROCKFORD, DOUG PALMER, DOMINIC IASPARRO, JOSEPH STEVENS, JAMES RANDALL, SCOTT MASTROIANNI, THEO GLOVER, KURT WHISENHAND, TORRY REGEZ, SHERYL LINDMARK AS THE INDEPENDENT EXECUTOR OF THE ESTATE OF GREGORY LINDMARK, AND UNKNOWN EMPLOYEES OF THE CITY OF ROCKFORD, awarding compensatory damages, costs, and attorneys' fees, as well as punitive damages against all individual defendants, and any other relief this Court deems just and appropriate.

### JURY DEMAND

Plaintiffs, TYJUAN ANDERSON, hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:


s/ Steve Greenberg
Attorney for Tyjuan Anderson


Steven A. Greenberg
Steven A. Greenberg and Assoc., Ltd.
53 W. Jackson Blvd.
Suite 1260
Chicago, IL 60604
(312) 879-9500