No. 18-2211
No. 18-2232

---

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

---

TYJUAN ANDERSON, LUMONT JOHNSON
 & ANTHONY ROSS

*Plaintiffs-Appellants*,

*v.*

CITY OF ROCKFORD, DOUG
PALMER, DOMINIC IASPARRO,
JOSEPH STEVENS, JAMES RANDALL,
SCOTT MASTROIANNI, THEO GLOVER
KURT WHISENHAND, and TORRY REGEZ,

*Defendants-Appellees*.

---

Appeal from the United States District Court for the
Northern District of Illinois
No. 3:15-cv-50064—Frederick J. Kapala, *Judge*.
No. 3:15-cv-50065—Frederick J. Kapala, *Judge*.

---

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

---

*Attorney for Plaintiff-Appellant*
*Anderson*

Steven Greenberg
Greenberg Trial Lawyers
53 W. Jackson Blvd., Ste. 1260
Chicago, IL 60604
Telephone: (312) 879-9500

*Attorneys for Plaintiffs-Appellants*
*Johnson & Ross*

Jon Loevy
Gayle Horn
Roshna Bala Keen
Elliot Slosar
Loevy & Loevy
311 N Aberdeen, 3rd Floor
Chicago, IL 60607
Telephone: (312) 243-5900

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................... i

TABLE OF AUTHORITIES ......................................................................... iii

ARGUMENT ................................................................................................... 1

   I.   The Adverse Inference From Lead Detective Palmer's Fifth
       Amendment Invocation Controverts Summary Judgment ..................... 2

  II.   Defendants Ignore Most Of Plaintiffs' Evidence Demonstrating
       Genuine Factual Disputes ................................................................... 5

       A. Denial of Plaintiffs' Evidence Violates Rules 56 ........................... 5

       B. Genuine Disputes of Material Facts Exist ..................................... 6

 III.   A Trial Is Required On Fabrication ...................................................... 10

       A. Dowthard ....................................................................................... 10

       B. Brown ............................................................................................. 14

       C. Montgomery ................................................................................... 17

          1.   Genuine Disputes of Fact ...................................................... 17

          2.   Montgomery's Fabricated Statement Deprived
                 Plaintiffs of Liberty .............................................................. 19

          3.   Other Relevant Purposes ...................................................... 20

       D. Croft .............................................................................................. 20

 IV.   A Trial Is Required on Plaintiffs' *Brady* Claims ................................. 21

       A. Rickedda Young's Suppressed Statement ..................................... 21

       B. Suppression of the Tapes ............................................................... 22

1.    The Tapes Were Withheld for Purposes of *Brady*.............. 22

2.    The Tapes Would Not Have Been Cumulative ................... 24

C. Suppressed Evidence of Witness Coercion and Fabrication ....... 24

D. Sonya White ................................................................... 25

V.    The Tapes Are Admissible And Should Have Been Considered ........... 25

A. Defendants, Not Plaintiffs, Have Forfeited
Hearsay Arguments.......................................................... 25

B. The Tapes Can Be Authenticated At Trial................................. 27

C. The Tapes Are Admissible................................................... 29

VI.    Issue Preclusion Does Not Apply .............................................. 30

VII.   Plaintiffs' Remaining Claims .................................................. 31

A. Remaining Federal and State Claims ......................................... 31

B. Dismissed Defendants .................................................... 32

CONCLUSION ..................................................................... 32

# TABLE OF AUTHORITIES

*ArlinGolf, LLC v. Vill. of Arlington Heights,* 631 F.3d 818
(7th Cir. 2011) ................................................................ 27

*Avitia v. Metro*, 49 F. 38 1219 (7th Cir. 1995) ....................................6

*Barton v. Warden, So. Ohio Corr. Facility*, 786 F.3d 450
(6th Cir. 2016) ................................................................24

*Baxter v. Palmigiano,* 425 U.S. 308 (1976)...............................................3

*Berger v. United States*, 295 U.S. 78 (1935) .............................................2

*Bonte v. U.S. Bank, N.A.*, 624 F.3d 461 (7th Cir. 2010)....................................30

*Brady v. Maryland, 373 U.S. 83 (1963)*....................................24

*California v. Trombetta*, 467 U.S. 479 (1984) ...............................................20

*Celotex Corp. v. Catrett*, 477 U.S. 317.........................................5, 26

*Crowley v. Winans, 920 F.2d 454 (7th Cir. 1990)* ...............................................4

*Daniels v. Pipefitters' Ass'n. Local Union No. 597*, 983 F.2d 800
(7th Cir. 1993) ...............................................................4

*Erickson v. Rush Presbyterian St. Luke's Med. Ctr*, 289 Ill. App. 3d 159
(1st Dist. 1997) ................................................................31

*F.D.I.C. v. Fid. & Deposit Co. of Maryland*, 45 F.3d 969
(5th Cir. 1995) ...............................................................3

*Fields v. City of Chicago*, No. 10 C 1168, 2014 WL 477394
(N.D. Ill. Feb. 6, 2014) ...............................................................19

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ...............................................14

*Fikes v. Alabama*, 352 U.S. 191 (1957) ...............................................16

*Gondeck v. A Clear Title and Escrow Exch., LLC*, 11 C 6341
2013 WL 4564994 (N.D. Ill. Aug. 28, 2013) ...........................................27

*Graystone Nash, Inc.*, 25 F.3d 187 (3rd Cir. 1994) ...............................................3

*Kyles v. Whitley*, 514 U.S. 419 (1995)...............................................19

*Laborers' Int'l Union of N. Am. v. Caruso,* 197 F.3d 1195
(7th Cir. 1999) ...............................................................23

*Leka v. Portuondo*, 257 F.3d 89, 100 (2nd Cir. 2001) ...........................................23

*M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313 (7th Cir. 2017) .................................................26

*Malhotra v. Cotter & Co.,* 885 F.2d 1305 (7th Cir.1989) .................................26

*Malley v. Briggs,* 475 U.S. 335 (1986) ..................................................23

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018) ........................................24

*Narducci v. Moore*, 572 F.3d 313 (7th Cir. 2009) .....................................27

*Palmquist v. Selvik*, 111 F.3d 1332 (7th Cir. 1997) ...................................6

*People v. Cannon*, 293 Ill. App. 3d 634 (1997) .......................................31

*People v. Gibson*, 2018 IL App (1st) 162177 ...........................................2

*People v. Johnson*, 2014 IL App (2d) 130368 .........................................30

*People v. Sutherland*, 223 Ill.2d 187 (2006) .........................................30

*Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014) ..............................14

*Phillips v. City of Chicago*, No. 14 C 9372, 2018 WL 1309881 (N.D. Ill. Mar. 13, 2018) ...............................................................15

*Sornberger v. City of Knoxville,* 434 F.3d 1006, 1020 (7th Cir. 2006) ..................................................................................31

*Sissom v. Purdue Univ.,* No. 4:04CV72, 2006 WL 897572 ............................29

*Sprosty v. Buchler,* 79 F.3d 635 (7th Cir. 1996). .....................................16

*Srivastava v. Russell's Barbecue, Inc.*, 168 Ill.App.3d 726 (1st Dist. 1988) ..................................................................................30

*Steinhauer v. DeGolier*, 359 F.3d 481 (7th Cir. 2004) ................................6

*Stichting Ter Behartiging Van de Belangen v. Schreiber* 407 F.3d 34 (2d Cir. 2005).........................................................................3

*Thompson v. City of Chicago*, 722 F.3d 963 (7th Cir. 2013) ....................12, 20

*Thorn v. Sundstrand Aerospace Corp.,* 207 F.3d 383, 389 (7th Cir. 2000) .........................................................12

*United States v. Agurs*, 427 U.S. 97 (1976) ..........................................22

*United States v. Cruz-Rea*, 626 F.3d 929 (7th Cir. 2010) ............................28

*United States v. Pollock,* 417 F.Supp (D.Mass.1976) ..........................................20

*United States v. Smith*, 557 F. App'x 606 (8th Cir. 2014).................................28

*United States v. Tolliver,* 454 F.3d 660 (7th Cir. 2006) .....................................28

*United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982) ...............................20

*Wearry v. Cain,* 136 S.Ct. 1002 (2016) .......................................................21, 25

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Circ. 2012) ............................19, 23

**Argument**

Plaintiffs were wrongfully convicted of murder, each spending over a decade in prison before being acquitted at a retrial. Notwithstanding overwhelming evidence of police misconduct, the district court granted Defendants summary judgment, erroneously assuming it could not consider much of the testimony in the record. This appeal followed.

In defense of an improvidently granted summary judgment, Defendants present a narrative that is mired in the past, before evidence of misconduct came to light, including fabricated statements, coerced witnesses, and suppressed evidence. They ignore that the lead detective, Doug Palmer, testified to framing Plaintiffs, and that he and other Defendants threatened witnesses into adopting false statements. They also ignore that Palmer subjected himself to adverse inferences in the civil suit by invoking the Fifth Amendment; that one of the State's two witnesses also asserted the Fifth Amendment when asked whether he perjured himself at the Plaintiffs' criminal trial; and that the State's other witness testified that he was threatened into giving a false statement. And they ignore suppressed witness statements and audio recordings that not only discredit the State witnesses' false testimony, but also corroborate the misconduct that the Plaintiffs have alleged.

Defendants' strategy is clear: ignore unfavorable evidence. That evidence which they do acknowledge, they try to jettison based on specious admissibility arguments. Contravening the summary judgment stage, they make credibility arguments and draw all inferences in their favor. Far from proving the absence of genuine factual disputes, Defendants' brief serves to highlight them. When the evidence is viewed in Plaintiffs' favor—as it must be—it is clear Plaintiffs are entitled to a trial.

## I.   The Adverse Inference From Lead Detective Palmer's Fifth Amendment Invocation Controverts Summary Judgment

This is an extraordinary case. The lead detective, Palmer, was asked during discovery whether he framed Plaintiffs in the manner that the evidence suggests he did. In response, Palmer did not deny violating Plaintiffs' constitutional rights, electing instead to assert his right against self-incrimination—a privilege available only where truthful answers could subject him to criminal liability. *See People v. Gibson*, 2018 IL App (1st) 162177, ¶¶ 105-108  (when an officer "is unwilling to assure the court that he and his colleagues did *not* physically coerce a confession, when he determines that a truthful answer could subject him to criminal liability, the court should take careful note.") (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)).

Palmer's privilege assertion undoubtedly served his personal interests. Yet there were significant costs for the litigation: his refusal to answer legitimate questions not only blocked Plaintiffs from conducting critical discovery (i.e., from building their case) but also from eliciting Palmer's admissions about whatever damaging evidence triggered his Fifth Amendment assertions.

Under the circumstances, summary judgment was totally inappropriate. The law permits Palmer to avoid self-incrimination, but that indulgence cannot be parlayed into summary judgment in his own favor. *See Stichting Ter Behartiging Van de Belangen v. Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005). Where Palmer seeks relief from trial under Rule 56, Plaintiff is entitled to all reasonable inferences, and the law in civil cases specifically permits an adverse inference. *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976); *Graystone Nash, Inc.*, 25 F.3d 187, 191 (3rd Cir. 1994). Were it otherwise, Defendants would routinely hide behind their silence, blocking legitimate discovery and then turning around to seek summary judgment. The law does not allow that result.

Nor do Plaintiffs seek to "impute" the Fifth Amendment to others. That concern is a red herring. *See F.D.I.C. v. Fid. & Deposit Co. of Maryland*, 45 F.3d 969, 978 (5th Cir. 1995). Juries may draw adverse inferences against the person invoking the privilege, whether party or witness. *Baxter*, 425 U.S. at

3

318; *Daniels v. Pipefitters' Ass'n. Local Union No. 597*, 983 F.2d 800, 802 (7th Cir. 1993) (recognizing permissive adverse inference against non-party witness). A jury could infer from the refusal to testify that a truthful response would expose him criminally. And that resulting inference may be probative of a fact in the case. *See Crowley v. Winans,*920 F.2d 454, 456 (7th Cir. 1990). If, hypothetically, Dowthard affirmatively admitted that he didn't see the shooting, or Palmer admitted that he framed Plaintiff, that testimony is probative and plainly admissible, even when considering claims against different Defendants. The result is no different just because rather than a direct admission, we are dealing with inferences deriving from the witnesses' privilege invocations.

With no other answer, Defendants attempt to invoke a narrow category of cases where summary judgment can be granted notwithstanding a Fifth Amendment assertion because there is literally no corroboration of wrongdoing. Courts are understandably wary about denying summary judgment where there is no evidence that a claim has merit and the plaintiff is taking advantage of the silence from a defendant facing other criminal problems.

But that is hardly the case here.  Each of Plaintiffs' claims is amply corroborated by sufficient evidence, as shown below.

**II.    Defendants Ignore Most Of Plaintiffs' Evidence Demonstrating Genuine Factual Disputes.**

**A. Denial of Plaintiffs' Evidence Violates Rules 56.**

Defendants alternately deny Plaintiffs' evidence, mischaracterize the evidence, and draw inferences in their own favor. For example, Defendants claim there is "no admissible evidence" that Montgomery's statement was fabricated by Defendants (Def.Br. at 29), when there plainly is. Montgomery testified that Defendant Palmer told him to falsely implicate Ross in the murder: "[O]f course, he asked me to lie …. He wanted me to say that Anthony Ross committed a murder." R.249-6 at 34:7-14. Similarly, Defendants rely on only the version of purported eyewitness Brown's statement that is favorable to them despite Brown's sworn 2015 testimony contradicting it.

As non-movants, Plaintiffs are required to present facts supporting their claims and challenging the movants' facts. Conversely, Defendants must demonstrate the *absence* of a genuine dispute, mindful that courts must take the facts in the light most favorable to the non-movants. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323. Where, as here, the record diverges significantly, Defendants may disagree with Plaintiffs' account, but those divergences are for the jury to resolve.

Yet Defendants ask this Court to strike Plaintiffs' statement of the case for "omit[ting] unfavorable material facts" and containing argument. *See* Def.Br. at 12. There is no legal basis support for striking Plaintiff's statement. It is neither argumentative nor a misstatement of the record.

Moreover, by ignoring Plaintiffs' evidence, Defendants' own statement on appeal fails to conform to the applicable legal standard, as is required. *See Avitia v. Metro*, 49 F. 38 1219, 1214 (7th Cir. 1995); *Palmquist v. Selvik*, 111 F.3d 1332, 1337 (7th Cir. 1997).[1]

## B. Genuine Disputes of Material Facts Exist

Defendants' strategy of isolating discrete portions of the record and ignoring the rest fails to consider the record "as a whole," which Rule 56 requires. *Steinhauer v. DeGolier*, 359 F.3d 481, 488 (7th Cir. 2004). When Plaintiffs' facts are credited, and reasonable inferences drawn in their favor, there is ample evidence for a jury to conclude:

---

[1] Substantively, Defendants' chart of alleged misstatements is misleading. Defendants' counter-citations prove the *existence* of significant factual disputes. Additionally, Defendants suggest far fewer record citations for given factual assertions than included in Plaintiffs' brief and scrutinize selected citations in a vacuum.

Plaintiffs, however, did inadvertently misidentify a set of record cites by listing their summary judgment exhibit number without the assigned prefix, R. 249-*. Thus, citations to R. 1, 2, 7, 8, 26, 30, 31, 37, 39, 44, 51, 52, 54-56, 59, 62, and 65, should be corrected to include the prefix "R.249-" before the number. Counsel apologizes for this error.

1. Dowthard and Brown did not actually see the shooter.

   - On April 14, Dowthard and Brown fled after hearing gunshots and drove straight to their relative's house (Rickedda Young); there, they told her they could not identify the shooter. R.249-21 at JR10967-69.

   - At his civil deposition, Dowthard averred that his May 31, 2002 statement was false. R.249-7 at 67.

2. Defendants Stevens, Palmer, and others **knew** Dowthard and Brown did not see the shooter.

   - Dowthard told Palmer, Stevens, Randall, and other police that he got into an altercation with Plaintiffs that evening, firing his gun (i.e., violating parole). R.249-34 at JR3669-70. He and Brown repeatedly told Defendants they did not see who committed the Hanson shooting. R.249-34 at JR3670; Def.Br. at 4 (citing R. 232 at ¶12); R.249-40 at RPD 7829-30. [2]

   - Rickedda Young relayed Brown and Dowthard's statements to the police. R.249-21 at JR10973. Defendants Stevens and Mastroianni interviewed her and would have learned this information, as would Defendant Palmer, who was the co-lead investigator on the case. R.249-29 at RPD8144-8145. As the "co-lead detective," Palmer was heavily involved in all important developments in the investigation. R.249-8 at JR10673-4.

---

[2] It is undisputed that earlier in the evening, Dowthard fired a gun toward Johnson and Anderson, and that Ross was not present. Def. Br. at 6-7. Contrary to Defendants' narrative, however, Johnson and Anderson were confused by the sound of gunshots, but saw no evidence of their van being hit, so they were unsure who were the intended targets. R.249-3 at 89:1-19; R.249-2 at 129:15-131:21, 135:1-14.

7

- Palmer invoked the Fifth Amendment when asked whether he knew Brown and Dowthard's statements were false and whether he fabricated them. *See, e.g.*, R.249-9 at 17, 81.

3. Palmer and Stevens coerced Dowthard and Brown into making false statements against Plaintiffs.

- After Dowthard said he could not identify the shooter, Palmer and Randall detained him on a parole violation, for discharging a gun. R.249-34 at JR3671. Palmer and Randall continued to question him though Dowthard was upset and knew nothing. *Id.* Defendants obtained a parole warrant and took Dowthard into custody. *Id.* at 003672.

- On May 2, Palmer, with Stevens present, interrogated Dowthard at IDOC and repeatedly hit him. R.249-65 at JR 21948-49; R.249-30 at 220. They also threatened to place charges on Dowthard. R.249-62 at JR21196.

- About a week later, Dowthard was served with a criminal warrant for an old forgery and now faced two charges: parole violation and forgery. *See* App.007.

- Meanwhile, on May 9, Palmer and Stevens re-interviewed Brown, though he too had told them he did not know who committed the shooting. Palmer and Stevens detained him for nine hours and threatened to jail him unless he gave a statement. R.249-1 at JR27078-79.  Due to the pressure, Brown relented and implicated Plaintiffs. *Id.*

- Two days later, Dowthard reveals on a recorded call that he was upset about the police pressure and the new charge, and stated that he "don't know why []they lyin," to which Antowan Lambert (the police go-between) responded, "[what] they trying to do is get the case solved before, before you get out." R.249-63 at JR21507-8. Lambert also said Stevens contacted him. *Id.*

- On May 20, Dowthard said the police were pushing him to the breaking point, even though he did not know who the shooter was. R.249-65 at JR21948.

8

- On May 23, Lambert was recorded telling Dowthard that the police told him, "[W]e got the case damn near closed. We just need dude to come on with it, man, you know what I'm sayin'?" R.249-64 at JR22111, JR22113. Lambert was told they would maintain Dowthard's parole hold indefinitely unless he complied. *Id.*

  Lambert elaborated: **what they want "is tell the[m] the light was green, when the[y] knew it was red already. They want a mother to say the light was green, man.** That's all these mother f** want to hear, man, so they can get on with this [] case." *Id.* at JR22118-9 (emphasis added). Lambert said Dowthard was guaranteed release from his parole hold if he helped put the men behind bars. *Id.* at 022120.

  Dowthard wanted a written guarantee, not just a verbal promise to assist with his parole hold: "If I sign somethin' man…, they gonna sign somethin' man." *Id.* at JR22123.

- One week later, Palmer and Stevens' supervisors Sergeants Lindmark and Glover obtained Dowthard's signed statement. *See* App.003. It parrots the statement Palmer and Stevens obtained from Brown.

- Dowthard's forgery charges were then dismissed; no reason was given. App.007.

4. Defendants buried evidence that impeached Brown's and Dowthard's statements and crafted false evidence to corroborate those statements.

- Defendants determined a red Grand Prix rented by Montgomery was the vehicle carrying the shooter. R. 249-30 at 243. Prior to obtaining Brown and Dowthard's statements, Defendants were aware Montgomery, not Plaintiffs, had the red car. R.249-30 at 246:5-12. Montgomery told Defendants in May that he did not loan the vehicle to Plaintiffs or anyone else. R.249-30 at 246:5-8. Defendants knew Plaintiffs could not have been in the red

9

> car, yet Brown and Dowthard's signed statements placed Plaintiffs in the red car.
>
> - Stevens did not write his police report regarding Young until May 9, the day he and Palmer secured the first inculpatory statement against Plaintiffs, even though he interviewed Young weeks earlier. His police report omits the statements materially impeaching Brown and Dowthard.

## III. A Trial Is Required On Fabrication.

Defendants' strategy of denying Plaintiffs' evidence and drawing self-serving inferences likewise infects their attack on Plaintiffs' due process claims.

### A. Dowthard

Defendants argue there is "no admissible evidence" that Dowthard (or Brown, discussed below) was threatened into giving false statements. But Plaintiffs have presented sufficient evidence, and Defendants' attempt to ignore it does not make it go away.

For example, Defendants deny that they threatened Dowthard or pursued a phony "eyewitness" account from him or that Palmer physically beat Dothward, arguing that Plaintiffs have not presented sufficient evidence of these claims; but Plaintiffs have.

There is much direct evidence from the coerced witness, Dowthard, from which a jury could find fabrication. On the Tapes, for example,

10

Dowthard complains, "[The police are] playin' with me, hurtin' me until I'm damn near at the point man…." R.249-65 at JR21948.[3] Dowthard singles out Palmer: "…Palmer man got – hittin' me all upside my head and everything, man, tellin' my sister what to – put his hands on me…." R.249-65 at JR 21948-49. He said the police "gonna bring up, talkin' about bringin' me up on some federal charges…" R.249-62 at JR21196.

Defendant Stevens, too, is named, during a conversation on May 11, 2002 between Dowthard and Lambert. R.249-63 at 6:5-22. Later on that same call, Dowthard says, "them saying they can put me there…. I wasn't [any]where around, you know what I'm saying. That's the killer part about it, man." *Id.* at 19:11-15.

On May 23, Lambert, the go-between, tells Dowthard it "don't take no [] rocket scientist to figure out what these people… wanna hear, man…" They wanted Dowthard to say ""the light was green" when they "knew the light was red," an unmistakable request to lie. *Id.* at 22115.

Defendants ignore this evidence, offering a more innocuous theory: Lambert reached out to the police on May 30 to tell them that Dowthard wanted to "tell the truth," as if Dowthard had a crisis of conscience and decided to come clean. Unsurprisingly, Defendants' citations do not support

---

[3] The admissibility of the Illinois Department of Corrections' recordings of Dowthard's prison calls (hereinafter "Dowthard Tapes" or "the Tapes") is discussed in Section V, *supra.*

11

this manifest inaccuracy. *See* Appellee's Brief at 4. Indeed, if nothing else changed, why did Dowthard and Brown suddenly decide to change their stories? Dowthard and Lambert's recorded conversation, plus the evidence supporting the fabrication claim summarized above, show that Defendants, not Dowthard, crafted his story.

Defendants also attack the twin assertions that Dowthard's statement was in fact false and that Defendants knew it was false. To be sure, a fabrication claim requires knowledge of falsity, not just coercion—and this record absolutely creates a factual dispute there.

As to falsity, Dowthard disavowed his statement and refused to testify against Plaintiffs at their re-trial. Since giving his original (false) testimony, Dowthard repeatedly asserted his Fifth Amendment privilege when asked whether he lied about seeing Plaintiffs commit the shooting. *See* R.232 at ¶¶56-57. The jury can draw an adverse inference from this. The one sworn admission he did make was admitting that his May 30, 2002 signed statement to the police (implicating Plaintiffs) was <u>false</u>. R.249-7 at 67. He then returned to asserting the Fifth.[4]

---

[4] Defendants baldly argue that Plaintiffs cannot rely on Dowthard's admission because he then invoked the Fifth and "withdrew" the admission. Def. Br. at 16. Circuit law holds the opposite. *See Thorn v. Sundstrand Aerospace Corp.,* 207 F.3d 383, 389 (7th Cir. 2000). Moreover, by subsequently taking the Fifth, Dowthard is "unavailable" for purposes of FRE 804, so his prior testimony is admissible. *See* Fed. R. Evid. 804(b)(1);

12

Defendants try to bolster Dowthard's patently false identification by arguing he stood by it in 2010, when re-interviewed by police. The police report they cite contains an unsigned *summary* of Dowthard's statements, unsworn and taken when Dowthard was in jail on unrelated charges. R.239-44 at RPD7056. This purported statement does not diminish the evidence of fabrication; at best, it creates a jury question. But the officers who interviewed Dowthard were not identified under FRCP 26, thus this evidence is inadmissible now and at trial. R.248 at 74-75.

As for Defendants' knowledge of the falsity, Plaintiffs need only create a factual dispute. They have. The key question is whether there is evidence supporting that Defendants knew that Dowthard and Brown had left the scene without actually *seeing* the shooters, but forced them to claim otherwise.

Prior to signing, Dowthard and Brown expressly told the police and Rickedda Young (who in turn told the police) that they did not see the shooter. What's more, Dowthard was willing to tell police of his altercation with Plaintiffs shortly before the murder. R.249-34 at JR3669-70. This fact eviscerates the *post-hoc* explanation that Dowthard did not implicate Plaintiffs so that he could "handle the situation himself." *Cf.* Def.Br. at 14.

---

*Thompson v. City of Chicago*, 722 F.3d 963, 975 n.4 (7th Cir. 2013); *United States v. Moore*, 936 F.2d 1508, 1516 (7th Cir. 1991).

Dowthard even told police he shot at Plaintiffs, notwithstanding his parole status. R.249-34 at JR3669-70. Hardly the reluctant witness, he revealed everything he knew, even implicating himself in criminal wrongdoing. A reasonable inference is that Defendants knew Dowthard was initially being truthful but pursued him until he lied.

When questioned about whether he knowingly fabricated Dowthard's statements, Palmer invoked the Fifth Amendment. The negative inference that could be drawn from his silence supports a factual dispute as to Defendants' knowledge at summary judgment.

Indeed, Defendants place our factual record on the wrong side of the line between coercion and fabrication. *Fields II* makes clear that coerced testimony gives rise to a fabrication claim when that testimony is known to be untrue "by whoever cajoled or coerced the witness to give it." *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014). Applying this standard, the Seventh Circuit in *Petty* found that underlying coercive tactics, even when they produce a false statement, did not give rise to a fabrication claim because Petty did not argue (unlike here) that defendants knew that statement to be false. *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014). The foregoing facts create a triable fabrication claim.

14

### B.   Brown

Plaintiffs allege that Brown did not actually see the shooter and only implicated Plaintiffs because police coerced a statement they knew to be false. The evidence proving Dowthard's statement was fabricated applies with equal force to Brown's statement and provides sufficient circumstantial evidence that Defendants knew Brown's statement was false. The two statements matched each other, both witnesses were interrogated by Palmer and Stevens, and both repeatedly said that they did not see the shooter.

Additionally, the fact that Stevens buried evidence impeaching Brown (namely, Brown told Young he didn't see the shooters) is strong evidence that Stevens knew Brown's later contradictory statement was false. *See, e.g., Phillips v. City of Chicago*, No. 14 C 9372, 2018 WL 1309881, at *26 (N.D. Ill. Mar. 13, 2018) ("Gardner has testified, moreover, that Defendants told the court reporter to stop typing when Gardner gave the "wrong answer" to certain questions. This suggests something beyond mere coercion.").

Defendants insist Brown's original account was truthful, notwithstanding the lack of corroboration, his own later contradictions, and the coercive environment that generated it. To that end, they portray an overly favorable picture of his testimony at Plaintiffs' retrial. This was originally a two-witness case, but on re-trial, neither witness stood by his original identification. Brown contradicted his written statement and

testified that he saw Plaintiffs in a red car (which they vehemently deny) but never saw them exit the car or commit the shooting. R.249-1 at JR26814. The circuit court who heard Brown's testimony, described it as "replete with contradictions, material omissions, lapses in memory. He was led alternately by the State and by the defense as though there were a bridle in his mouth so to speak…." *Id.* at JR27283.

Defendants also suggest there is insufficient evidence of the fact that Brown was coerced into adopting his statement (which would arguably undermine Plaintiffs' fabrication claim), but in so arguing they overlook Brown's testimony that he did not sign the statement until he had been held for nine hours and Palmer "threaten[ed] to put [him] in jail if [he] [didn't] give a statement" R.249-1 at JR27078-79. That description of coercion came directly from Brown, and cases have long-established that those two factors— lengthy detention and threats—are constitutionally impermissible. *See, e.g., Petty,* 754 F.3d at 423 ( "threatening [witness] with jail time if he did not cooperate, holding him against his will in a locked room without food or water for over 13 hours, badgering him, and pressuring him to identify [plaintiff] as one of the assailants" were "similar in nature to other coercion cases"). *See also Fikes v. Alabama,* 352 U.S. 191, 195 (1957); *Sprosty v. Buchler,* 79 F.3d 635, 646 (7th Cir. 1996).

16

Taken together, these facts, and the inferences that flow from them, preclude summary judgment.

## C.     Montgomery

### 1. Genuine Disputes of Fact

Defendants' response to evidence that third-party witness Casel Montgomery's statement was fabricated is, once again, to simply avoid it. Defendants ignore Montgomery's testimony that his August 2002 statement was false. *E.g.,* R.249-6 at 31:20-22 (Q: "Did Anthony Ross borrow a red Grand Prix from you on the night of the murder?" A: "No."); R.249-6 at 30:6 ("[Ross] never confessed to me about no murder.").

Likewise, they ignore Montgomery's testimony that Palmer manufactured the statement, knowing it to be false: "[O]f course, [Palmer] asked me to lie," explaining, "He wanted me to say that Anthony Ross committed a murder." R.249-6 at 34:7-14.

Montgomery clarified that Palmer, not he, crafted his signed statement: "I told him I didn't know, a lot of times. But he insisted that I say something. … **[H]e had his own story**." R.249-6 at 34:15-20.

Montgomery testified that he adopted Palmer's false story because of Palmer's threats, including threatening to charge him with murder. *See, e.g.,* R.249-6 at 33:13-16, 17:6-24. Further, Randall was present "a lot of times" during the threats.  R.249-6 at 17:15-24.

17

Defendants offer no coherent argument about why Montgomery's sworn testimony is inadmissible, and there is none. As outlined in Plaintiffs' opening brief, Montgomery cannot take the Fifth on topics about which he already testified. *See* Pls. Br. at 34-35. Even were he to, his deposition testimony would be admissible under FRE 804(b)(1) due to unavailability. *See supra* n.4.

Unable to overcome this evidence of fabrication, Defendants attempt to factually undermine Montgomery by citing out-of-context snippets portraying him as having no memory or giving inconsistent testimony, but that portrayal mischaracterizes the record. For instance, Defendants claim Montgomery testified he didn't remember whether he told detectives that he saw Ross drive away in the red rental, but in the immediately preceding passage, Montgomery testified: "I remember that I told them that Little Daddy wanted to borrow the car because…Palmer was adamant about saying that." R.249-41 at 222:8-18.

At that same hearing, Montgomery explained that he put "facts" into his signed statement because "That's what Palmer told me to say, so yeah, that's what I said at the time." R.249-41 at 220:8-16.

Defendant Palmer does not deny fabricating Montgomery's statement. Rather, he asserts the Fifth. R.249-9 at 37-41. Again, a reasonable jury could draw an adverse inference (that he *did* fabricate Montgomery's statement). It

was error to ignore Montgomery's sworn testimony and Palmer's Fifth Amendment invocation. Properly considered, the evidence creates a triable issue.

### 2. Montgomery's Fabricated Statement Deprived Plaintiffs of Liberty

As argued in Plaintiffs' opening brief, Montgomery's false statement deprived Plaintiffs of liberty "in some way" by tainting evidence that otherwise may have been exculpatory. *See* Pl. Br. at 32-34. Montgomery had opportunity and motive to commit the shooting, and at trial, Plaintiffs presented evidence that Montgomery had the red rental car. But they could not call Montgomery to establish they didn't borrow his car because he would be impeached by his signed statement *implicating the Plaintiffs*. Absent the fabrication, Plaintiffs could have called him to refute the prosecution's theory of their guilt by establishing that they did not have the vehicle observed at the murder scene. *See, e.g.*, *Fields v. City of Chicago*, No. 10 C 1168, 2014 WL 477394, at *7 (N.D. Ill. Feb. 6, 2014); *Whitlock*, 682 F.3d at 583.

Additionally, Defendants' pursuit of Plaintiffs despite knowing it was Montgomery who had the car was itself highly relevant evidence that could have "attack[ed] the thoroughness and even the good faith of the investigation." *Kyles v. Whitley*, 514 U.S. 419, 445 (1995).

There is a question of what role the fabricated evidence played in depriving Plaintiffs' liberty, a fact-specific inquiry into causation for the jury.

### 3. Other Relevant Purposes

Finally, evidence that Defendants fabricated Montgomery's statements is relevant to Plaintiffs' other fabrication claims. How Defendants crafted a statement they knew to be false and forced Montgomery to sign it is probative of how they behaved with Dowthard and Brown. *See Thompson v. City of Chicago*, 722 F.3d 963, 974 (7th Cir. 2013) (evidence of officer's similar misconduct was "powerful circumstantial evidence" of misconduct toward plaintiff). It is also relevant to show that Defendants' actions diminished Plaintiffs' ability to present a defense through alternative suspect evidence. *California v. Trombetta*, 467 U.S. 479, 486 (1984); *United States v. Pollock,* 417 F.Supp. 1332 (D.Mass.1976); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982).

### D. Croft

Yet again Defendants take the prohibited tack of refuting Plaintiffs' evidence – this time arguing why a jury should reject Croft's original (untainted) police statement. *See* Def.Br. at 31-32. Defendants are free to cross-examine Croft, but those factual disputes cannot be resolved at summary judgment.

As with Montgomery, moreover, evidence that Defendants fabricated Croft's false statement bears directly on Plaintiffs' due process claims. *See* Section III.C.2-3.

## IV.  A Trial Is Required on Plaintiffs' *Brady* Claims.

### A.     Rickedda Young's Suppressed Statement

Defendants do not dispute that Stevens suppressed Young's statement impeaching Dowthard and Brown, and that concession is appropriate. Def.Br. at 33. They argue only that Young's statement was immaterial and cumulative under *Brady v. Maryland, 373 U.S. 83 (1963).*

Defendants try to minimize the impeachment value of Young's statement by theorizing that Dowthard and Brown had a motive to lie to Young and play "dumb." Def.Br. at 14. Unsurprisingly, Defendants do not cite anything supporting this rank speculation. Moreover, such inference cannot be drawn against the nonmoving party.

Instead, the materiality of Young's statement -- that her cousin (Brown) and her close friend (Dowthard) said they did not see the shooter(s) – must be evaluated by a jury. To establish materiality, Plaintiffs need not show they "more likely than not" would have been acquitted had the new evidence been admitted." *Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2016) (internal citation omitted). "Evidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'

21

" *Id.* Materiality must be evaluated based on the cumulative effect of all suppressed evidence and not in isolation. *Wearry*, 136 S. Ct. at 1006; *Kyles*, 514 U.S. at 421.

Given the absence of physical evidence tying Plaintiffs to the murder and Plaintiffs' alibi evidence, the prosecution's case rose and fell with Dowthard's and Brown's statements. Young's statement directly impeached Dowthard and Brown's explanation of *why* their story changed. It is material impeachment evidence. The criminal jury was tasked with weighing Dowthard and Brown's credibility and evaluating their shifting accounts. *See United States v. Agurs*, 427 U.S. 97, 113 (1976) (materiality depends on the strength of other evidence used in the criminal case; in cases with scant evidence of guilt, it takes less for the suppressed or fabricated evidence to be deemed material). Robbed of the crucial impeachment from Young, Plaintiffs were severely restricted in their ability to cross-examine these witnesses.

Relatedly, Young's suppressed statement is not cumulative of the police reports. The explanation for Dowthard and Brown's evolving story in their signed police statements (that they wanted to handle the matter without police involvement) does not fit their statements to Young. And no other document contained Young's suppressed statement.

### B. Suppression of the Tapes

#### 1. The Tapes Were Withheld for Purposes of *Brady*

Defendants argue that Stevens did not "conceal" the Tapes prior to trial. It is undisputed, however, that Stevens suppressed them until the eve of trial, and then only disclosed them to the prosecution because Plaintiffs' counsel requested them. *See* App.016; R.239-49 at JR7704. In fact, Plaintiffs Johnson and Anderson did not have an opportunity to consider and use the Tapes at the criminal trial. By withholding the Tapes such that they were effectively unavailable to Plaintiffs Johnson and Anderson at their criminal trial, Stevens violated Plaintiffs' due process right to a fair trial. *See Leka v. Portuondo*, 257 F.3d 89, 100 (2nd Cir. 2001) (disclosure should be made at a time when it would be of value to the accused).

Defendants blame the State for the late production, but prosecutors did not receive the Tapes from Stevens until days before trial. Defendants also attempt the new argument on appeal that the criminal court judge, not Detective Stevens, caused Plaintiffs' inability to use the Tapes. Having not been raised below, this argument is waived. *Laborers' Int'l Union of N. Am. v. Caruso,* 197 F.3d 1195, 1197 (7th Cir. 1999). On the merits, moreover, the Seventh Circuit has rejected superseding causation in analogous contexts. *See Malley v. Briggs*, 475 U.S. 335, 345 (1986) (judge's issuance of arrest warrant does not break chain); *Whitlock v. Brueggemann*, 682 F.3d 567, 582-83 (7th Cir. 2012) (prosecutor's introduction of evidence does not break chain).

### 2. The Tapes Would Not Have Been Cumulative.

Defendants fail to address any of Plaintiffs' arguments and instead parrot the district court's order in arguing that the Tapes contain the same information as the police reports, so at best are cumulative.

Both the facts and the law undercut this argument. First, the police reports do not disclose that Dowthard was violently coached into falsely adopting the police rendition, but the Tapes do. Second, even if the police reports contained any of that information (which they do not), the law still requires disclosure of "*all* material exculpatory and impeachment evidence to the defense. It does not require the State to simply turn over *some* evidence, on the assumption that defense counsel will find the cookie from a trail of crumbs." *Barton v. Warden, So. Ohio Corr. Facility*, 786 F.3d 450, 468 (6th Cir. 2016). Police "cannot satisfy [their] *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative. Rather, the [police are] obligated to disclose *all* material information casting a shadow on a government witness's credibility.'" *Mellen v. Winn*, 900 F.3d 1085, 1097-98 (9th Cir. 2018) (citation omitted).

### C. Suppressed Evidence of Witness Coercion and Fabrication

Defendants do not challenge that (*i)* they did not disclose any evidence of coercion or fabrication, or (*ii*) that such evidence had to be disclosed under *Brady v. Maryland.* They instead dispute that any coercion or fabrication

24

occurred. For the reasons stated above and in Plaintiffs' opening brief, there is sufficient evidence of coercion and fabrication that the associated *Brady* claims should advance.

### D. Sonya White

Defendants misapprehend Plaintiffs' claim, which stems from White's expectations in <u>2002</u> when she concocted her story: she thought police would help her with her pending home invasion charge. R.249-52 at JR11348-49. Whether that information was material is a jury question. *See Wearry*, 136 S.Ct. at 1006-07; 7th Cir. Pattern Civ. Jury Inst. No. 7.14.

## V.    The Tapes Are Admissible And Should Have Been Considered.

Defendants strenuously argue that the Tapes are inadmissible, hoping to jettison Plaintiffs' case if successful. To be clear, Plaintiffs' claims should proceed to trial regardless of the evidentiary ruling on the Tapes. That said, the Tapes are crucial evidence of the due process violations that Plaintiffs suffered; they are admissible; and they should be considered at summary judgment.

### A. Defendants, Not Plaintiffs, Have Forfeited Hearsay Arguments.

Defendants argue that the district court correctly found Plaintiffs waived their hearsay defense by not affirmatively establishing the Tapes' admissibility.

But neither the district court nor Defendants identified legal support for the proposition that the non-movant must affirmatively demonstrate admissibility of all evidence when opposing summary judgment. *Cf. Celotex*, 477 U.S. at 323 (parties need not present summary judgment evidence in admissible form, so long as it would be admissible at trial).

Even were there such a rule, there can be no waiver or forfeiture because the factual predicate for the various hearsay exceptions that govern the Tapes—namely, the taped statements themselves, what they showed, and their civil and criminal implications—were contained in the record and discussed in Plaintiffs' brief. By contrast, Defendants made no admissibility arguments against the Tapes in their motion, despite their burden to prove the absence of genuine issues, and waited until reply. Plaintiffs were not required to respond to arguments not raised. *See, e.g., Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1310 (7th Cir.1989).

Moreover, Defendants' belated arguments about the Tapes' admissibility were so cursory that they amount to forfeiture. Defendants' summary judgment pleadings contain only a throwaway two-word reference to the Tapes as "inadmissible hearsay" without any discussion of the applicable legal principles. *See* R.258 at PAGE ID#19998; R.259 at PAGE ID# 20240*; M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.,* 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped

26

arguments are waived, as are arguments unsupported by legal authority."); *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) (affirming finding of waiver where movants made new argument in summary judgment reply brief). *Gondeck v. A Clear Title and Escrow Exch., LLC*, 11 C 6341, 2013 WL 4564994, at *3 (N.D. Ill. Aug. 28, 2013) is instructive. There, the movant objected to the non-movant's use of a letter by objecting merely that it "contains inadmissible hearsay" without development. That objection was so cursory that the hearsay objection was forfeited. *Id.,* citing *ArlinGolf, LLC v. Vill. of Arlington Heights,* 631 F.3d 818, 822 (7th Cir. 2011).

### B. The Tapes Can Be Authenticated At Trial.

Defendants made only a passing objection to the Tapes' authenticity in their summary judgment reply, and the district court did not address the issue. Plaintiffs can readily authenticate the Tapes at trial. *See* Plaintiffs' June 28, 2016 Supplemental Rule 26(a)(1) disclosures, listing IDOC employees Major Bryan A. Kuder and Allan A. Dallas, who recorded the tapes, sent them to Stevens, and can address chain of custody and authenticity. R.249-30 at 227:2-11.[5] Stevens may testify that he received the Tape, listened to them, and tagged them into evidence.

---

[5] Each recording made by IDOC contains the date, time, number being dialed, and that the call is "made by Inmate Alexander Dowthard, B62040.". *See, e.g.*, R.249-64 at 2.

27

Additionally, several witnesses can identify the speakers. *See, e.g., United States v. Smith,* 557 F. App'x 606 (8th Cir. 2014) (affirming admission of jail calls where no officer testified about recording device or authenticity, but officer identified defendant as speaker and conversation was voluntary). Stevens was "familiar with" Lambert's voice and "would have recognized it" on the Tapes. R.249-30 at 229:19-230:1. *See also* R.249-36 at JR011698 (Stevens interrogated Dowthard, supporting the reasonable inference that Stevens recognized Dowthard's voice); R.249-28 at 198-99 (Stevens was aware he was listening to conversations between Lambert and Dowthard); R.249-28 at 198-99 (Stevens listened to every Tape).

Stevens has the requisite knowledge to authenticate the Tapes. *See United States v. Tolliver*, 454 F.3d 660, 670 n.4 (7th Cir. 2006) (officer familiar with relevant voices could authenticate recording). FRE 901(b)(5) provides that "identification of a voice…may be established by opinion testimony that is 'based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." *United States v. Cruz-Rea*, 626 F.3d 929, 934-35 (7th Cir. 2010). In this Circuit, only "minimal familiarity" with the voice is required. *Id.*

Plaintiff Lumont Johnson is also familiar with Dowthard and Lambert and could identify their voices on the Tapes. *See* R.249-2 at 39:2-11; *id.* at 42:20-43:7. And Antowan Lambert and Estella Dowthard, two speakers on

28

the Tapes, are witnesses and are competent to identify their own and

Dowthard's voices.

Finally, Defendants' remaining arguments about authenticity are

unpersuasive. *See* Def.Br. at 23. Defendants cite no rule requiring Plaintiffs

to attach the underlying audio files (produced in the litigation as Johnson-

Ross 021042-021079) to their summary judgment when, as here, they

attached certified, notarized transcripts (signed by owner *and* transcriber)

and offered to make the actual recordings available to the Court. R.247 at 28

n.1. *See also, e.g.*, R.249-65 at JR021971. Defendants never challenged the

accuracy of any transcript nor obtained competing transcripts. That certain

words are inaudible is fodder for argument at trial but does not warrant

exclusion. Defendants' authority, *Sissom v. Purdue Univ.*, No. 4:04CV72,

2006 WL 897572, involved privately taped conversations that a *pro se*

plaintiff transcribed himself.  The case at bar involves recordings made by

IDOC, transcribed and certified by a certified court reporter.[6]

### C . The Tapes Are Admissible.

Defendants ignore Plaintiffs' arguments about the applicable hearsay

exceptions, statement against interest and state of mind, and the various

---

[6] Alternatively, Plaintiffs respectfully seek limited remand for the opportunity to provide additional foundation to authenticate the Tapes pursuant to FRCP 56(e).

*non*-hearsay purposes of the Tapes, *see* Pl. Br. at 23-28. Defendants have waived those arguments. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (collecting cases).

Defendants cursorily argue that the Tapes contain double hearsay. But Lambert's statements to Dowthard are non-hearsay, elicited for their effect on the listener. *See* Pl.Br. at 25. Moreover, Detective Stevens' statements to Lambert are admissible under FRE 801(d)(2).

## VI. Issue Preclusion Does Not Apply.

Defendants argue that the state court's post-conviction rulings preclude this lawsuit. Plaintiffs incorporate their responsive briefing from R. 246 at 15-26 (summary judgment pleadings).

In summary, several required elements of issue preclusion cannot be met. First, the party bound by a previous ruling must have had opportunity to appeal that ruling. *People v. Sutherland,* 223 Ill.2d 187, 207 (2006). The State's appeal does not satisfy this requirement, particularly as it concerned only whether the Tapes were material. *People v. Johnson*, 2014 IL App (2d) 130368. Plaintiffs properly responded to that argument, but given their success below, could not raise any findings that were adverse to them on Plaintiffs' other claims. *See Srivastava v. Russell's Barbecue, Inc.*, 168 Ill.App.3d 726, 733 (1st Dist. 1988).

Likewise, the findings that are to be used for preclusion must have been "essential" to the judgment. *See Erickson v. Rush Presbyterian St. Luke's Med. Ctr*, 289 Ill. App. 3d 159, 167 (1st Dist. 1997). None of the court's other "findings" – some of which deal with third-party confessions not relevant to this appeal – relates to the Court's decision on the Tapes. Judge McGraw's opinion granted postconviction relief "[f]or the sole reason" that the outcome of the Plaintiffs' criminal trials may have been different had the Tapes been timely disclosed and Dowthard cross-examined about the contents therein. R.249-91 at 5.

Finally, application of collateral estoppel is inappropriate here because Plaintiffs have uncovered substantial new evidence corroborating their claims of police misconduct, including the due process claims that Defendants seek to bar. *See Sornberger v. City of Knoxville,* 434 F.3d 1006, 1020 (7th Cir. 2006). Given the volume of new evidence generated since Plaintiffs' post-conviction petitions were granted, application of collateral estoppel here would be fundamentally unfair. *See People v. Cannon*, 293 Ill. App. 3d 634, 640-42 (1997).

## VII.  Plaintiffs' Remaining Claims

### A. Remaining Federal and State Claims

Plaintiffs rely on their opening briefs in response to Defendants' Sections V, VI, and VII.

**B. Dismissed Defendants**

Plaintiffs do not concede summary judgment as to Randall, Stevens, and Mastrioanni for Counts II (failure to intervene), III (conspiracy), VIII (malicious prosecution), IX (state law malicious prosecution), X (state law IIED), XI (*respondeat superior*), and XII (indemnification). Those counts should be reinstated for the reasons supporting Count I. Likewise, the pendant state law claims should be reinstated. Finally, Plaintiffs have presented sufficient evidence that Dowthard only signed the statement obtained by Sergeant Glover because of relentless police pressure to lie. App. 003. While it is true that Palmer and Stevens were the primary architects of the fabricated case, the work of the other defendants who conspired to obtain a false statement is also actionable.

## Conclusion

The record presents substantial disputes of material fact, and summary judgment is not appropriate. For the foregoing reasons, Plaintiffs respectfully ask this Court to reverse the decision of the district court and remand for trial on all the claims raised in this appeal.

RESPECTFULLY SUBMITTED,


 s/ Roshna Bala Keen
*Counsel of Record for Plaintiffs-Appellants*


Jon Loevy
Gayle Horn
Roshna Bala Keen
Elliot Slosar
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
roshna@loevy.com

## CERTIFICATE OF SERVICE

I, Roshna Keen, hereby certify that I served the Reply Brief on April 12, 2019, using the CM/ECF system, which effected service on all counsel of record for the Defendants-Appellees.

s/ Roshna Bala Keen
*Counsel of Record for Plaintiffs*

Jon Loevy
Gayle Horn
Roshna Bala Keen
Elliot Slosar
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
roshna@loevy.com

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

In accordance with Fed. R. App. P. 32(a)(7)(C)(i), I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 6930 words, beginning with the words "Argument" on page 1 and ending with the words "appeal" on page 32. In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was Microsoft Word.

/s/ Roshna Keen

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

In accordance with Circuit Rule 30(d), I certify that the short appendix to this brief contains all of the materials required by Circuit Rule 30(a) & (b).

/s/ Roshna Keen